**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs,**

v.

**Kemal UZAN, et al., Defendants.**

**No. 02 CIV.666 JSR.**

United States District Court, S.D. New York.

July 31, 2003.

As Corrected Aug. 8, 2003.

Steven Davidson, Gordon M. Clay, John O'Connor, Howard Stahl, Steptoe & Johnson LLP, Washington, DC, for Motorola per pro hac vice.

Mishell B. Kneeland, Paul Fishman, Friedman Kaplan Seiler & Adelman LLP, New York, NY, Allison G. Kort, Jason Brown, Holland & Knight LLP, New York, NY, for Nokia.

Robert F. Serio, Mark Holton, Prasanth R. Akkapeddi, Gibson, Dunn & Crutcher, New York, NY, David Rosenberg, Marcus, Rosenberg & Diamond LLP, New York, NY, Stanley R. Mortenson, James R. Heavner, Jr., Baker Botts LLP, Washington, DC, for Cem Uzan, Murat Hakan Uzan.

Kenneth M. Bailo, Emmet, Marvin & Martin, LLP, New York, NY, for Kemal Uzan, Cem Cengiz, Murat Hakan Uzan, Melahut Uzan and Aysegul AkayAtty pro hac vice.

Brian V. Otero, Hunton & Williams, New York, NY, Jennifer Culotta, David F. Geneson, Hunton & Williams, Washington, DC, for Keith Bane, pro hac vice.

Andrew N. Vollmer, Andrew Weissman, Wilmer, Cutler & Pickering, Washington, DC, for ABN AMRO Bank N.V., pro hac vice.

Timothy P. Harkness, David Polk & Wardwell, New York, NY, for Deloitte & Touche LLP.

*OPINION and ORDER*

RAKOFF, District Judge.

As the Court of Appeals has noted, "[t]his case raises a host of unusual [legal] questions...." *Motorola Credit Corporation v. Uzan*, 322 F.3d 130, 134 (2d Cir. 2003). Part I of this Opinion and Order resolves such of those questions as are presently ripe for decision. No legal

thicket, however, can hide the fact that all the credible evidence before the Court proves that the defendants—in particular, the members of the Uzan family—have perpetrated a huge fraud. Under the guise of obtaining financing for a Turkish telecommunications company, the Uzans have siphoned more than a billion dollars of plaintiffs' money into their own pockets and into the coffers of other entities they control. Having fraudulently induced the loans, they have sought to advance and conceal their scheme through an almost endless series of lies, threats, and chicanery, including, among much else, filing false criminal charges against high level American and Finnish executives, grossly diluting and weakening the collateral for the loans, and repeatedly disobeying the orders of this Court. Part II of this Opinion and Order details the overwhelming evidence of this misconduct and the legal consequences that flow therefrom, including, among much else, an award of damages in excess of $4 billion and an order for the arrest and confinement of the individual defendants should they be brought within the jurisdiction of the Court.

Before turning to any of this, however, a brief background is in order. Plaintiff Motorola Credit Corporation ("MCC") is the financing affiliate of Motorola, Inc., a major provider of telecommunications equipment and services. Co-plaintiff Nokia Corporation ("Nokia") is another major telecommunications manufacturer. Nokia's financial arrangements, so far as here relevant, were handled through the Stockholm Branch of ABN–AMRO Bank N.V. ("ABN–AMRO Bank").

The defendants are the five leading members of the Uzan family, namely Kemal Uzan, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, and Aysegul Akay (collectively, the "Uzans"), their associate Antonio Luna Betancourt, and three Uzan-controlled companies, namely, Unikom Iletism Hizmetleri Pazarlama A.S., Standart Pazarlama A.S., and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S. ("Standart Telekom"). Directly or indirectly, the Uzans—reputedly among the richest families in the world, see e.g., L. Kroll, The World's Billionaires, Forbes, Feb. 28, 2002—also control more than 130 other companies, including, of particular relevance here, a telecommunications company named Telsim Mobil Telekomunikayson Hizmetleri A.S. ("Telsim").

Between April 1998 and September 2000, the Uzans fraudulently induced MCC and Nokia to transfer to Telsim approximately $2.7 billion, supposedly to finance a major expansion of Telsim's operations. Actually, however, the Uzans intended to divert a large part of these funds to other entities they controlled and to their own pockets, so as to fund their economic empire and to pay for such personal items as private airplanes, yachts, helicopters, and multimillion dollar apartments in New York and elsewhere. Although defendants' refusal to provide much of the Court-ordered discovery leaves uncertain the full extent of the fraudulent diversion, it amounts at least to $1 billion, involving the direct transfer of $450 million from Telsim to other Uzan-controlled entities in Turkey, a separate diversion of $133 million from Telsim to certain Uzan-controlled entities in the Netherlands Antilles, and still another $552 million diversion through the device of inflated "Telsim" expenses payable to Uzan-controlled entities. Ultimately, it appears that as much as $300 million found its way into the Uzans' personal bank accounts.

Plaintiffs were slower to uncover this fraud than they otherwise might have been because the defendants provided them with false financial information about Telsim, because the defendants falsely repre-

sented that further financing from third parties was imminent, and, most especially, because the plaintiffs thought they were protected by substantial collateral. Specifically, the Uzans had arranged for still another of their companies, Rumeli Telefon Sistemleri A.S. ("Rumeli Telefon"), which at that time owned about three-quarters of Telsim's outstanding shares, to pledge virtually all those shares to the plaintiffs as collateral for the plaintiffs' loans to Telsim. But in April 2001, the Uzans, knowing that they could no longer stave off default, convened a secret meeting of Telsim's shareholders at which they diluted the economic value of Rumeli Telefon's shares in Telsim to a third of what it had previously been and transferred majority control of Telsim from Rumeli Telefon to Standart Telekom. A few months later, at another secret meeting, they stripped the remaining collateral of its voting rights and took other steps to further diminish its value.

Meanwhile, plaintiffs, having finally declared Telsim in default, sent financial investigators to Turkey to try to uncover the truth. The Uzans retaliated by filing criminal complaints against high ranking executives of Nokia, Motorola, Inc., and Motorola Turkey (Motorola, Inc.'s local affiliate), falsely charging the executives with threatening to kill the Uzans. But, despite these and other impediments, plaintiffs eventually uncovered enough evidence of the fraud to commence the instant lawsuit.

The complaint, filed in January, 2002, charged the defendants with federal acts of racketeering, state claims of fraud, and other serious misconduct. Early in the case, the Court issued injunctive relief for the purpose of maintaining the status quo, including the preservation of what little was left of the collateral. But, the defendants contemptuously refused to obey the Court's orders, in one case even breaking their sworn promise not to further eviscerate the collateral. The defendants also repeatedly reneged on promises to provide discovery ordered by Magistrate Judge Maas (to whom certain aspects of the pre-trial preparation of the case were assigned), and instructed their counsel not to reveal to this Court or the Court of Appeals secret steps they were taking in Turkey to obtain *ex parte* orders undercutting the prior orders of this Court. Additionally, the defendants, though not themselves parties to any arbitration agreement with either of the plaintiffs, demanded that the instant disputes be submitted to Swiss arbitration pursuant to arbitration agreements between Telsim and MCC and between Telsim and ABN–AMRO Bank.

Notwithstanding these difficulties, the Court conducted two evidentiary hearings and a trial, at which the aforementioned facts, and much else, were established. Subsequent to the trial, however, the Court of Appeals, to which the defendants had appealed from the Court's preliminary injunction order, determined that those of plaintiffs' claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, must be dismissed as unripe—without prejudice, however, to their being reinstated when they become ripe. Since several of this Court's orders were premised, at least in part, on the viability of the RICO claims, the Court of Appeals remanded so that this Court could reconsider its prior rulings in light of this development. Thereupon, this Court, while dismissing the RICO claims (without prejudice), in accordance with the mandate of the Court of Appeals, *see* Order, dated April 3, 2003, invited motion practice on all issues implicated by the Court of Appeals' decision or otherwise preliminary to any final determination of the underlying claims. Having received extensive submissions on these

matters, the Court now adjudicates these motions in Part I of this Opinion and Order.

## I. *The Motions*

The motions presently pending before the Court are resolved as follows:

1. Plaintiffs' motion to preclude defendants (on grounds of waiver and the like) from further contesting any disputed matter in this case is denied as to jurisdictional matters and those legal disputes that reasonably could not have been expected to be raised except in the new posture of the case created by the Court of Appeals' decision, but is otherwise granted.

2. Plaintiffs' motion to supplement the Complaint to reinstate the RICO claims is denied, without prejudice to those claims being reinstated when the contractual remedies have been exhausted.

3. Defendants' motion to dismiss for lack of standing MCC's four claims relating to computer hacking, *viz.,* Counts VIII–XI of the Complaint, is granted.

4. Plaintiffs' motion requesting the Court to retain supplemental jurisdiction over plaintiffs' remaining state claims is granted.

5. Defendants' motion to dismiss MCC's claims under Illinois law alleging common law fraud, promissory fraud, and civil conspiracy is denied.

6. MCC's motion to amend its complaint to assert a claim under Illinois law for impairment of collateral is denied as moot.

7. Plaintiffs' motion to extend their constructive trust claim to apply to certain property in New York is denied.

8. Defendants' motion to dismiss on grounds of *forum non conveniens* is denied.

9. Defendants' renewed motion to compel arbitration is denied.

10. Defendants' motion to dissolve the Court's preliminary injunction and attachment orders and to void all related findings of contempt is denied.

11. Defendants' motion to dissolve the Court's order enjoining defendants from pursuing certain Swiss arbitrations is granted.

12. Plaintiffs' motion for a further finding of civil contempt against defendants based on defendants' failure to comply with the Court's Memorandum Order dated January 6, 2003 is granted.

13. Plaintiffs' motion for attorneys' fees and expenses as prevailing plaintiffs under RICO, 18 U.S.C. § 1964(c), is denied without prejudice, and MCC's motion for attorneys' fees and expenses as prevailing party on its computer hacking claims, *see* 18 U.S.C. §§ 2520, 2711, is denied with prejudice.

14. The motion of non-party HSBC Mortgage Corporation (USA) to modify certain aspects of the Court's prior orders of attachment is granted.

The reasons for the Court's deciding these motions as indicated above are as follows:

■ *As to the first motion,* plaintiffs move to preclude defendant from further contesting any disputed matters in this case (including those matters implicated by the Court of Appeals' decision), on the ground that defendants, by expressly refusing to attend or participate in the trial of this case that commenced on February 19, 2003, waived, forfeited, or otherwise irretrievably lost their right to participate further in the case or to contest any issue therein. To some extent, this issue is addressed to the sound discretion of the Court, albeit informed by such considerations as whether defendants' alleged waiver was intentional, whether plaintiffs'

would suffer prejudice if defendants were allowed to belatedly raise otherwise waived issues, etc. Here, the duplicitous "gamesmanship" practiced by defendants in this case makes it an appropriate situation for the application of doctrines of waiver and the like.

For example, while conceding at the outset that the Court had personal jurisdiction over Cem Uzan, his counsel refused to make him available to testify for his deposition, at the preliminary injunction hearing, or at trial, invoking different, but equally frivolous, excuses on each occasion. Or, to give another example (of many), after the Uzans brought in their own separate counsel and, through him, unequivocally represented to Magistrate Judge Maas that they intended to provide previously-ordered discovery and litigate the case on the merits, *see Motorola Credit Corp. v. Uzan,* 02 Civ. 666(JSR)(FM), 2003 WL 203011, at *2 (S.D.N.Y. Jan. 29, 2003), they then secretly procured *ex parte* Turkish injunctions that purported to prohibit them from fulfilling these very promises, *see* Order, dated January 6, 2003, 2003 WL 56998 at *2–3.

In such circumstances, when defendants, invoking the same specious self-procured injunctions, refused to participate in the long-scheduled trial of this case, *see* Defendants' Statement of Intention Regarding the Trial Scheduled for February 10, 2003, dated January 24, 2003, the Court would have been well within its rights to have simply issued a default judgment in plaintiffs' favor. Instead, taking account of such factors as the size and significance of the case, plaintiffs' expensive preparations for trial, the availability of the proof developed at the six-day evidentiary hearing and the two-day contempt hearing that the defendants *had* contested, and the benefit to any reviewing court of detailed findings of fact and conclusions of law, the Court proceeded with the trial. The findings and conclusions resulting therefrom, so far as they relate to remaining claims, appear in Part II of this Opinion and Order.

 Under the circumstances, defendants are plainly precluded by the most elementary principles of waiver from further litigating any factual disputes they could reasonably have raised at trial, as well as any waivable legal issues not otherwise preserved that could have been raised at trial or earlier. On the other hand, there are certain issues that can never be waived, such as subject matter jurisdiction and standing. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction."). Also, if there are legal issues that, though waivable in principle, have previously been fully preserved or that could not reasonably have been expected to be raised until after the trial (notably, those issues that only became salient as a result of the Court of Appeals' decision), those issues may still be litigated and are considered below.

*As to the second motion,* plaintiffs' move, pursuant to Fed.R.Civ.P. 15(d), to file a supplemental complaint reinstating their RICO claims.

In dismissing plaintiffs' RICO claims, the Court of Appeals found here applicable the holding of *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir. 1994), that " 'a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated.' " *Motorola,* 322 F.3d at 136, *quoting First Nationwide,* 27 F.3d at 768.[1] The

---

1. Other circuits have disagreed with *First Na*

*tionwide,* either implicitly, *see Isaak v. Trum*

Court found that because plaintiffs, though declaring Telsim in default, had not yet pursued all their contractual remedies against Telsim, including foreclosing on the collateral and seeking damages from Telsim through Swiss arbitration, the extent of their RICO damages was uncertain and their RICO claims were therefore premature at this time. *See Motorola,* 322 F.3d at 136.

In now seeking to reinstate their RICO claims, plaintiffs contend that pursuing their contractual remedies any further would be futile because there is no "real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced," *Motorola,* 322 F.3d at 136, either by foreclosure on the collateral or by resort to other contractual remedies. This argument is far from frivolous. As to the collateral, defendants have not only, as noted, significantly diluted its value, but also have effectively stripped it of its voting, auditing, and management control rights. Specifically, after the defendants, in April 2001, had diluted the value of the collateral to one-third of what it had been, the defendants, on January 4, 2002, held another unannounced meeting of Telsim's shareholders at which they caused Telsim to enact certain resolutions that, upon being registered with the Turkish government, would create a new class of Uzan-controlled shares, unencumbered by any pledge to MCC or Nokia, the holders of which would have authority to nominate four of Telsim's five directors and all three of Telsim's statutory auditors. The resolutions also permitted Telsim to become a member of certain Turkish "foundations," the assets of which are largely protected from creditors. In direct defiance of this

Court's preliminary injunction order, as well as their own express promise to the Court, the defendants then registered these resolutions with the Turkish authorities on July 19, 2002. *See* Opinion, dated May 20, 2002, 202 F.Supp.2d 239, 248 & n.4; Opinion and Order, dated August 22, 2002, 2002 WL 1963301 at *2–4.

Moreover, defendants have repeatedly resisted, and gone into contempt of, this Court's orders to transfer the collateral (or its functional equivalent) to the registry of this Court so that it could be used to satisfy any judgment. They have also declined the proffered alternative of posting a bond in lieu of the collateral, preferring to remain in contempt. *See e.g.,* Opinion and Order, dated August 22, 2002 (holding all defendants in civil contempt for failing to deposit the collateral with the Court and the individual defendants in civil contempt for registering the January 4 Resolutions); Order, dated October 15, 2002 (enhancing contempt sanctions); Memorandum Order, dated October 15, 2002, 2002 WL 31319932 at *4 & n.1 (finding that defendants commenced Swiss arbitrations "in an effort to undercut the prior orders of, and proceedings before, this Court"); Memorandum Order, dated January 7, 2003, 2003 WL 56998 (discussing defendants' procurement of Turkish injunctions purporting to stay the instant action in contravention of this Court's September 30 and October 15 Orders).

But the fact that the value of the collateral has been hugely diminished and made more difficult to realize does not make it worthless. Indeed, even after July 19, 2002, plaintiffs repeatedly sought to have the collateral, or some equivalent thereof,[2]

*bull Savings & Loan Co.,* 169 F.3d 390, 396–98 (6th Cir.1999), or explicitly, *see Grimmett v. Brown,* 75 F.3d 506, 516–17 (9th Cir.1996).

2. In lieu of their actual collateral, plaintiffs requested that the Court require defendants to deposit into the Court's registry the Telsim shares issued to Standart Telekom as part of

moved to the registry of the Court on the basis that it could be used to help materially satisfy any judgment rendered in their favor. *See* Plaintiffs' Memorandum of Law in Support of their Motion for a Preliminary Injunction, dated January 28, 2001, at 27–28. Moreover, defendants, while contemptuously resisting transfer of the shares to this Court, have represented that they will seek permission from the Turkish courts to transfer the collateral, or its equivalent, to the Swiss arbitrations. *See* Transcript, dated June 21, 2002 at 194.

Nonetheless, if it were only a question of the collateral, the Court might well agree with plaintiffs that there is no "real possibility" that it will ever be made available to "significantly" reduce defendants' conceded debt to plaintiffs of more than $2.7 billion. But under their contracts with Telsim, MCC and ABN–AMRO Bank (on behalf of Nokia) can seek a judgment for damages against Telsim, to which it appears that Telsim's only defense is its claim of "economic *force majeure.*" While ABN–AMRO Bank commenced such an arbitration shortly prior to the filing of this lawsuit, it does not appear to have pursued it aggressively; and MCC has not pursued arbitration at all, so this remedy has not been put to the test.

■ In any event, the Court of Appeals implicitly anticipated the argument plaintiffs here make, noting that "[i]t may be that the arbitration is a forlorn hope for MCC and Nokia, and that, in any event, the collateral will yield little of value." *Motorola,* 322 F.3d at 137. Yet even after countenancing this possibility, the Court of Appeals dismissed the RICO claims as being premature until the contractual remedies were exhausted. It follows that, this precondition being still unmet, plaintiffs' motion to reinstate the RICO claims must be denied (though, once again, without prejudice).

■ *As to the third motion,* defendants move to dismiss MCC's various claims alleging so-called "computer hacking," specifically, Count VIII (alleging violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4)), Counts IX and X (alleging violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1)(A), 2701(a)(2)), and Count XI (alleging violation of the Illinois Trade Secrets Act, 765 ILCS Ch. 1065), on the ground that the only injury, if any, that resulted from the alleged hacking was an injury to Motorola, Inc., not to MCC. While, given their affiliated status, it may be that Motorola, Inc. and MCC can be conflated or viewed as agents of one another for certain evidentiary and other purposes, when it comes to bringing a claim the corporate forms must be respected and, absent an assignment or the like (not present here), only a company that itself suffered an injury can sue on that claim. *See, e.g., Bross Utils. Serv. Corp. v. Aboubshait,* 618 F.Supp. 1442, 1445 (S.D.N.Y. 1985) ("[C]ourts will not allow a *parent* to pierce the corporate veil it created for its own benefit, so as to assert the claims of its subsidiary.") (emphasis in original). Here, defendants are correct that the evidence adduced by MCC on these charges shows only that an attempt was made to gain access to a server belonging to Motorola, Inc., not MCC; that proprietary information was copied from a database belonging to Motorola, Inc., not MCC; and that only Motorola, Inc., not MCC, expended funds in investigating the aforementioned incidents. *See* Plaintiffs' Trial Exhibit ("PT")–458 (Allan Baxter testimony at preliminary injunction hearing) at

the April dilution. *See* Plaintiffs' Memorandum of Law in Support of their Motion for a

Preliminary Injunction, dated January 28, 2001, 2003 WL 203011 at *3.

369–373, 384–386; PT–460 (Declaration of Ian Menzies dated February 7, 2003) at 2–6. While MCC argues that it made use of Motorola, Inc.'s computer network, *see* Transcript, dated February 19, 2003 (Ian Stuart Menzies testimony at trial) at 82; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions of April 4, 2003, dated April 24, 2003, at 64, it has adduced no evidence that any communication to or from MCC was actually intercepted. Similarly, while MCC argues that the contact list of customers that was copied "naturally included customers of [MCC]," *id.*, it has adduced no admissible evidence to sustain this inference.

MCC's strongest response, however, is that defendants waived the instant objection by not raising it at or before trial. Thus, for example, if defendants were asserting that MCC was not the real party in interest, *see* Fed.R.Civ.P. 17(a), failure to raise this defense before trial would normally constitute waiver of the defense. *See, e.g., United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996) ("Because the requirements in Rule 17(a) are for the benefit of the defendant, we have held that an objection on real party in interest grounds should be raised with reasonable promptness in the trial court proceedings. If not raised in a timely or seasonable fashion, the general rule is that the objection is deemed waived.")

(internal quotation marks omitted); *Whelan v. Abell*, 953 F.2d 663, 672 (D.C.Cir. 1992) ("[W]here a *Rule 17(a)* defense is made, judges abuse their discretion in allowing the plea as late as the start of the trial if the real party has been prejudiced by the defendant's laxness."); *see also Gogolin & Stelter v. Karn's Auto Imports, Inc.*, 886 F.2d 100, 102 (5th Cir.1989); *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1153 n. 2 (10th Cir.1985); *Rosenblum v. Dingfelder*, 111 F.2d 406, 407 (2d Cir. 1940).[3]

But here the objection is more in the nature of an objection to MCC's standing. It is not as if MCC believed it stood in the shoes of Motorola, Inc., but was mistaken in this belief, a classic situation for the application of Rule 17(a).[4] *See, e.g., Del Re v. Prudential Lines, Inc.*, 669 F.2d 93, 96–97 (2d Cir.1982) (declining to allow Rule 17(a) ratification where "no difficulty, confusion or mistake ever existed ... regarding the identify of the party in whose name the suit must be brought"). Rather, MCC has at all times asserted that it is suing on its own behalf, but it has proven unable to adduce anywhere that, as such, it suffered any injury from the alleged computer hacking. It therefore lacks standing to bring these claims, a failure that is jurisdictional in nature and therefore unwaivable. *See Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir.1994).[5]

---

3. Relatedly, even if such a defense were not waived, the objection could be cured, short of dismissal, by ratification, joinder, or substitution of the real party in interest. *See* Fed. R.Civ.P. 17(a).

4. Indeed, MCC does not even refer to Rule 17(a) anywhere in its papers.

5. Since the objection is to lack of standing, rather than failure to name the real party in interest, the savings provisions of Rule 17(a) have no application. *See Zurich Ins. Co. v. Logitrans Inc.*, 297 F.3d 528, 531 (6th Cir. 2002). Plaintiffs' related argument that the

objection is really to lack of capacity under Rules 17(b) and 9(a), and therefore waivable, is without merit. As the court explained in *Felson v. Miller*, 674 F.Supp. 975, 977 (E.D.N.Y.1987):

> The differences between standing and capacity can easily be illustrated. An infant alleging personal injury would lack capacity but would satisfy the standing requirement. A competent adult failing to allege an interest in a claim would lack standing, but have capacity to sue.

*Id.* Here the objection is that MCC suffered no injury to itself from the alleged computer

Accordingly, Counts VIII through XI are hereby dismissed.

*As to the fourth motion,* given that all federal claims have now been dismissed (albeit without prejudice in the case of the RICO claims), plaintiffs move for the Court to retain supplemental jurisdiction over the remaining state claims, *i.e.,* MCC's claims under Illinois law for common law fraud, promissory fraud, and civil conspiracy, and MCC's and Nokia's joint claim (under New York law, *see infra*) for imposition of a constructive trust.

■ As a threshold matter, a district court can retain supplemental jurisdiction over state claims following dismissal of all federal claims only if it had original jurisdiction over some or all of the now-dismissed federal claims. Since the federal claims (*i.e.,* the RICO claims and three of the computer hacking claims) were dismissed for lack of standing, defendants argue that the Court never had original jurisdiction over those claims. But in the case of the RICO claims, dismissal was without prejudice precisely because what was lacking was not original jurisdiction but rather a failure to satisfy a further, judicially-created requirement that a plaintiff not bring a RICO suit until he has exhausted his contractual remedies and thereby clearly and definitely ascertained his RICO damages. *Motorola,* 322 F.3d at 135. As the Court of Appeals, in contrasting the higher RICO standard of causation with the lower constitutional standard, recently held in *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 117 (2d Cir.2003), "RICO standing is not a jurisdictional prerequisite the absence of which would divest the district court of the original jurisdiction required to support supplemental jurisdiction." Similarly here, although plaintiffs have not satisfied the prerequisite of

hacking. Hence, the objection is to lack of

RICO standing that their injuries be "clear and definite," they have met the lower constitutional standing threshold of alleging injuries that are " 'distinct and palpable,' " *see Matter of Appointment of Indep. Counsel,* 766 F.2d 70, 73 (2d Cir.1985), *citing Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66, (1979). That is all that is required for original jurisdiction.

■ Since, therefore, the Court had original jurisdiction over the RICO claims that it has now dismissed, it may, but is not required to, continue to exercise supplemental jurisdiction over the state claims. 28 U.S.C. § 1367(c). Apart from the dismissal of the federal claims, none of the statutory reasons for declining supplemental jurisdiction in such circumstances is present here: the state claims do not raise novel or complex issues of state law; the state claims do not substantially predominate over the now-dismissed but potentially-reinstatable federal claims; and no exceptional circumstances compel the Court to decline to exercise supplemental jurisdiction. *Id.*

Numerous factors, however, weigh in favor of the Court's retaining supplemental jurisdiction here, including such classic factors as "considerations of judicial economy, convenience, and fairness to litigants," *see Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994). Indeed, with respect to judicial economy, this is a particularly strong case for retaining supplemental jurisdiction, since the Court has not only spent considerable time dealing with the legal issues and becoming fully conversant with the facts but also has conducted a trial on the merits, so that it is in the position to promptly enter final judgment on the supplemental claims (*see* Part II *infra*). Moreover, if the Court were to decline

standing.

supplemental jurisdiction, plaintiffs might be deprived of the previously-granted injunctive relief, without which they would suffer irreparable injury. *See* Orders, dated May 9 and May 10, 2002 (granting plaintiffs' preliminary relief); Opinion, dated May 21, 2002 (setting forth the reasons for the May 9 and May 10 Orders); *see also* Supplemental Order of Attachment, dated January 3, 2003; Supplemental Order of Attachment, dated November 14, 2002; Order, dated August 29, 2002.

Accordingly, plaintiffs' motion to have the Court retain supplemental jurisdiction over the remaining state claims is hereby granted.

*As to the fifth motion,* defendants move to dismiss MCC's state law claims for common law fraud, promissory fraud, and civil conspiracy. Defendants argue that, as in the case of the RICO claims, these Illinois claims are unripe for adjudication because, until the contractual remedies are exhausted, the extent of damages remains uncertain.

But the Illinois law of fraud recognizes no equivalent of the Second Circuit's stringent rule that denies RICO standing unless contractual remedies are exhausted and the calculation of the remaining damages is clear and definite. Rather, as in most states, Illinois allows fraudulent inducement and extrinsic fraud claims to proceed even where contractual remedies may be available and requires only that the damages not be so speculative as to leave in doubt whether plaintiff has been materially harmed at all.

The case on which defendants here primarily rely, *City of Chicago v. Mich. Beach Hous. Coop.*, 297 Ill.App.3d 317, 231 Ill.Dec. 508, 696 N.E.2d 804 (1998), is simply an example of such extreme speculativeness that casts even the fact of injury

in substantial doubt. In that case, the court rejected the City of Chicago's argument that it had been damaged by defendant's misrepresentation that a loan from the city to defendant would be used to transform low-income rental housing into a cooperative when instead defendant simply intended to use the funds to subsidize the low-income housing. The Court explained:

> The city argues that even though the loan is not yet in default, it has been injured by defendants' inability to pay and the increased risk to the city's investment. But we can only speculate about whether the loan will be repaid when it becomes due after 42 years, or whether the building's use as rental housing makes the investment "riskier."

*Id.* 231 Ill.Dec. 508, 696 N.E.2d at 810. In other words, the action was dismissed because it was unclear whether plaintiff had been placed at greater risk than it had bargained for or that it had suffered any economic injury at all.

■■■■ Here, by contrast, MCC has clearly been placed at greater risk by, among other thing, the fraudulent diversion of no less than $1 billion of the loaned monies away from the company they were lent to and into the hands of the defendants and by the huge (and measurable) decline in the value of the fraudulently impaired collateral. Thus, so far as the Illinois fraud claims are concerned, the case is governed by decisions like *Application of Busse*, 124 Ill.App.3d 433, 79 Ill. Dec. 747, 464 N.E.2d 651 (1984). There, the court held that defendants' impairment of the value of plaintiff's bargained-for collateral constituted "sufficient proof of actual damages to sustain an action for fraud," even though the debtor had not yet defaulted on the underlying loan. *Id.* 79 Ill.Dec. 747, 464 N.E.2d at 658.[6] As the

---

**6.** Here, of course, MCC claims that Telsim has defaulted but defendants claim that the

Court there stated, "while damages may not be predicated on mere speculation, hypothesis, conjecture or whim, absolute certainty concerning the amount of damage is not necessary to justify a recovery where the existence of damage is established; the evidence need only tend to show a basis for computation of damages with a fair degree of probability." *Id.* 79 Ill.Dec. 747, 464 N.E.2d at 655. *See also Mich. Beach Hous. Coop.*, 231 Ill.Dec. 508, 696 N.E.2d at 809.

In the instant case, where, as a result of the defendants' fraudulent looting of Telsim, that company has defaulted on its loan repayments and proven unable to repay more than a tiny fraction of the loans, and where, as a result of the defendants' fraudulent diluting of the collateral, the collateral's value is at best, a small fraction of what is owed on the loan, plaintiffs have more than made out a basis for bringing suit under Illinois law. The fact that Telsim may have quasi-contractual defenses to the default ("economic *force majeure*") or that the collateral, though of ascertainable value, has not yet been foreclosed upon are matters that the defendants may raise as affirmative defenses or in mitigation of damages, but they do not, under Illinois law, preclude plaintiffs from bringing suit.

Where, moreover, the loan was fraudulently induced, Illinois law, in a principle established as early as 1886 permits (though does not require) recovery of the full amount of the loan, plus interest, *see Horne v. Walton*, 117 Ill. 141, 7 N.E. 103, 104 (1886); *see also Busse*, 79 Ill.Dec. 747, 464 N.E.2d at 658–59, putting the burden on the borrower to prove any reductions, set off, or mitigation, *see Commercial Nat'l Bank of Peoria v. Fed. Deposit Ins. Corp.*, 131 Ill.App.3d 977, 87 Ill.Dec. 107, 476 N.E.2d 809, 813 (1985).

More generally, while the Second Circuit in *First Nationwide*, 27 F.3d at 768, suggested that "[t]he general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud," *id.*,[7] Illinois law is both broader and more flexible. As surveyed at some length in *Giammanco v. Giammanco*, 253 Ill.App.3d 750, 192 Ill.Dec. 835, 625 N.E.2d 990 (1993), fraud damages in Illinois are most commonly calculated by a benefit-of-a-bargain approach, occasionally by an out-of-pocket approach, and sometimes by still other approaches. *Id.* 192 Ill.Dec. 835, 625 N.E.2d at 998–1001. The common denominator is to try to fashion, if at all possible, a remedy in damages for a victim of an intentional fraud, *id.*, especially where (as here) the defendant's wrongful conduct has made it difficult to establish the measure of the plaintiff's injury, *Fed. Deposit Ins.*

default is excused by "economic *force majeure*." As *Busse*, 79 Ill.Dec. 747, 464 N.E.2d at 657, illustrates, however, even where no default whatever has yet occurred, Illinois law allows recovery for, among other things, the heightened risk that defendants' fraud has imposed.

7. In support of this proposition, the Court of Appeals cited a single case *Disher v. Info. Res., Inc.*, 691 F.Supp. 75,79 (N.D.Ill.1988), but *Disher* states only that a plaintiff in a federal securities fraud case is not entitled to recovery where he has not suffered any economic loss but has instead profited on the

securities transaction notwithstanding the fraud. In *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540 (7th Cir.1990), the court explained that the rationale for this measure of damages is rooted in the federal securities laws, *id.* at 1551, *see e.g., Levine v. Seilon, Inc.*, 439 F.2d 328 (2d Cir.1971), and went on to note: "State law may be another matter.... [Plaintiff] has not discussed state law, but our research indicates that Illinois follows the benefit of the bargain approach in asset cases." *Id.* at 1552. *Accord,* Restatement (Second) Torts § 549(2) cm. g (1977).

*Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 624 (7th Cir.1989) (applying Illinois law).

 Furthermore, regardless of the measure of compensatory damages, a defrauded plaintiff may also be entitled to punitive damages under Illinois law. *See Busse*, 79 Ill.Dec. 747, 464 N.E.2d at 655; *Fed. Deposit Ins. Corp.*, 877 F.2d at 623.

A few examples will illustrate how courts have applied these flexible principles of Illinois fraud law to situations similar to the present case:

In *Horne*, 7 N.E. at 103–04,—the seminal Illinois decision in this area—where a loan was induced by fraudulent misrepresentations regarding the value of the collateral, the Supreme Court of Illinois rejected the lower court's conclusion that the plaintiff was only entitled to recover the difference between the value of the collateral as represented and its actual worth, and held instead that she was entitled to recover the full amount of her loan plus interest. *Id.*

In *Fed. Deposit Ins. Corp.*, 877 F.2d at 623, applying Illinois law to a case where defendant fraudulently induced plaintiff to lend it $75 million allegedly to develop natural-gas fields that the defendant knew were worthless, but where no default had occurred, Judge Posner (with typical creativity) held that the measure of damages was the total amount the plaintiff could have made by investing the loaned money elsewhere minus the sum of the interest already received on the loan and the remaining value of the actual loan as determined by discounting its face value by the percentage of unlikelihood it would be repaid—a measure that, whatever its conceptual merits, obviously involved some considerable guesswork. In addition, the Court of Appeals upheld the jury's award of $25 million dollars in punitive damages above its award of $25 million in compensatory damages, noting

that "treble damages are a common form of punitive damages," and that plaintiff in the case received only double damages. *Id.*

In *Busse*, 79 Ill.Dec. 747, 464 N.E.2d at 657–58, where, as discussed, the collateral was fraudulently impaired but no default had yet occurred on repayment of the loan, the Court, though recognizing that under Illinois law it could have awarded plaintiff the full amount of the loan plus interest, limited recovery to the reduction in the value of the collateral. *Id.*

Finally, in *Commercial Nat'l Bank of Peoria*, 87 Ill.Dec. 107, 476 N.E.2d at 815, a case where plaintiff was fraudulently induced to lend $90,000 to a small manufacturing corporation by false statements as to the financial viability of that corporation, the Illinois Appellate Court, citing *Horne*, opined that the proper measure of damages was "the sum of money lent plus interest for the time that plaintiff was deprived of possession" (in that case, from the time of the loan until judgment). *Id.*

 From the foregoing discussion, it is clear that Illinois fraud law has no limitation of standing comparable to the Second Circuit's RICO requirement that a plaintiff exhaust his contractual remedies and show a clear and definite measure of damages before bring suit. On the contrary, Illinois courts have allowed plaintiffs who were fraudulently induced into making loans to sue for fraud even before default occurred and to recover any of a wide variety of damages, up to and including the full amount of the loan plus interest, not to mention punitive damages. Finally, it is clear that Illinois law places on the defendant the burden of proving contractual defenses and mitigation of damages, rather than making pursuit of these aspects part of the plaintiff's burden of

bringing suit.[8] Accordingly, defendants' motion to dismiss MCC's claims under Illinois law for common law fraud, promissory fraud, and civil conspiracy must be denied.

■ *As to the sixth motion*, MCC moves to amend its complaint to assert an Illinois claim for impairment of collateral. While Illinois law recognizes such a claim, *see Hummer v. R.C. Huffman Const. Co.*, 63 F.2d 372 (7th Cir.1933), the measure of fraud damages available to the Court under Illinois law, as surveyed above, enables the Court, if it finds for MCC on the fraud claims (as it does, *see* Part II, *infra*), to fully compensate MCC for all the damages it suffered from defendants' entire scheme. Accordingly, there is no occasion to add the impairment claim, and MCC's motion to add a claim for impairment of collateral is therefore denied as moot.

*As to the seventh motion*, plaintiffs move to extend their constructive trust claim to cover certain of defendants' money and property located in New York.

By way of background, plaintiffs' constructive trust claim—Count XII of the Complaint—applies on its face only to the Telsim stock presently held by defendant Standart Telekom. The theory of the claim is that when, as part of the fraudulent scheme to dilute the collateral, Rumeli Telefon waived its preemptive rights, thereby allowing Standart Telekom to acquire 49% of the outstanding shares of Telsim, it was tantamount to a conversion of a large part of the collateral and accordingly the Telsim shares so acquired should be deemed to be constructively held for plaintiffs' benefit. *See Motorola*, 322 F.3d at 138 n. 5. *See generally, Republic of Philippines v. Marcos*, 806 F.2d 344, 355 (2d Cir.1986). In addition, however, after the Court learned that defendants, in violation of their sworn promise not to register the resolutions of January 4, 2003 transferring control rights from the shares held by Rumeli Telefon to those held by Standart Telekom, had gone ahead and done so—thereby completing the effective conversion of plaintiffs' collateral—it allowed plaintiffs to broaden their constructive trust claim to apply to the collateral or its functional equivalent (so as to obviate the fraudulent conversion and restore plaintiffs' true collateral to the *status quo ante*).

■ Although defendants now try to suggest, (albeit only in a footnote, *see* Defendants' Memorandum of Law in Support of their Motions of April 4, 2003, at 60 n. 36) that this Court previously dismissed this claim, that is entirely inaccurate, as the underlying reference cited in defendants' footnote plainly shows that, far from having decided the issue in defendants' favor, the Court had not at that time yet focused on the constructive trust question. *See* PT–458 (oral argument at preliminary injunction hearing) at 1211–12. Indeed, the Court of Appeals recognized as much, for it directed this Court, on remand, to determine whether, even though Nokia did not join in the Illinois fraud claims (presumably because Nokia had insufficient contacts with Illinois), "Nokia's allegation of a Constructive Trust/Equitable Lien cause of action (it is unclear whether that

---

**8.** In the instant case, defendants, by failing to appear at trial, have failed to meet this burden in any respect and have therefore effectively waived any affirmative defenses or mitigative reductions they might otherwise be able to assert to plaintiffs' fraud claims or to the assessment of damages thereunder. In a similar fashion, while defendants raise in their motion to dismiss a number of additional objections to the state law claims beyond those considered above, these are without exception non-jurisdictional defenses that reasonably could have been raised at or before the trial and have therefore been waived. *See* Part I(1), *supra*.

claim is based on Illinois or New York law) might provide an alternative basis for upholding the preliminary injunction in aid of Nokia." *Motorola*, 322 F.3d at 137 n. 4. Even now, moreover, defendants have not argued in their memorandum of law that the constructive trust claim as set forth in the Complaint should be dismissed; and any objections to it they now raise for the first time—such as the suggestion that it is governed by Turkish or Swiss law—have long since been waived.[9]

As for the query put by the Court of Appeals regarding whether this claim is governed by Illinois or New York law, since there appears to be no substantive difference in the law of those two states applicable to this claim, the Court does not have to reach which law governs. Both New York and Illinois take a very broad view of constructive trust that would readily make it applicable to any form into which the original collateral was fraudulently diverted. As stated in the leading New York case of *Simonds v. Simonds*, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189, 194 (1978), a "constructive trust will be erected whenever necessary to satisfy the demands of justice .... [I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them," and the court "re-

serves freedom to apply this remedy to whatever knavery human ingenuity can invent." (internal quotation marks omitted).

 Plaintiffs, however, have now moved to amend the Complaint to extend the constructive trust beyond the collateral to certain money and property located in New York that the plaintiffs have attached in connection with this lawsuit. So far as MCC is concerned, however, such extension of the constructive trust is unnecessary, since, for reasons set forth in Part II, *infra*, MCC is entitled to a monetary judgment against which it can directly apply the attached money and property: hence, it has an adequate remedy at law. *See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 333 (Bankr.S.D.N.Y. 1999). As for Nokia, it has failed to satisfy the tracing requirement of a constructive trust claim so far as the New York property is concerned. *See Rogers v. Rogers*, 63 N.Y.2d 582, 483 N.Y.S.2d 976, 473 N.E.2d 226, 227 (1984).[10]

Accordingly, plaintiffs' motion to amend the complaint to extend the constructive trust claim to cover certain money and property located in New York is denied.

*As to the eighth motion*, defendants renew their previously-denied motion to dismiss the case on *forum non conveniens*

---

9. Even if this were not so, defendants have also waived their right to seek application of foreign law by failing to comply with Rule 44.1, Fed.R.Civ.P., or otherwise to provide sufficient information to warrant application of foreign law, *see* Restatement (Second) of Conflict of Laws § 136 cmt. h (1971) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice."); *Torah Soft Ltd. v. Drosnin*, 224 F.Supp.2d 704, 712 (S.D.N.Y.2002) ("It is well-established that in the absence of

proof of foreign law, the law of the forum governs."); *In re Bennett Funding Group, Inc. Secs. Litig.*, 270 B.R. 126 (S.D.N.Y.2001) ("[E]ven if [the parties had not consented to the application of New York law], the Court finds that the law of the forum state—i.e., New York—would still apply because none of the parties have proven foreign law through the submission of affidavits, statutory authority, case authority, sworn testimony or other similar evidence.").

10. By contrast, Nokia has satisfied the tracing requirement on the collateral. *See* Part II, *infra*.

grounds, noting that this Court's prior denial relied, *inter alia,* on the presence of the now-dismissed RICO claims, which, in the form here pleaded, have no equivalent in the proposed alternative forum of Switzerland. *See* Order, dated September 30, 2002; Memorandum Order, dated October 16, 2002, 2002 WL 31319932, at *3.

■ "To prevail on a motion to dismiss on the ground of *forum non conveniens,* a defendant must demonstrate (1) that there exists an adequate alternative forum, and (2) that the ordinarily strong presumption favoring the plaintiff's chosen forum is overcome by a balance of the relevant factors of private and public interest weighing heavily in favor of the alternative forum." *Aguinda v. Texaco, Inc.,* 142 F.Supp.2d 534, 538 (S.D.N.Y.2001)(internal citations omitted), *aff'd,* 303 F.3d 470 (2d Cir.2002).

■ Here, defendants do not even meet the first requirement, for they have not consented to being sued in the courts of Switzerland (their only proposed alternative forum) and are not otherwise subject to personal jurisdiction in those courts. *See Jota v. Texaco, Inc.,* 157 F.3d 153, 159 (2d Cir.1998). The fact that, through their counsel, they have consented to submit these matters to arbitration before a Swiss Arbitral Tribunal sponsored by the Zurich Chamber of Commerce is irrelevant, for the doctrine of *forum non conveniens* relates to transfer between the courts of different sovereigns and has no bearing on transfer to an arbitral entity, consent to whose jurisdiction is a matter of private contract, *see* Part I(9), *infra; see generally, AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Moreover, an entity of such limited powers as the Swiss Arbitral Tribunal, which, for example, does not allow for either injunctive relief or discovery, *see* Transcript of Oral Argument Before the Court of Appeals, dated August 5, 2002, at 24, would not be an adequate forum in any case.

■ Moreover, even if defendants could somehow satisfy the first requirement for transfer under the doctrine of *forum non conveniens,* they could not satisfy the second requirement of showing that the balance of public and private factors [11] weighed sufficiently in their favor to overcome plaintiffs' choice of forum. Indeed, given that the trial on the merits has already concluded, the notion that it would be more "convenient" to retry the case in another forum is absurd. Defendants' decision not to participate in the trial should not alter this balance, since that decision was based not on any difficulty defendants faced in accessing the forum but on defendants' own tactical choice and their collusive procurement of Turkish injunctions purportedly barring their attendance.

Accordingly, defendants' motion to dismiss for *forum non-conveniens* is denied.

*As to the ninth motion,* defendants renew their previously-denied motion to compel arbitration of the remaining claims, arguing that the dismissal of the RICO

---

**11.** The private interest factors include the relative ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, as well as "all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Borden, Inc. v. Meiji Milk Products Co.,* 919 F.2d 822, 827 (2d Cir.1990)(*quoting Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). The public interest factors include the administrative difficulties flowing from court congestion, the "local interest in having localized controversies decided at home," and the interest of having the trial of a case in a forum that is at home with the law that must govern the action. *Id.*

claims undercuts part of the rationale for the Court's prior denial.

It is true that the presence of the RICO allegations, supported not only by predicate acts of fraud but also by independently sufficient predicate acts of extortion, made this Court's earlier denial of arbitration a relatively easy decision. But this was not because of the presence of a RICO cause of action *per se*,[12] but because of the nature of the underlying allegations, most of which were entirely extrinsic to the transactions covered by the underlying contracts that included the arbitration clauses here in issue, and also because the defendants were not in any event parties to those contracts. *Cf. Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 848 (2d Cir.1987) (holding the RICO claims there asserted within the scope of the contractual arbitration because "[t]he wire, mail, and transportation fraud allegations which form[ed] the predicate acts of Genesco's RICO claim all derive[d] from the parties' transactions under the sales agreements [that contained the arbitration clause]"). How could it be said that the Uzans, with whom the plaintiffs had no contractual privity whatever (let alone an agreement to arbitrate disputes), could compel the plaintiffs to have a private commercial tribunal determine matters so extrinsic to Telsim's financing arrangements as whether the Uzans had falsely and for extortionate purposes, charged various Motorola, Inc., Motorola Turkey, and Nokia executives with threatening their murder and procured the arrest and prosecution of several of these executives? Such allegations—fully supported by the evidence (*see* Part II, *infra*)—are light-years removed from anything MCC or Nokia (or ABN–AMRO Bank, acting as Nokia's agent) could reasonably, indeed, conceivably, have understood they were agreeing to arbitrate when they entered into their contracts to lend money to Telsim.

The point is that, while federal policy favors arbitration generally, and most especially in the context of international business transactions, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 629–31, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), the obligation to arbitrate nevertheless remains a creature of contract, *see AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (internal quotation marks omitted).[13] "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id. Accord, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 120 (2d Cir.2003).

With this bedrock principle in mind, the Court now addresses whether, in the absence of the RICO claims, arbitration of the remaining claims (*i.e.*, common law

**12.** RICO claims are not inherently non-arbitrable. *See Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 239–243, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

**13.** The current judicial preference for arbitration—stretched, perhaps, beyond any reasonable limits, *see* Thomas E. Carbonneau, *Arbitral Justice: The Demise of Due Process in American Law*, 70 Tul. L.Rev.1945 (1966)—purports to be grounded in the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and in the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997, codified in 9 U.S.C. § 201 *et seq.* But neither of these statutes purports to overrule or extend the contractual agreements of private parties, but simply to effectuate what they have agreed to as determined by ordinary principles of contractual interpretation.

fraud, promissory fraud, civil conspiracy, and constructive trust) must be compelled. This, in turn, is a two-part inquiry: a court must decide "whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims." *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 249 (2d Cir.1991).

With respect to the first inquiry, it is undisputed that neither of the plaintiffs entered into any arbitration agreement with any of the defendants. Defendants, argue, however, that this is an artifice of pleading, an attempt to get around the arbitration agreements that MCC directly, and Nokia indirectly (through ABN–AMRO Bank) entered into with Telsim regarding the very loans that form the financial subject of this case. In such circumstances, defendants argue courts have "estopped [signatories] from avoiding arbitration with [ ] non-signator[ies] 'when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Choctaw Generation Ltd. Partnership v. Am. Home Assur. Co.*, 271 F.3d 403, 404 (2d Cir.2001), *quoting Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir.1999).

Such estoppel, however, is inapplicable here, for several reasons. First, the very allegations of the Complaint, let alone the overwhelming evidence now adduced in their support (*see* Part II, *infra*) show that this is not a case of trying to plead-around an agreement to arbitrate but rather of directly suing the real culprits, the Uzans, who simply used Telsim as a front to commit the instant fraud. It is Telsim that, if named, would have been the artificial defendant, for the Uzans are the real parties in interest.

Second, the estoppel doctrine invoked by defendants is rooted in equity, *see Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 824 (2d Cir.1994), and is therefore subject to the equitable maxim that "he who comes into equity must come with clean hands," *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (internal quotation marks omitted). From the very outset of this case, plaintiffs have demonstrated that defendants have acted fraudulently, a showing they made even before defendants sought to compel arbitration.[14] Thereafter, defendants, through inconsistencies, omissions, false representations, and tactical diversions, effectively carried their fraud right into the courtroom. *See* Findings of Fact, *infra*.[15] A court faced with such conduct is constrained to deny the equitable relief of estoppel that defendants here seek to invoke in aid of arbitration.

---

**14.** Indeed, it was some weeks into the litigation before defendants first suggested that arbitration should be compelled. *See* Memorandum of Law in Support of Defendants' Motion to Compel Arbitration, dated March 20, 2002. Thereafter, they did not unequivocally consent to arbitration until, on appeal before the Second Circuit, that Court required them to clarify their prior equivocations. *See* Transcript of Oral Argument Before the Court of Appeals, dated August 5, 2002, at 38–39.

**15.** For example, after procuring, beginning on or about April 19, 2002, injunctions purporting to enjoin transfer of the collateral to this Court, defendants instructed their U.S. counsel, who learned of the injunctions in late April or early May, not to reveal their existence to this Court or to the Court of Appeals in seeking an emergency stay on May 22, 2002. Instead, not until May 28, 2002, well after the entry of the preliminary injunction order, did defendants bring these injunctions to the Court's attention. *See* Opinion, dated August 22, 2002, 2002 WL 1963301 at *5 & n. 3; PT–459 (Hakan Uzan testimony at contempt hearing) at 30–32, 248.

See *Precision Instrument Mfg Co.*, 324 U.S. at 814–15, 65 S.Ct. 993; *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933).

Finally, it may be noted that in entering into the agreements with Telsim that defendants here seek to invoke, MCC and ABN–AMRO Bank (on behalf of Nokia) expressly agreed that such agreements would be governed by the law of Switzerland, which strictly enforces privity of contract and generally prohibits non-parties from seeking to invoke contractual terms on their behalf. *See* Plaintiffs' Preliminary Injunction Exhibit ("PI")–14 (Declaration of Professor Dr. Franz Kellerhals dated April 2, 2002) ¶¶ 14–16; PI–19 (Declaration of Dr. Peter Straub dated March 19 2002) ¶ 7; PT–458 (Rolf Weber testimony at preliminary injunction hearing) at 359. While certain caselaw, although not exactly on point, suggests that this objection would not ordinarily prevent this Court from referring the matter in the first instance to the Swiss Arbitration Panel, *see Mitsubishi*, 473 U.S. at 639, 105 S.Ct. 3346; *Rhone Mediterranee Compagnia Francese di Assicurazioni E Riassicurazoni v. Lauro*, 712 F.2d 50 (3d Cir.1983); *Meadows Indemnity Co. Ltd. v. Baccala & Shoop Ins. Services*, 760 F.Supp. 1036 (E.D.N.Y.1991); *Marchetto v. DeKalb Genetics Corp.*, 711 F.Supp. 936 (N.D.Ill. 1989), here the objection serves to reinforce the appropriateness in invoking equity to preclude defendants' motion, for it illustrates how, once again, they seek to misuse doctrines that were developed to effectuate legitimate arbitration to compel a commercial arbitration of their criminal scheme.

Accordingly, since the parties to this lawsuit did not agree to arbitrate any dispute between them, and since no basis exists in law or equity for allowing them to invoke Telsim's agreement to arbitrate, defendants' motion to compel arbitration must be denied.

It remains only to add that, even if this were not so, defendants would still not be able to compel arbitration with MCC, because the scope of the agreement between MCC and Telsim does not, as a matter of law, encompass MCC's remaining claims in this case. According to the Court of Appeals:

> To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry. First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Louis Dreyfus Negoce v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir.2001) (internal quotation marks and citations omitted).

The agreements between MCC and Telsim most directly here relevant—the License Financing and Security Agreement, dated April 24, 1998 ("License Financing Agreement"), and the Equipment Financing and Security Agreement, dated April 24, 1998 ("Equipment Financing Agree-

ment"), upon which the loans were extended—each provides in pertinent part:

> This Financing Agreement shall be governed by and interpreted in accordance with the internal laws (without regard to the laws of conflicts) of Switzerland. In the event a dispute *arises hereunder,* or under any document or agreement delivered in connection herewith, the parties will attempt to resolve such dispute through negotiation, mediation or another form of ADR in the first instance. Any dispute which cannot be resolved between the parties through negotiation, mediation or other form of ADR within four (4) months of the date of the initial demand for ADR by one of the parties, shall then be resolved, to the exclusion of the ordinary courts by a three-person Arbitral Tribunal in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce ("the COC Rules").... (emphasis supplied) [16]

Plaintiffs' Separately Marked Trial Exhibit DX ("DX")-3 (License Financing Agreement), at 23; DX–5 (Equipment Financing Agreement), at 23 (emphasis supplied). Similarly, the other relevant agreement— the Share Pledge Agreement, dated April 24, 1998—incorporates this language by reference. *See* DX–14 (Share Pledge Agreement) at 7 ("This Agreement shall be governed by and construed in accordance with the laws of Switzerland, and disputes shall be resolved in accordance with the procedures, terms and conditions set forth in the License Financing Agreement for resolution of disputes."). [17]

Thus, what the parties agreed to arbitrate was only a dispute that "arises hereunder, or under any document or agreement delivered in connection herewith." Under still binding Second Circuit precedent, this language renders the arbitration clause narrow in scope, *see In re Kinoshita,* 287 F.2d 951, 953 (1961), and inapplicable to MCC's state law claims of fraud and the like, which on their face concern matters extrinsic to the contract itself, such as fraudulent inducement, fraudulent diversion, and the like, rather than "disputes and controversies relating to the interpretation of the contract and matters of performance." *Id.*

The Court is aware that *Kinoshita* "has been frequently criticized in this Circuit" and has been "confined to its precise facts," that is to the phrase "arising under" or, at most, "its equivalent." *ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.,* 307 F.3d 24, 33 (2d Cir.2002) (internal quotation marks omitted). But these are the words here used in the applicable agreements, and the fact remains that *Kinoshita* has not been overruled, *see, e.g., Genesco v. T. Kakiuchi & Co.,* 815 F.2d 840, 854 n. 6 (2d Cir.1987) ("[W]e decline the invitation [to overrule *Kinoshita* ]."); *S.A. Mineracao da Trindade–Sam-*

---

**16.** These agreements further provide that "The use of any ADR procedures will not be construed under the doctrine of laches, waiver or estoppel to affect adversely the rights of either party, and nothing in this section will prevent either party from resorting to judicial proceedings if: (1) good faith efforts to resolve the dispute under these procedures have been unsuccessful, or (2) interim relief from a court is necessary to prevent serious and irreparable injury to one party or to others." DX–3 (License Financing and Security Agreement dated April 24, 1998), at 3; DX–5, at 23. Thus, even if arbitration could be compelled, the injunctive relief ordered by this Court, *see* Part II, *infra,* would remain in aid of arbitration.

**17.** While MCC or its affiliates also entered into several other agreements containing arbitration clauses, these agreements were, at best, collateral to the transactions here pertinent. *See* DX–18 (Pledgeholder Agreement) § 6.3; DX–19 (February 1, 2000 amendment to Pledgeholder Agreement) at 3–4; DX–1 (GSM Frame Contract) at 40.

*itri v. Utah Int'l, Inc.,* 745 F.2d 190, 194 (2d Cir.1984) ("We decline to overrule *In re Kinoshita.*"). *Kinoshita* is therefore binding where, as here, the arbitration clause is indistinguishable from, if not more narrow than, the clause at issue in that case.

Moreover, it may be suggested that there is a good reason why *Kinoshita* has not been overruled. For all the current "tilt" in favor of arbitration, it is still a function of what the parties agreed to. Under ordinary principles of contract interpretation—indeed, under plain English meaning—"arising under" a contract cannot fairly be read to extend to disputes that either proceeded the formation of the contract (such as fraudulent inducement) or that are entirely extrinsic to the contract (such as the Uzans diverting of the loan monies into their own pockets). However much some courts may prefer arbitration, private parties are still entitled to have straightforward contractual agreements that are couched in simple English words enforced in accordance with their terms.

The difference between the language in MCC's contract with Telsim and the language in ABN–AMRO Bank's contract with Telsim still further reinforces the conclusion that MCC never agreed to arbitrate the instant disputes. The ABN–AMRO Bank agreement, which in its most recent form is known as the "Third Facili-

ty Agreement" dated May 30, 2000 (*see* Findings of Fact, *infra*), provides that:

Any dispute(s) *arising between the Parties out of or in connection with* this Agreement (including its interpretation, closing, execution, binding effect, amendment, breach, termination or enforcement) shall be submitted, to the exclusion of the ordinary courts, to a three-person arbitration tribunal in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce....

PT–1004D (Third Facility Agreement) §§ 22.1–22.2 (emphasis supplied).[18]

This is classic "broad" language, but by its very breadth it illustrates why the MCC–Telsim language is narrow and should not be interpreted to cover the same scope as the broad ABN–AMRO–Telsim language.[19]

To be sure, Nokia itself is not a party to any of these agreements, but a reasonable argument can be advanced that ABN–AMRO Bank was acting as Nokia's agent in regard to these agreements. Thus, if the instant defendants were able to invoke these agreements on their own behalf, they could compel Nokia, but not MCC, to arbitrate. *See Thomson–CSF, S.A. v. Am. Arbitration Assoc.,* 64 F.3d 773, 777 (2d Cir.1995) ("Traditional principles of agency law may bind a nonsignatory to an arbitration agreement."). But since, as previously noted, the instant defendants cannot

**18.** Substantively identical language appears in the other agreements between ABN–AMRO Bank and Telsim, including the Second Facility Agreement dated March 10, 2000, *see* PT–1003B (Second Facility Agreement) §§ 22.1–22.2; the First Facility Agreement dated June 1999, *see* PT–1002A (First Facility Agreement) §§ 22.1–22.2, PT–1002E (First Facility Agreement) §§ 22.1–22.2; the Share Pledge Agreement dated March 10, 2000 (the "Phase II Share Pledge Agreement"), *see* PT–1003C (Phase II Share Pledge Agreement) §§ 6.2–6.3; the Share Pledge Agreement, dated October 1, 1999 (the "Phase I Share Pledge Agreement"), *see* PT–1002A (Phase I Share Pledge Agreement) § 12; and the NSS Frame Contract dated October 9, 1999 (the "Supply Contract"), *see* PT–1006A (Supply Contract) at 38.

**19.** Presumably this is why, as noted by the Court of Appeals, ABN–AMRO Bank (but no one else on either side) commenced arbitration with Telsim prior to the start of this lawsuit. *See Motorola,* 322 F.3d at 134.

invoke these agreements on their own behalf with respect to either of the plaintiffs, defendants motion to compel arbitration must be denied in its entirety.

*As to the tenth motion,* defendants move to dissolve the Court's preliminary injunction and attachment orders and void all related findings of contempt, on the grounds that (a) the case is subject to arbitration, (b) the remaining claims are insufficient to support a preliminary injunction, and (c) the Court's preliminary injunction was structurally flawed.

 The first of these arguments fails because, as determined above, the case is not subject to arbitration. Moreover, even if this were not the case, the injunctive relief would be warranted as an injunction in aid of arbitration. Indeed, as noted earlier, MCC expressly bargained for such relief when it agreed with Telsim (in the arbitration clause defendants now seek to invoke for their benefit) that "nothing in this section will prevent either party from resorting to judicial proceedings if ... interim relief from a court is necessary to prevent serious and irreparable injury to one party or to others." [20]

As to the other objections, they are largely mooted by the fact that the Court of Appeals expressly declined to vacate the preliminary injunction but only directed this Court to address its scope, *see Motorola,* 322 F.3d at 138–39, and by the fur-

ther fact that, as a result of the Court's determination of the merits (*see* Part II *infra*), the preliminary injunctions are now replaced by the permanent injunctive relief set forth below. Moreover, the same findings that supplement the Court's original grant of preliminary injunctive relief would have equally supported the same relief even if the only claims then before the Court were the state-law claims. *See* Supplemental Order of Attachment, dated January 3, 2003; Supplemental Order of Attachment, dated November 14, 2002; Order, dated August 29, 2002; Opinion, dated May 21, 2002; Order, dated May 10, 2002; Order, dated May 9, 2002.

It follows that defendants were rightfully held in contempt for failure to abide by the preliminary injunction, and that they remain in contempt to this day (*see* Part II, *infra*). While the Court of Appeals questioned the portion of the preliminary injunction extending beyond the collateral-derived Telsim stock held by defendant Standard Telekom to the collateral-related Telsim stock still held by non-party Rumeli Telefon, *see Motorola,* 322 F.3d at 138,[21] defendants willfully refused to transfer even the former stock to the registry of this Court, and that failure, along with their willful contempt of other provisions of the preliminary injunction not here challenged, was more than sufficient to require the finding of contempt.

---

**20.** Also, there is no doubt about the power of this Court to issue injunctions and attachments in aid of arbitration pursuant to Rule 65, Fed.R.Civ.P. *See, e.g., Daye Nonferrouse Metals Co. v. Trafigura Beheer B.V.,* 96 Civ. 9740(RWS), 1997 WL 375680 at *5 (S.D.N.Y. July 7, 1997), 1997 U.S. Dist. LEXIS 9661 at *12, *vac. on other grounds* 1998 WL 385968 (2d Cir.1998)1998 U.S.App. LEXIS 12943; *Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd.,* 876 F.Supp. 482, 487 (S.D.N.Y. 1994). (To the extent defendants have preserved their objection under *Grupo Mexicano v. Alliance Bond Fund,* 527 U.S. 308, 119

S.Ct. 1961, 144 L.Ed.2d 319 (1999)—which they have not raised in their post-*Motorola* submissions—the objection is answered in the Court's Opinion, dated May 21, 2002, 202 F.Supp.2d at 250.)

**21.** On a prospective basis in connection with the grant of permanent injunctive relief, *see* Part II, *infra,* the Court extends this aspect of the injunction to any Telsim stock presently held by any of the defendants or other Uzan-controlled entities that is the functional equivalent of the original collateral.

*As to the eleventh motion,* defendants move to dissolve the Court's order enjoining defendants from pursuing certain Swiss arbitrations.

■ In granting plaintiffs' motion to enjoin defendants from pursuing some (but not all) foreign arbitrations, the Court noted that "it [was] painfully obvious that they were commenced in an effort to undercut the prior orders of, and proceedings before, this Court." Order, dated October 15, 2002, 2002 WL 31319932 at *4. As final judgment is now being entered on plaintiffs' state law claims and as plaintiffs' RICO claims will most likely not ripen until the arbitrations conclude, the arbitrations will no longer interfere with this Court's jurisdiction, and it is appropriate that they go forward at this time, so that plaintiffs can ultimately qualify to reinstate their RICO claims. Accordingly, the motion to dissolve the prohibition on defendants' pursuing certain Swiss arbitrations is granted.

This is not to suggest, however, that these defendants (as opposed to Telsim) have a lawful right to participate in such arbitrations; indeed, as previously indicated, this Court believes they do not. But in the present posture that itself becomes an issue for the arbitration panel, this Court holding only that defendants have no right to compel arbitration. Also, of course, any failure by defendants to adhere to this Court's prior order forbidding them from participating in the Swiss arbitrations may still be relevant to the assessment of issues of willfulness and contempt still relevant to the instant case.

■ *As to the twelfth motion,* plaintiffs move to hold defendants in a further act of civil contempt for their failure to comply with the Court's Memorandum Order, dated January 6, 2003, which, *inter alia,* directed defendants, their proxies, and all others in concert with them "to take all

steps necessary to withdraw and cause to be dissolved the Turkish injunction granted on November 27, 2002 and the action on which it is premised, and enjoin[ed] defendants from initiating any similar proceeding." Memorandum Order, dated January 6, 2003, 2003 WL 56998 at *2–3. Against the background of the defendants' prior acts of contempt, *see* Opinion and Order, dated August 22, 2002; Order, dated October 15, 2002; Memorandum Order, dated January 6, 2003, and for the further reasons set forth in the Findings of Fact, *infra,* the Court finds by clear and convincing evidence that the defendants have unreasonably failed to comply with the requirements of the January 6, 2003 Order. *See EEOC v. Local 580,* 925 F.2d 588, 594 (2d Cir.1991). Further, as the aforementioned findings make plain, defendants' non-compliance was willful and was purposely designed to obstruct the proceedings before this Court. Accordingly, the Court hereby finds defendants in civil contempt for their non-compliance with the January 6 Order. The related issue of appropriate sanction to compel compliance is considered below in Part II.

■ *As to the thirteenth motion,* plaintiffs move for attorneys' fees and expenses as prevailing plaintiffs on their federal claims. As to the RICO claims, the motion is denied as moot and without prejudice to reinstatement should plaintiffs ultimately prevail on their RICO claims if and when they become ripe and are reinstated. As to the federal computer hacking claims, the motion is denied with prejudice, since these claims have now been dismissed with prejudice.

■ *As to the fourteenth motion,* nonparty HSBC Mortgage Corporation (USA) ("HSBC") moves to modify the Court's prior orders of attachment to provide, in effect that, certain real properties present-

ly attached can be sold pursuant to mortgage foreclosure, provided the proceeds are deposited with the United States Marshal for the Southern District of New York and become subject to the attachment, at which point the attachment orders shall not thereafter be liens on the real properties themselves. Having satisfied itself that no party to this litigation will be prejudiced by such modification, the Court hereby grants the motion.

Having disposed of the motions,[22] the Court next turns to the merits of the remaining state law claims and matters related thereto:

## II. *The Merits*

### *Findings of Fact*

The Court makes the following findings of fact based on the evidence of record, reasonable inferences drawn therefrom (including negative inferences drawn from false testimony), assessment of credibility and demeanor, and resolution of conflicts in the evidence. Exhibit and testimonial references cited below indicate some, though not necessarily all, of the direct evidence pertaining to a given finding but not necessarily the inferences drawn therefrom, which in some cases depend on assessment of the entire record.

Plaintiffs and their Affiliates

1. Plaintiff Motorola Credit Corporation ("MCC"), an international supplier of telecommunications equipment, is a wholly owned subsidiary of Motorola, Inc. Both MCC and Motorola, Inc. have primary offices in Illinois. MCC provides financing for certain customers of Motorola, Inc. and affiliated companies. *See* Plaintiffs' Trial Exhibit ("PT") 458 (Edward Hughes testimony at preliminary injunction hearing) at 8, 12–13.

2. Motorola Ltd. is a company based in the United Kingdom that manufactured the cellular infrastructure equipment purchased by the Uzan-controlled company, Telsim Mobil Telekomunikayson Hizmetleri A.S. ("Telsim"), for the construction of its cellular telephone network.

3. Motorola Turkey is a company based in Turkey that provided some services with respect to Telsim's network and that sold certain handsets to Telsim.

4. Plaintiff Nokia Corporation ("Nokia"), headquartered in Finland, is a worldwide supplier of telecommunications equipment. Nokia provided Telsim with switching equipment and related services.

Defendants

5. Defendant Kemal Uzan is a citizen and domiciliary of the Republic of Turkey. Kemal Uzan is also an officer, director and/or owner of various companies controlled by the Uzans. *See* PT–232 (Rumeli Holding Annual Report); PT–442 (Thomas Brunner Deposition) at 27.

6. Defendant Murat Hakan Uzan ("Hakan Uzan") is a citizen and domiciliary of the Republic of Turkey and also is a citizen of the Kingdom of Jordan. Hakan Uzan is an officer, director and/or owner of various Uzan-controlled companies. Hakan Uzan is the son of defendant Kemal Uzan. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 4; PT–232 (Rumeli Holding Annual Report); PT–233 (Telsim marketing materials); Answer ¶ 6.

7. Defendant Cem Cengiz Uzan ("Cem Uzan") is a citizen and domiciliary of the

---

**22.** In their Notice of Motion, dated April 4, 2003, defendants also purport to move on numerous other grounds, all of which are frivolous and, more importantly, in support of which, defendants offer no arguments in their Memorandum of Law accompanying the notice. Accordingly, all purported motions raised by defendants not otherwise addressed herein are hereby dismissed.

Republic of Turkey and also is a citizen of the Kingdom of Jordan. Cem Uzan is an officer, director and/or owner of various Uzan-controlled companies. Cem Uzan is the son of defendant Kemal Uzan and is the brother of defendant Hakan Uzan. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 11; PT–232 (Rumeli Holding Annual Report); Answer ¶ 7.

8. Defendant Melahat Uzan is a citizen and domiciliary of the Republic of Turkey. Melahat Uzan is the wife of defendant Kemal Uzan, and holds positions in various of the Uzan-controlled entities. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 26; PT–176 (Rumeli Cimento Charter Agreement, listing her as a "founder"); PT–178 (Registration and Approval of the Rumeli Cimento Charter Agreement); PT–179 (Rumeli Telekom Contract of Incorporation, listing her as a "foundation shareholder"); Answer ¶ 8.

9. Defendant Aysegul Akay ("Akay") is a resident of Istanbul, Turkey. Akay is a director and/or owner of various Uzan-controlled companies. Akay is the daughter of defendant Kemal Uzan and the sister of defendants Hakan Uzan and Cem Uzan. *See* Preliminary Injunction Exhibit ("PI") 26; (Rumeli Telefon board resolution); PI–29 (Standart Telekom articles of incorporation); PI–30 (Telsim board resolution); PT–177 (Rumeli Cimento corporate resolution); Answer ¶ 9.

10. Defendants Kamal Uzan, Hakan Uzan, Cem Uzan, Melahat Uzan, and Akay are collectively referred to here as the "Uzans" or the "Uzan family."

11. Defendant Antonio Luna Betancourt ("Luna") is a citizen of Mexico. Luna is a close associate of the Uzan family and has served as a director of numerous Uzan-controlled companies. *See* PT–284 (Appendix 7 to Samuel Report) at 5–22, 24–26 (summary of bank transactions in-

cluding instances in which Luna transacted business for various Uzan offshore companies); PT–1135 (letter dated May 20, 1998 from Luna to Nokia).

12. Defendant Standart Pazarlama A.S. ("Standart Paz") is a corporation organized under the laws of the Republic of Turkey with its principal place of business in Istanbul, Turkey. Defendants Cem Uzan and Hakan Uzan each own 39.4% of Standart Paz, and Akay owns another 20%, so that 98.8% of Standart Paz's stock is owned by the Uzans. *See* PT–218 (Standart Paz shareholder registry); *see also* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 42, 43; Answer ¶ 11.

13. Defendant Standart Telekomunikasyon Bilgisayar Hizmetleri A.S. ("Standart Telekom") is a corporation organized under the laws of the Republic of Turkey with its principal place of business in Istanbul, Turkey. Defendants Cem Uzan and Hakan Uzan each own 39.4% of Standart Telekom, and Akay owns another 20%, so that 98.8% of Standart Telekom's stock is owned by the Uzans. *See* PI–29 (Standart Telekom articles of incorporation); PI–37 (Standart Telekom shareholder registry); PT–436 (Responses to MCC Requests to Admit) at Response Nos. 45–49; Answer ¶ 12.

14. Defendant Unikom Iletism Hizmetleri Pazarlama A.S. ("Unikom") is a corporation organized under the laws of the Republic of Turkey with its principal place of business in Istanbul, Turkey. Rumeli Telekom A.S. ("Rumeli Telekom"), another Turkish company controlled by the Uzan family, owns 90% of the stock of Unikom. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 53–55; Answer ¶ 13.

Procedural Background

15. Plaintiffs filed this action on January 28, 2002. On that same day, plaintiffs

sought an ex parte temporary restraining order commanding defendants to, among other things, deposit 73.5% of Telsim's stock into the Court's registry and to refrain from further diverting any assets from Telsim. The Court granted the temporary restraining order and set a hearing for February 11, 2002 to determine whether the restrictions placed upon defendants should be continued.

·16. At an in-court conference on February 1, 2002, defendants through their counsel Robert F. Serio Esq., of the law firm of Gibson, Dunn & Crutcher LLP (who at the time represented all defendants), requested a postponement of the February 11, 2002 hearing, so that it could be consolidated with a full preliminary injunction hearing, but, pending that hearing, consented to continuation of all of the restrictions placed upon defendants by the temporary restraining order other than the requirement that they deposit Telsim stock into the Court's registry and requested leave to file a motion to modify the temporary restraining order so that defendants would not be required to deposit Telsim's stock into the Court's registry. The Court set a briefing schedule for defendants' motion to modify the temporary restraining order, and scheduled the preliminary injunction hearing for April 9, 2002.

17. On February 7, 2002, defendants filed their motion to modify the temporary restraining order. In those papers, defendants consented to all portions of the temporary restraining order until a decision was rendered on plaintiffs' preliminary injunction motion, other than the requirement that defendants deposit Telsim's stock into the Court's registry.

18. On February 14, 2002, after receiving further briefing, the Court issued an opinion and order on defendants' motion to modify the temporary restraining order.

Although the Court rejected defendants' argument that the Court lacked the power to order the deposit of Telsim's stock into the Court's registry, the Court granted defendants' motion as a matter of prudence, recognizing that a full evidentiary hearing on plaintiffs' preliminary injunction motion was scheduled to begin on April 9, 2002.

19. On March 15, 2002, defendants filed an opposition to plaintiffs' motion for a preliminary injunction. Included in that filing were sworn declarations from Kemal Uzan, Melahat Uzan, Hakan Uzan, Akay, Luna, and representatives of the three corporate defendants.

20. On March 20, 2002, defendants served two motions to dismiss plaintiffs' complaint and to compel arbitration. All of the defendants other than Cem Uzan asserted the defense of lack of personal jurisdiction. Counsel for defendants subsequently confirmed in open court (at the preliminary injunction hearing) that Cem Uzan was not contesting personal jurisdiction. *See* PT–458 (transcript of PI hearing) at 796–97. It was not until August 5, 2002, however, during the oral argument before the Court of Appeals, that all of the defendants unequivocally consented to arbitration. *See* Transcript of Oral Argument Before the Court of Appeals, dated August 5, 2002, at 38–39.

21. On March 25, 2002, defendants filed a motion seeking a "blocking order" that would render Hakan Uzan immune from service of process if he appeared at the preliminary injunction hearing. In an order dated April 1, 2002, the Court denied defendants' motion as insufficiently supported. (However, the Court subsequently granted a motion for a blocking order in connection with the contempt hearing, *infra*.)

22. On March 22, 2002, the Court entered a Case Management Plan and Scheduling Order after receiving comments from both sides. On April 3, 2002, the parties exchanged initial disclosures as required by the Case Management Plan and Scheduling Order.

23. The preliminary injunction hearing began as scheduled on April 9, 2002 and concluded on April 18, 2002. The Court heard testimony on April 9, 10, 12, 15, and 16, 2002, and heard oral argument from counsel on April 18, 2002.

24. The preliminary injunction hearing was a fully contested hearing. Plaintiffs, who had the burden of proof, called a total of seven witnesses, namely, Edward Hughes, Ernst Kramer, Dr. Fadlullah Cerrahoglu, Randy Rosetta, Ferda Yildiz, Allan Baxter, and Jeffrey Diamond, Esq. Defendants' attorneys cross-examined all of these witnesses other than Mr. Diamond, a New York lawyer who has represented the Uzans for several years and who was called by plaintiffs for the purpose of establishing facts relevant to the issue of personal jurisdiction.

25. Defendants called a total of five live witnesses, namely, Fatih Azami, Dr. Omer Teoman, Professor Necmi Yuzbasioglu, Michael Coyne, and Gervase MacGregor. Mr. Azami, the Chief Financial Officer of Telsim, was also permitted to remain at defendants' counsel table throughout the proceedings on defense counsel's representation that "he is likewise a representative of the Uzan family." PT–458 (Robert Serio statement at PI hearing) at 749. Additionally, each of the defendants other than Cem Uzan submitted a sworn statement that the Court received, including a seventy-six page declaration from Hakan Uzan. Defendants also submitted a declaration from Vincent Love, a witness who was available to testify but as to whom plaintiffs waived their right of cross-examina-

tion. However, although the Court had previously indicated its preference for live testimony over affidavits, none of the defendants elected to appear in person to testify at the preliminary injunction hearing.

26. On May 9, 2002, after receiving further briefing, the Court issued a preliminary injunction, ordering defendants to, among other things, deposit 73.5% of Telsim's stock into the Court's registry by May 24, 2002 and prohibiting defendants from taking any action to affect the status of the Telsim stock pledged to plaintiffs. The Court followed that order with an opinion dated May 21, 2002 detailing its findings that plaintiffs had proved, by clear and convincing evidence, both a strong likelihood of success on the merits and a strong likelihood that they would be irreparably harmed if the injunction did not issue.

27. On May 10, 2002, the day after the Court issued the preliminary injunction, defendants, in direct violation of the injunction and the prior temporary restraining order, took steps in Turkey to further dilute the Telsim shares pledged to plaintiffs. This was not revealed to the Court until discovered by plaintiffs on May 21, 2002.

28. On May 14, 2002, the firm of Baker Botts LLP, by R. Stan Mortenson, Esq., filed a notice of appearance on behalf of the individual Uzan defendants.

29. Beginning on or about April 19, 2002, at the instance of third parties acting in collusion with defendants, three injunctions were issued by local Turkish courts prohibiting the transfer of Telsim stock outside Turkey. Defendants expressly directed their U.S. counsel not to reveal this to the Court, or subsequently, to the Court of Appeals to which defendants appealed on May 22, 2002 for an emergency stay of

the preliminary injunction. Defendants' counsel did not reveal this information until May 28, 2002. *See* Opinion and Order, dated August 22, 2002, 2002 WL 1963301 at *5 & n.3.

30. As defendants had failed to comply with the preliminary injunction by failing to deposit 73.5% of Telsim's stock into the Court's registry and by taking action to dilute the value of the stock pledged to plaintiffs, plaintiffs moved on May 28, 2002 for a finding of civil contempt against defendants. The Court scheduled a hearing on the contempt motion for June 10, 2002.

31. At the June 10, 2002 hearing, defense counsel informed the Court that Hakan Uzan would like to appear to present live testimony on the contempt motion, but that he was concerned that plaintiffs would serve him with process during his appearance in New York and that the Court might use Hakan Uzan's appearance to order him coercively confined pending compliance with the preliminary injunction motion. Plaintiffs, however, agreed not to serve any process on Hakan Uzan during his travel to New York for testimony on the contempt motion, and the Court gave Hakan Uzan "safe passage" by indicating that it would not issue a ruling on the contempt motion during the time that Hakan Uzan was in New York to testify. The Court scheduled a resumption of the contempt hearing for June 21 and 24, 2002 so that Hakan Uzan could appear to testify.

32. At the June 10, 2002 hearing, defense counsel once again reconfirmed that Cem Uzan had waived any defense of lack of personal jurisdiction. *See* Transcript dated June 10, 2002, at 20 (statement by defendants' counsel that "Mr. Cem Uzan, by not filing a motion has, for legal purposes, waived the defense [of lack of personal jurisdiction]").

33. Hakan Uzan appeared and gave live testimony on both June 21 and 24, 2002. The Court made clear that Hakan Uzan was free to testify about virtually any issue relevant to the case, since it would all bear on his intent with regard to the contempt. *See* PT-459 (transcript of contempt hearing) at 26.

34. On August 22, 2002, the Court issued an order finding Hakan Uzan's testimony incredible in material respects and holding defendants in civil contempt based on their violations of the preliminary injunction order. *See* Opinion and Order dated August 22, 2002. Nevertheless, the Court imposed a modest coercive fine of $1000 (doubling, however, each month) in the express hope that it would bring defendants into compliance.

35. On September 23, 2002, defendants—representing that they were intent on fully litigating the merits of the case— moved for a three-month extension of the October 15, 2002 cut-off set in the Case Management Plan. On October 1, 2002, the Court granted their request in part, extending the discovery cut-off until November 22, 2002.

36. Meanwhile, defendants had also represented to Magistrate Judge Maas, to whom certain discovery aspects of the case had been referred, that they intended to fully litigate the case on the merits. *See Motorola Credit Corp. v. Uzan,* 02 Civ. 666(JSR) (FM), 2003 WL 203011, at *2 (S.D.N.Y. Jan. 29, 2003). In response, by order dated September 13, 2002 (and over plaintiffs' objections), Magistrate Judge Maas extended the limit on the number of depositions to twenty depositions per side, plus experts. *See* Transcript dated September 13, 2002, at 46–47.

37. On September 30, 2002, the Court issued an order denying defendants' motion to dismiss plaintiffs' complaint, and denying defendants' motion to compel arbi-

tration. *See* Order, dated September 30, 2002; Memorandum Order, dated October 15, 2002.

38. On October 1, 2002, a hearing was held on plaintiffs' request to increase the contempt sanctions. At that hearing, defendants requested additional time to comply with the Court's May 9 preliminary injunction order, and represented that they would make diligent efforts to do so over the next six to eight weeks. Based on this representation, the Court issued a decision on October 15, 2002, keeping the contempt fines at the presently-set levels until November 26, 2002 but increasing the fine at the end of November 2002 to $100 million, with the fine to double each month thereafter. *See* Order dated October 15, 2002.

39. On October 15, 2002, defendants filed their answer to plaintiffs' complaint. Defendants Hakan Uzan and Cem Uzan filed counterclaims and third-party claims, which they subsequently voluntarily dismissed on November 11, 2002.

40. By letter dated October 21, 2002, defendants moved to stay this lawsuit pending their appeal of the Court's September 30 and October 15 orders. The Court denied this motion by Memorandum Order dated October 28, 2002.

41. On November 27, 2002, defendants obtained an *ex parte* order from a Turkish court purporting to enjoin this Court from proceeding with this action. On January 6, 2003, this Court issued an order enjoining defendants from proceeding with the Turkish suit and requiring them to take all steps necessary to have the injunction dismissed or withdrawn. *See* Memorandum Order dated January 6, 2003, 2003 WL 56998 at *2–3.

42. Despite periodic claims that they were appearing in this suit for limited purposes and/or that they were barred by the Turkish courts from defending this action, defendants filed more than seventy-five separate legal papers in this action, both in this Court and in the Second Circuit. Defendants' counsel appeared more than twenty-nine times for hearings in this action.

43. Until November 2002, defendants also participated in discovery in this action. Defendants served document requests on plaintiffs, in response to which plaintiffs produced more than 96,000 pages of documents. Defendants also appeared on multiple occasions before Magistrate Judge Maas to seek orders compelling plaintiffs to produce documents, and other discovery. Ultimately, however, defendants refused to produce themselves for depositions or to produce most of the other discovery requested by plaintiffs, raising various objections that Judge Maas determined were spurious. *See Motorola Credit Corp. v. Uzan*, 02 Civ. 666(JSR)(FM), 2003 WL 203011, at *1–4 (S.D.N.Y. Jan. 29, 2003).

44. As a result, plaintiffs were able to obtain only five depositions, all of non-parties.

45. The Court had previously set a February, 2003 trial date. On January 24, 2003, defendants filed a statement reciting that they would not participate in person, or through counsel, in the trial of this action, purportedly on the basis of the Turkish injunction that they had obtained contumaciously in violation of this Court's order. *See* Defendants' Statement of Intention Regarding the Trial Scheduled for February 10, 2003, dated January 24, 2003.

46. On January 31, 2003, the Court granted plaintiffs' motion to withdraw their jury demand. In light of the fact that defendants had previously contested both the preliminary injunction hearing and the contempt hearing, the Court permitted plaintiffs' counsel to rely at trial on

evidence from those prior hearings, as well as to present new evidence.

47. At the February 18, 2003 trial, plaintiffs principally relied on testimony adduced at the preliminary injunction hearing, a hearing in which defendants' counsel had participated and vigorously cross-examined plaintiffs' witnesses. In addition, plaintiffs presented additional testimony by declaration from Edward Hughes, Ernst Kramer, Anthony Samuel, and Ian Menzies. The four witnesses who submitted declarations all appeared in court on February 18, 2003 in order to take the stand and respond to any questions posed by the Court. Of particular importance was plaintiffs' expert, Mr. Samuel, whose report and testimony evidences the huge diversions of funds from Telsim by defendants. Plaintiffs also relied on documentary evidence, much of which was evidence admitted into the record at the preliminary injunction hearing. Neither defendants nor their counsel appeared for trial.

Personal Jurisdiction

48. Notwithstanding defendants' refusal to be deposed, plaintiffs, as the Court has previously ruled, *see* Opinion dated May 21, 2002, 202 F.Supp.2d at 251; Order dated September 30, 2002, have carried their burden of establishing personal jurisdiction over defendants. Indeed, given Cem Uzan's concession of personal jurisdiction and the Court's findings, *infra,* that he participated from New York in furthering a civil conspiracy that included the other defendants that alone would be sufficient to establish personal jurisdiction over all defendants. Also, regarding the Illinois state counts, it is undisputed that various of the Uzan defendants signed numerous documents relating to the transactions here in issue that were forwarded to MCC in Illinois. Additionally, however, the fol-lowing facts support personal jurisdiction as to each defendant.

Kemal Uzan

49. Kemal Uzan owns real property in New York at 100 United Nations Plaza, # 45A, New York, New York 10017. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 2; PT–453 (Declaration of Kemal Uzandated March 14, 2002 ("K. Uzan Decl.")) ¶ 2; PT–448 (Kemal Uzan witness statement in English proceeding) ¶ 4.

50. Kemal Uzan admits to "maintain[ing] bank accounts at two New York financial institutions." PT–453 (K. Uzan Decl.) ¶ 6.

51. Kemal Uzan has had frequent and extensive contacts with the New York City branch of UBS AG ("UBS New York").

52. For example, Kemal Uzan has maintained a personal bank account with UBS New York since 1997. He has used this account to pay condominium fees and utility expenses associated with his New York real property. *See* PT–142 (UBS letter attaching Kemal Uzan's bills dated August 14, 2002); PT–181 (account master agreement dated July 31, 1997).

53. Kemal Uzan also serves as a client contact for Telsim's account at UBS New York. According to the account master agreement and power of attorney, he is the only individual with full signatory authority on the account. *See* PT–185 (account master agreement dated March 9, 1998); PT–186 (power of attorney dated March 20, 1998).

54. Kemal Uzan is likewise a client contact for Rumeli Cimento's account at UBS New York. According to the account master agreement, he is the only individual with full signatory authority on the account. *See* PT–180 (account opening dated July 21, 1997); PT–182 (account master agreement dated July 31, 1997).

55. Kemal Uzan is listed as a client contact on UBS New York's account for Yapi ve Ticaret ("Yapi"). *See* PT–134 (client commercial profile dated March 22, 1999). This account has had a balance as high as $200 million. *See* PT–285 (bank statement) at UBS 1 00734.

56. Kemal Uzan is listed as a client contact for Rumeli Telekom's account with UBS New York. *See* PT–192 (client commercial profile dated September 25, 1998).

57. Kemal Uzan negotiated with UBS New York for a $300 million loan to Telsim, which was combined with funds from MCC to purchase a Global Standard for Mobile ("GSM") license from Turkey in 1998. The loan was guaranteed by the cash deposits of Rumeli Cimento, Yapi, and Kemal Uzan himself. In April 1999, the loan was renewed by UBS New York for a year. In 2000, Kemal Uzan arranged for the loan to be paid off when he knew that such payment was in violation of the Telsim's agreements with MCC. *See* PT–127 (UBS credit protocol dated April 3, 1998); PT–131 (Telsim credit approval dated April 23, 1999); PT–435 (Samuel Report) at 85–92 (discussing improper repayment).

58. In association with both his personal bank account and the accounts of Rumeli Group companies with UBS New York, Kemal Uzan has had extensive contacts with UBS representatives (mainly in New York City) for the purpose of transacting business through New York. The following table summarizes some of those contacts that have been recorded in UBS Client Visit Reports/Call Reports:

| Exhibit | Description |
| --- | --- |
| PT–147 | Meeting in New York 10/7/97 |
| PT–145 | Meeting in New York 12/30/97 |
| PT–148 | Meeting in New York 4/2/98 |
| PT–148 | Meeting in New York 4/7/98 |
| PT–148 | Meeting in Istanbul 6/16/98 |
| PT–148 | Meeting in New York 7/17/98 |
| PT–148 | Meeting in New York 10/20/98 |
| PT–148 | Meeting in New York 10/11/96 |
| PT–148 | Telephone Conversation 5/1/97 |
| PT–148 | Telephone Conversation 7/10/97 |
| PT–148 | Telephone Conversation 3/2/98 |
| PT–148 | Telephone Conversation 4/15/98 |
| PT–148 | Meeting in Istanbul 11/20/97 |
| PT–148 | Meeting in New York 1/29/01 |
| PT–123 | Meeting 3/4/99 |
| PT–124 | Meeting 3/20/00 |

59. Kemal Uzan also maintains a personal bank account with the New York branch of JP Morgan Chase (formerly Chase Manhattan Bank). *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 227; PT–285 (bank statement) at Chase 0006.

60. Kemal Uzan's passport indicates that he has entered the United States on at least twenty occasions since 1997. On nineteen of those trips he traveled to New York City. *See* PT–225 (passports).

61. In addition, Kemal Uzan admits in his declaration to having visited New York "approximately three times each year since January 1, 1997" and to "hav[ing] spent a maximum of approximately ten days at the New York apartment during each visit since January 1, 1997." PT–453 (K. Uzan Decl.) ¶ 3. Thus, by his own admission, he has spent approximately thirty days a year in New York each year since 1997. He also admits in his declaration to having visited the United States, other than New York, five times since January 1, 1997. *See* PT–453 (K. Uzan Decl.) ¶ 7.

Hakan Uzan

62. Hakan Uzan owns real property in New York at 100 United Nations Plaza # 40E, New York, New York 10017, and also at 100 United Nations Plaza # 46B, New York, New York 10017. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 8 and 9. *See also* PT–459 (Hakan Uzan testimony at contempt hearing) at 96; PT–454 (Declaration of Hakan Uzan dated March 14, 2002, ("H. Uzan Decl. dated March 14, 2002")) ¶ 185.

63. Hakan Uzan possesses a New York driver's license, which he has had since 1988 and which lists his address as 100 United Nations Plaza, # 45A, New York, New York, 10017. *See* PI–43 (N.Y. Driving Record Abstract); PT–436 (Responses to MCC Requests to Admit) at Response No. 196; *see also* PT–459 (Hakan Uzan testimony at contempt hearing) at 108.

64. Hakan Uzan also owns vehicles registered in the United States. *See* PT–20 (vehicle registrations and related documents).

65. In April 1999, Hakan Uzan purchased apartments # 89A and # 89B at 845 United Nations Plaza, New York, New York, 10017 for a combined price of over $14 million. These apartments made up the second highest floor (Cem Uzan purchased the top floor for $17 million) in the new Trump World Tower. Between April 1999 and October 2001, Hakan Uzan paid over $3 million dollars toward the purchase of the apartments. *See* PT–384 (Cem Uzan's purchase agreement for # 89A); PT–385 (purchase agreements of April 26, 1999); PT–435 (Samuel Report) at 95–97 (describing payments).

66. In October 2001, Hakan Uzan refused to close on the Trump World Tower apartments. He and Cem Uzan then availed themselves of New York courts by bringing an action attempting to rescind their purchase agreements and to recover their down payments. In their complaint in that action, Hakan Uzan asserted that he maintained residences in the County, City, and State of New York. *See* PI–102 (Complaint, *Cem and Hakan Uzan v. 845 UN Plaza Partnership* ); *see also* PT–459 (Hakan Uzan testimony at contempt hearing) at 96–97.

67. Hakan Uzan has been represented for several years by the New York law firm of Marcus, Rosenberg, and Diamond ("MRD") in New York real estate transactions and other personal matters. The following is a summary of matters on which MRD performed work for Hakan Uzan, as demonstrated by MRD billing records:

| Exhibit | Client Matter |
| --- | --- |
| PI–126 | Cem and Hakan Uzan v. 845 UN Plaza Partnership |
| PI–129 | Purchase of Apartments # 40E and # 46B at 100 UN Plaza |
| PI–130 | Hakan Uzan Airplane Purchase |
| PI–131 | Trump World Tower Apartment Purchase |
| PI–134 | Star TV, USA Office Lease at 450 Park Ave. |
| PI–137 | Cem and Hakan Uzan Contract Rescission |
| PI–139 | Star TV, USA General Representation |

68. Hakan Uzan appointed Luna his attorney in fact for the purchases of apartments # 40E and # 46B at 100 United Nations Plaza. *See* PI–45 (powers of attorney).

69. Flight logs indicate that Hakan Uzan has traveled to the United States on at least twenty-seven occasions between 1997 and 2002. *See* PT–175 (flight logs). In addition, Hakan Uzan admits that he has visited New York "approximately

three times each year since January 1, 1997" and has "spent a maximum of approximately six total days at the New York apartments during each visit since January 1, 1997." PT–454 (H. Uzan Decl. dated March 14, 2002) ¶ 186. Thus, by his own admission, Hakan Uzan has been in New York City approximately eighteen days a year since 1997. Hakan Uzan's Turkish passport indicates that he has entered the United States on nine occasions between 1999 and 2001. See PT–173 (passport log).

70. Hakan Uzan maintains a personal bank account with UBS New York. He has used this account to pay condominium fees and utility expenses associated with his New York property. See PT–143 (UBS letter to Hakan Uzan dated August 14, 2002 attaching bills); PT–164 (UBS transaction detail for Hakan Uzan dated January 1, 2001 to February 7, 2001).

71. Hakan Uzan has joint signature authority along with Cem Uzan and Akay over Kemal Uzan's UBS New York account. See PT–181 (account master agreement dated July 31, 1997); PT–183 (power of attorney).

72. Hakan Uzan also maintains personal bank accounts with the New York branches of JP Morgan Chase (formerly Chase Manhattan Bank) and HSBC USA. See PT–436 (Responses to MCC Requests to Admit) at Response Nos. 225, 227; PT–285 at Chase 0576, HBUS 00332.

73. Hakan Uzan maintains joint signatory authority with Cem Uzan and Akay over Rumeli Cimento's account with UBS New York. See PT–177 (Rumeli Cimento corporate resolutions); PT–180 (account opening dated July 21, 1997); PT–182 (account master agreement dated July 31, 1997).

74. Hakan Uzan maintains joint signatory authority with Cem Uzan and Akay over Telsim's account with UBS New York. See PT–185 (account master agreement dated March 9, 1998); PT–186 (power of attorney of March 20, 1998).

75. Hakan Uzan maintains joint signatory authority with Cem Uzan and Akay over Rumeli Telekom's account with UBS New York. See PT–191 (account master agreement dated August 26, 1998); PT–192 (commercial client profile dated September 25, 1998).

76. Hakan Uzan also transacts business extensively in New York and in other parts of the United States in his assorted roles with Rumeli Group companies. In 2001, Hakan Uzan filed and obtained a Non–Immigrant Visa for his role as Chairman of Rumeli Telecom, USA, which incorporated in New York in November 2000. See PI–44 (certificate of incorporation); C–49 (non-immigrant visa petition); see also PT–454 (H. Uzan Decl. dated March 14, 2002) ¶ 187; PT–459 (Hakan Uzan testimony at contempt hearing) at 105–108. In connection with this business endeavor, Rumeli Telecom leased office space on Park Avenue. See PT–459 (Hakan Uzan testimony at contempt hearing) at 104; see also PT–458 (Jeffrey Diamond testimony at PI hearing) at 228–229.

77. On numerous occasions, while working in the United States, Hakan Uzan contacted representatives of MCC in furtherance of the activities that are at issue in this case. For example, in an email to Edward Hughes dated December 27, 1999, relating to the loans here in issue, Hakan Uzan represented that he was "working" in New York and could be reached at his "home number" or his "New York mobile" number. See PI–83 (email dated December 27, 1999 from Hakan Uzan to Edward Hughes); see also PT–459 (Hakan Uzan testimony at contempt hearing) at 103.

78. Hakan Uzan met with MCC in New York on April 11, 2001 and, in order to forestall the possibility that MCC would

foreclose on the collateral, falsely represented to MCC that Telsim would take no action that would adversely affect MCC's ability to recover on its loans to Telsim. The Court finds that Hakan Uzan knew this representation was false when made, as shown by the overall fraudulent scheme described *infra* and also by the fact that less than two weeks later the Uzans, through Telsim and other entities they controlled, diluted the value of the collateral by two-thirds. *See* PT–458 (Edward Hughes testimony at PI hearing) at 80–81; *see also* PT–459 (Hakan Uzan testimony at contempt hearing) at 102–103.

Cem Uzan

79. As previously found, Cem Uzan does not contest personal jurisdiction over him. For example, as stated by his then attorney, Robert Serio, Esq., at the preliminary injunction hearing:

> Mr. Serio: Your Honor, if I might, Cem Uzan has not raised a personal jurisdiction defense, and so I wonder if these questions are relevant.
>
> Mr. Brown: I guess the issue is whether Cem Uzan consents to jurisdiction.
>
> The Court: I thought he had.
>
> Mr. Serio: Your Honor, we had not raised any personal jurisdiction defense in this case.
>
> The Court: With respect to him?
>
> Mr. Serio: With respect to Cem.
>
> The Court: So I take that to be de facto consent.
>
> Mr. Serio: We certainly assume it would be so taken.

PT–458 (transcript of PI hearing) at 796–97.

80. Cem Uzan owns the following real property in New York: 515 Park Ave. # 19, New York, New York 10022; 515 Park Ave. # 3K, New York, New York 10022; 515 Park Ave. Storage Unit 3K, New York, New York 10022; 100 United Nations Plaza # 29C, New York, New York 10017; 845 United Nations Plaza # 80B, New York, New York 10017. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 17, 18, 19, 20, 21; *see also* PT–447 (Cem Uzan Declaration in English proceeding) ¶ 4.

81. Cem Uzan's wife and children currently reside in the United States, as they did in 2001. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 22, 23; *see also* PT–459 (Hakan Uzan testimony at contempt hearing) at 92–93.

82. Cem Uzan's children currently attend school in New York, as they did in 2001. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 24, 25; *see also* PT–459 (Hakan Uzan testimony at contempt hearing) at 92–93.

83. Cem Uzan has possessed a New York Driver's License from 1998 to the present. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 197, 198.

84. In April 1999, Cem Uzan purchased apartments # 90A and # 90B at 845 United Nations Plaza, New York, New York, 10017, for a combined price of over $17 million. These apartments made up the top floor in the new Trump World Tower (Hakan Uzan purchased the second highest floor for $14 million). Between April 1999 and October 2001, Cem Uzan paid over $3 million toward the purchase of the apartments. *See* PT–380 (purchase agreement for # 90B); PT–386 (purchase agreement for # 90A); PT–435 (Samuel Report) at 95–97 (describing payments).

85. In October 2001, Cem Uzan refused to close on the Trump World Tower apartments. He and Hakan Uzan then availed themselves of New York courts by bringing an action attempting to rescind the purchase agreements and to recover their down payments. In their complaint

in that action, Cem Uzan asserted that he maintained residences in the County, City, and State of New York. *See* PI–102 (Complaint, *Cem and Hakan Uzan v. 845 UN Plaza Partnership* ).

86. Cem Uzan has been represented by the New York law firm MRD in New York real estate transactions and other personal matters. The following is a summary of matters on which MRD performed work for Cem Uzan, as demonstrated by MRD billing records:

| Exhibit | Client Matter |
| --- | --- |
| PI–126 | Cem and Hakan Uzan v. 845 UN Plaza Partnership |
| PI–128 | Cem Uzan Purchase of Connecticut House |
| PI–131 | Trump World Tower Apartment Purchase |
| PI–133 | Cem Uzan Purchases at 515 Park Ave. |
| PI–137 | Cem and Hakan Uzan Contract Rescission |
| PI–139 | Star TV, USA General Representation |

87. Cem Uzan has recorded powers of attorney with New York County in connection with his real estate purchases. For example, he appointed Diamond and Marcus his attorneys in fact for the purchases of apartments at 515 Park Avenue. *See* PI–46 (power of attorney).

88. Flight logs indicate that Cem Uzan has traveled to the United States on at least twenty-six occasions between 1997 and 2002. *See* PT–175 (flight logs). Cem Uzan's passport shows that he has entered the United States on at least eleven occasions between 2000 and 2002. *See* PT–173 (passport log).

89. Cem Uzan has maintained a personal bank account with UBS New York. *See* PT–170 (Cem Uzan account statement for period dated April 1, 1996 to April 30, 1996).

90. Cem Uzan has joint signature authority along with Hakan Uzan and Akay over Kemal Uzan's UBS New York account. *See* PT–181 (account master agreement dated July 31, 1997); PT–183 (power of attorney).

91. Cem Uzan also maintains personal bank accounts for himself and his wife with the New York branch of HSBC USA. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 225; PT–285 (bank statement) at HBUS 378–505.

92. Cem Uzan maintains joint signatory authority with Hakan Uzan and Akay over Rumeli Cimento's account with UBS New York. *See* PT–177 (account signatories dated December 15, 1992); PT–180 (account opening dated July 21, 1997); PT–182 (account master agreement dated July 31, 1997).

93. Cem Uzan maintains joint signatory authority with Hakan Uzan and Akay over Telsim's account with UBS New York. *See* PT–185 (account master agreement dated March 9, 1998); PT–186 (power of attorney dated March 20, 1998).

94. Cem Uzan maintains joint signatory authority with Hakan Uzan and Akay over Rumeli Telekom's account with UBS New York. *See* PT–191 (account master agreement dated August 26, 1998); PT–192 (commercial client profile dated September 25, 1998).

95. Cem Uzan also transacts business extensively in New York and in other parts of the United States in his assorted roles with Rumeli Group companies. For example, Cem Uzan oversees the business of Star Newspaper, USA and Star Television USA, both of which are incorporated in New York. *See* PI–44 (incorporation documents). Cem Uzan directed the law firm of MRD to form these companies.

*See* PT–458 (Jeffrey Diamond testimony at PI hearing) at 214. He employed a personal assistant in New York, Nil Erbil, who worked at Cem Uzan's direction on these matters and others. *See id.* at 214–15. These entities also negotiated a lease for office space on Park Avenue. *See id.* at 228–229.

Melahat Uzan

96. Melahat Uzan owns real property in New York at 100 United Nations Plaza # 23B, New York, New York, and 100 United Nations Plaza # 26A, New York, New York. She has owned # 23B since July 1996. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 27, 28; PT–220 (power of attorney for # 23B); PT–221 (contract for sale of # 23B); PT–223 (checks for Melahat Uzan purchase of # 23B); *see also* PT–451 (Declaration of Melahat Uzan dated March 14, 2002 ("M. Uzan Decl.")) at ¶ 2.

97. Melahat Uzan has collected rent on one or more of her properties in New York. For example, she rented # 23B to Luna following water damage in his apartment in 1999. *See infra.* She admits to having purchased the apartment as an investment. *See* PT–451 (M. Uzan Decl.) ¶ 2.

98. Melahat Uzan has held a New York driver's license at some time between April 24, 1998 and now. The license listed her address as 100 United Nations Plaza # 45A, New York, New York. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 200; PI–43 (license information).

99. Melahat Uzan was represented by the New York law firm MRD in her purchase of 100 United Nations Plaza # 23B. *See* PI–138 (MRD billing records for # 23B); PT–224 (letter from Jeffrey Diamond attaching deed to # 23B).

100. Melahat Uzan's passport indicates she has entered the United States at least ten times since 1997, nearly always in New York. *See* PT–173 (passport log); PT–219 (Melahat Uzan passports). In addition, she admits to having visited New York approximately four times each year since January 1, 1997 and having spent a maximum of approximately ten days in New York during each such visit. *See* PT–451 (M. Uzan Decl.) ¶ 3. Thus, by her admission, she has spent approximately forty days in New York each year since 1997. In addition, she states that she has visited the United States (other than New York) five times since January 1, 1997. *Id.* ¶ 9.

101. Melahat Uzan maintains a personal bank account at JP Morgan Chase (formerly Chase Manhattan Bank) in trust for Akay. *See* PT–285 (bank statement) at Chase 0107. *See also* PT–451 (M. Uzan Decl.) ¶ 8.

102. Melahat Uzan is listed as a founder of Rumeli Cimento on that corporation's 1992 charter and the registration form for the charter. Rumeli Cimento transacts business in New York through its UBS account. *See* PT–176 (Rumeli Cimento charter agreement); PT–178 (Rumeli Cimento registration of charter); PT–180 (Rumeli Cimento UBS account opening).

Aysegul Akay

103. Aysegul Akay's passport indicates that she has entered the United States on at least four occasions since 1997, always in New York. *See* PT–173 (passport log). She admits to having visited New York "approximately two times each year since 1997" and to having spent a "maximum of approximately ten days in New York" during each such visit. PT–452 (Declaration of Aysegul Akay dated March 14, 2002) ¶ 3. In addition, she states that she has visited the United States (other than New York) four times since January 1, 1997. *See id.* ¶ 8.

104. A sales agent for 845 United Nations Plaza swore under oath that Akay purchased one of the Trump World Tower apartments. *See* C–112 (Summary Judgment Motion and Affidavit of Sherry Tobak dated December 27, 2001).

105. Akay transacts business for the Rumeli Group companies through their New York bank accounts. On nearly all such accounts, she has signatory authority.

106. Akay maintains joint signatory authority with Hakan Uzan and Cem Uzan over Rumeli Cimento's account with UBS New York. *See* PT–177 (account signatories dated December 15, 1992); PT–180 (account opening dated July 21, 1997); PT–182 (account master agreement dated July 31, 1997).

107. Akay maintains joint signatory authority with Hakan Uzan and Cem Uzan on Telsim's account with UBS New York. *See* PT–185 (account master agreement dated March 9, 1998); PT–186 (power of attorney dated March 20, 1998).

108. Akay maintains joint signatory authority with Hakan Uzan and Cem Uzan on Rumeli Telekom's account with UBS New York. *See* PT–191 (account master agreement dated August 26, 1998); PT–192 (commercial client profile dated September 25, 1998).

109. Akay maintains joint signatory authority with Hakan Uzan and Cem Uzan on Kemal Uzan's personal account with UBS New York. *See* PT–181 (Kemal Uzan account master agreement dated July 31, 1997).

Antonio Luna Betancourt

110. Luna owns the following real property in New York: 100 United Nations # 40E, New York, New York 10017; 845 United Nations Plaza # 59C, New York, New York 10017; 845 United Nations Plaza # 59D, New York, New York 10017. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 39; PT–381 (Luna purchase agreement for # 59C); PT–382 (Luna purchase agreement for # 59D); C–50 (deed for # 59C); PT–450 (Declaration of Luna dated March 14, 2002 ("Luna Decl.")) ¶ 2. He has stated that he bought these apartments primarily as an investment. *See* PT–450 (Luna Decl.) ¶ 2.

111. The purchase price of $2.36 million was funded by the Rumeli Group with monies Luna purportedly received from his "employment within the Rumeli Group." *Id.; see also* PT–458 (Jeffrey Diamond testimony at PI hearing) at 207–08, 211–12. The money was wired by the Rumeli Group to MRD's Citibank account in New York. *See* PT–458 (Jeffrey Diamond testimony at PI hearing) at 207–08, 211–12.

112. In 1999, Luna was residing with his family at 100 United Nations Plaza in Apartment # 40E (which he owns) when that apartment suffered water damage due to a leak from the floor above. While the apartment was repaired, Luna paid rent to Melahat Uzan and moved his family to her apartment (# 23B) in the same building. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 40, 41; C–109 (lease from Melahat Uzan to Luna).

113. Luna was represented by MRD in the dispute over payment for the water damage in his apartment in 1999. According to an MRD letter regarding this dispute, "Mr. Luna and his family were forced to move out of the apartment for six months, and considerable time and money [was] spent to repair the apartment and replace their belongings." In addition, MRD represented Luna in his purchase of Apartments # 59C and # 59D in the Trump World Tower at 845 United Nations Plaza. *See* PI–132 (billing records for water damage); C–110 (letter dated

January 10, 2000 from MRD to Hon. Mohammed Samhan); PI–135 (billing records for purchase of #59C and #59D).

114. Luna holds a New York Driver's license. *See* C–43 (Luna's driver's license).

115. Hakan Uzan appointed Luna as his attorney in fact to coordinate and complete the purchases of Apartments #40E and #46B at 100 United Nations Plaza. *See* PI–45 (powers of attorney).

116. Luna maintains bank accounts with the New York branches of UBS, JP Morgan Chase (formerly Chase Manhattan Bank), and HSBC USA. *See* PT–450 (Luna Decl.) ¶6; PT–156, 157 (Luna UBS client visit reports); PT–285 (Luna bank statement) at Chase 0693; PT–285 (HSBC transaction report) at HBUS 01054. He has used funds from the Chase account to pay for condominium fees and other expenses related to his property in New York. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 225, 227–28; PT–153 (UBS client visit report dated August 14, 2001); PT–19 (Luna check from Chase account); PT–285 (bank statement) at HBUS 01054.

117. Luna has frequently been in contact with representatives of UBS New York to carry out transactions for himself and the Uzans. The following table describes these contacts as reported in UBS Client Visit Reports/Call Reports:

| Exhibit | Description |
| --- | --- |
| PT–153 | Meeting in New York 8/14/01 |
| PT–154 | Cash Withdrawal 8/14/01 |
| PT–155 | Cash Withdrawal 4/20/01 |
| PT–156 | Meeting in New York 4/12/01 |
| PT–157 | Meeting in New York 2/9/01 |
| PT–158 | Meeting in New York 11/28/00 |
| PT–159 | Meeting 3/4/99 |
| PT–160 | Telephone Conference 8/16/00 |

118. Luna facilitated the purchase of an aircraft for the Uzans from Bombardier through accounts at UBS, receiving a "substantial payment" as a commission. *See* PT–156 (client visit report dated April 12, 2001); PT–153 (client visit report dated August 14, 2001).

119. Luna has been issued passports by a number of countries, including Italy, Monaco, and Mexico. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 202–05.

120. Luna has stated that he has visited New York "approximately six times each year since January 1, 1997" and has spent "a maximum of approximately eight days in New York during each visit since January 1, 1997." PT–450 (Luna Decl.) ¶3. Thus, by his own admission, he has spent approximately forty-eight days in New York each year since 1997. In addition, he states: "[o]ther than New York, [he has] visited the United States twenty times since January 1, 1997." *Id.* at ¶7.

121. Luna has stated that he holds positions as "an officer" of the New York companies of Star TV and Rumeli USA and that he has conducted meetings for these corporations in New York in his official capacity. *Id.* at ¶4.

122. Luna participated in negotiations between Telsim and MCC in December 1999 in Chicago that led to the Seventh Amendment, one of the financing agreements involved in this case. *See* PT–458 (Edward Hughes testimony at PI hearing) at 35.

123. Personal jurisdiction over the corporate defendants exists because they were, as detailed below, totally controlled by the Uzan defendants with respect to the transactions here in issue. In addition,

further findings regarding jurisdiction over these entities is set forth *infra.*

**Joint Control and Foundation for Civil Conspiracy**

124. The Uzan defendants, directly or indirectly, own or control more than 130 active companies, including two holding companies—Rumeli Holding A.S. ("Rumeli Holding") and Prime Holding A.S.—as well as companies in the banking, cement, electricity, television, radio, newspaper, printing, insurance, construction, trade, jewelry, telecommunications, Internet, and sports industries. *See* PT–232 (Rumeli Holding Annual Report) at 12; PT–458 (Edward Hughes testimony at PI hearing) at 58–59; Answer ¶ 23; PT–325 (list of contact information for Uzan-controlled companies provided to UBS, with 62 different companies listed).

125. Specifically, the Uzan family directly or indirectly owns a majority interest in and controls the following companies:

Adabank AS (PT–232 at 9)

Adanaspor Spor Faaliyetleri AS (PT–232 at 9)

Alloy Aircraft Co., Ltd. (PT–403; PT–449)

Alpha International Co. Ltd. (PT–435, Appendix 4 at 8)

Altintas Altin ve Muceveherat (PT–437 at 16)

Ant Gazetecilik (PT–232 at 8)

Aysan Anadolu Yay Sanayi AS (PT–232 at 9)

Banko Musik AS (PT–232 at 9)

Bartin Cimento Sanayii Turk (PT–437 at 113)

Basintas Anadolu Basin Endustrisi (PT–437 at 63)

Beta Insaat ve Ticaret (PT–437 at 73)

Beyaz Basin Sanayi ve Ticaret AS (PT–437 at 84)

Bilgi Bilgisayar Ticaret AS (PT–437 at 62)

Birlesik Insaat Ticaret AS (PT–437 at 49)

Bis Organizasyon ve Menajerlik Ticaret AS (PT–437 at 253)

Brampton N.V. (PT–435 at app. 4, 7; PT–307; PT–341; PT–344; PT–348)

Brampton Holdings and Investment N.V. (PT–435, Appendix 4, at 1; PT–303; PT–340; PT–341; PT–344; PT–442 at 105, 107, 110 (Thomas Brunner Deposition))

BVS Bira Viski Su Sanayi (PT–437 at 174)

Cementownia Nowa Huta (Poland) (PT–232 at 9)

Clear Cut Ltd. (PT–435, Appendix 4, at 15)

Corfez Cimento ve Hazir Beton Sanayi ve Ticaret (PT–437 at 256)

Cukurova Elektrik AS (PT–437 at 271)

Demas Demir Mamulleri AS (PT–232 at 9)

Dogan Kardes Matbaacilik (PT–437 at 154)

Edime Lalapasa Cimento (PT–232 at 9)

EMS Management Systems AG (PT–156; PT–311; PT–400; PT–405)

ERI Ltd. (PT–435, Appendix 4, at 16)

Ergani Cimento (PT–232 at 9)

Filpark Internet Hzm (PT–437 at 238)

Gaziantep Cimento Sanayii Turk (PT–437 at 138)

Grup Medya Reklamcilik ve Filmcilik (PT–437 at 95)

Gumushane Cimento Sanayii (PT–437 at 83)

Hawk Aviation Ltd. (PT–366; PT–367; PT–435, Appendix 4, at 16; PT–468)

Hurriyet International GMBH (PT–232 at 8)

Imar Bank (PT–437 at 314)

Imar Bank Offshore Ltd. (PT–433 at T0004605)

Imar Finansal Kiralama (PT–437 at 67)

Incidentally Ltd. (PT–435, Appendix 4, at 14–15)

Inter Televizyon Servisleri (PT–437 at 288)

Isaac Ltd. (PT–435, Appendix 4, at 14)

Istanbulspor Spor Faaliyetleri AS (PT–232 at 9)

Jordan Public Payphones (PT–435, Appendix 4 at 9–10)

Joy FM (PT–232 at 8)

Kepez Elektrik (PT–437 at 318)

Keps Kurumsal Telekom Hzm (PT–437 at 313)

Kingsbury Holding and Investment N.V. (PT–435, Appendix 4 at 6–7; PT–304; PT–336)

Klasik Insaat ve Ticaret (PT–437 at 124)

Klavama B.V. (PT–435, Appendix 4 at 16)

Kral FM (PT–232 at 8)

Kral TV (PT–232 at 8)

Kristal Insaat ve Ticaret (PT–437 at 130)

Kutup Produksiyon ve Filmcilik AS (PT–232 at 9)

Ledranet Operations Ltd., Internet Services/Kibrisbee (PT–232 at 8)

Lismas Liman Isletmeleri AS (PT–232 at 9)

Lokum FM (PT–232 at 8)

Mavi Reklamcilik AS (PT–232 at 9)

Mavi Turizm Yatirimlari Ticaret AS (PT–437 at 218)

Media Print Basim Ticaret AS (PT–437 at 48)

Medya Park Yayincilik Sanayi AS (PT–437 at 209)

Merkez Cimento Terminali Isletmeleri (PT–437 at 170)

Merkez Hazir Beton Imalat (PT–437 at 57)

Merkez Kagit Torba (PT–437 at 54)

Merkez Nakliyat (PT–232 at 9)

Merkez Yatirim ve Ticaret (PT–437 at 100)

Metas Izmir Metalurji (PT–232 at 9)

Metro FM (PT–232 at 8)

Netbul Internet Hzm ve Pazarlama Ticaret AS (PT–437 at 311)

O2 Oksijen Teknoloji Gelistirme ve Bilism Sis (PT–437 at 213)

Pal Produksiyon Hzm (PT–437 at 155)

Pamukova Telekom (PT–437 at 5)

Park Medya Reklancilik (PT–232 at 9)

Park Reclamcilik Filmcilik ve Pazarlama (PT–437 at 87)

Prime Holding AS (PT–437 at 183)

Polaris Produksiyon ve Filmcilik AS (PT–232 at 9)

Profil Insaat ve Ticaret AS (PT–437 at 246)

R.T. Net Internet Hzm ve Pazarlama Ticaret AS (PT–437 at 304)

Radio Blue (PT–232 at 8)

Ritmo Latino (PT–232 at 8)

Rumeli Bank, Ltd. (PT–232 at 9)

Rumeli Celik Sanayi AS (PT–437 at 264)

Rumeli Cimento Ihracat (PT–437 at 11)

Rumeli Cimento Sanayi ve Ticaret (PT–437 at 96)

Rumeli Cimento Terminali Sanayi (PT–437 at 156)

Rumeli Elektrik (PT–437 at 160)

Rumeli Finansal Hizmetleri AS (PT–232 at 9)

Rumeli Hava Tasimacilik ve Isletmecilik (PT–437 at 169)

Rumeli Hayat Sigorta AS (PT–437 at 250)

Rumeli Holding (PT–437 at 212)

Rumeli Metal (PT–437 at 151)

Rumeli Sigorta (PT–437 at 150)

Rumeli Tanitim (PT–437 at 136)

Rumeli Teknik Komunikasyon Hzm AS (PT–437 at 10)

Rumeli Telefon (PT–437 at 1)

Rumeli Telekom (PT–437 at 193)

Rumeli Telekom Artel Azerbaijan Data Services (PT–232 at 8)

Rumeli Telekom Atkif Kablo A.S. (PT–232 at 8)

Rumeli Telekom JPPS/Jordan Pay-Phone Services (PT–232 at 8)

Rumeli Telekom Webbee Internet Services (PT–232 at 8)

Rumeli Yazilim (PT–437 at 34)

Sanal Icerik Iletism Hzm Ticaret AS (PT–437 at 308)

Sanart Produksiyon Yapim Ticaret (PT–437 at 145)

Sanliurfa Cimento Sanayii Turk (PT–437 at 147)

Silikon Grafik Tanitim AS (PT–232 at 9)

Simetri Cimento (PT–437 at 225)

Simetri Elektrik Yatirimi (PT–437 at 221)

Simetri Hava Yollari Yatirim (PT–437 at 234)

Simetri Holding (PT–437 at 230)

Simetri Insaat (PT–437 at 236)

Sistem Direk Pazarlama (PT–437 at 197)

Sistem Ticaret ve Insaat (PT–437 at 120)

Standart Aluminyum Sanayi AS (PT–437 at 262)

Standart Beton Sanayi AS (PT–437 at 29)

Standart Cimento Sanayi AS (PT–437 at 19)

Standart Elektrik Sanayi AS (PT–437 at 23)

Standart Holding AS (PT–437 at 38)

Standart Insaat ve Ticaret (PT–437 at 163)

Standart Metal Sanayi AS (PT–437 at 26)

Standart Pazarlama AS (PT–437 at 301)

Standart Telekom (PT–437 at 205)

Star Digital (PT–232 at 8)

Star Digital Interactif (PT–437 at 201)

Star Telekom (PT–437 at 244)

Star Televizyon Hzm AS (PT–437 at 294)

Super FM (PT–232 at 8)

Super Musik AS (PT–232 at 9)

Teknik Yapi AS (PT–437 at 167)

Telsim Cagri Hzm (PT–437 at 77)

Telsim Mobil Telekomunikasyon (PT–437 at 273)

Ticaret Unvani Ladik Cimento (PT–437 at 107)

Toros Insaat Sanayi ve Yatirim (PT–437 at 259)

Turizm Endustrisi Yatirim (PT–437 at 69)

Ultra Filmcilik ve Raklamcilik Sanayi ve Ticaret AS (PT–437 at 281)

Ulus Factoring AS (PT–437 at 251)

Unitel Telefon Pazarlama AS (PT–437 at 269)

Utterton Ltd. (PT–435, Appendix 4, at 10)

Van Cimento Sanayii (PT–437 at 104)

Wisteria Bay Ltd. (PT–435, Appendix 4, at 13)

Yapi ve Ticaret (PT–123, PT–124, PT–134, PT–146, PT–147, PT–148, PT–168)

126. Kemal Uzan currently owns shares in at least fifty-seven of these companies; Cem Uzan currently owns shares in at least sixty-nine of them; Akay currently owns shares in at least sixty-two of them; Melahat Uzan currently owns shares in at least forty-two of them; and Hakan Uzan currently owns shares in at least seventy-four of them.

127. Rumeli Holding, established by Kemal Uzan (its chairman) and in which each member of the Uzan family owns shares, is the primary corporate entity through which the Uzans conduct their business. By the mid–1990s, Rumeli Holding had grown into a major Turkish conglomerate, with dozens of subsidiary companies, all of which are controlled by the Uzans. *See* PT–232 (Rumeli Holding Annual Report) at 8–9; Answer ¶ 24; PT–437 (index of Turkish companies).

128. Rumeli Holding is comprised of "six fundamental core sectors": the Energy Sector; the Communications Sector; the Media and Entertainment Sector; the Industrial Sector; the Finance Sector; and the Investment Sector. PT–232 (Rumeli Holding Annual Report) at 8–9, 12.

129. The Rumeli Holding Annual Report describes the structure of Rumeli Holding as follows:

> The different sectors have various groups under them, which are either directly or indirectly owned by the various companies in their respective sectors. Although Rumeli Holding does not have a direct holding ownership structure, the companies under the various sectors are either owned by the leading sector company or by the family shareholders. Essentially, Rumeli Holding and all of its companies are a family owned group of companies. A few of the core companies are publicly traded and the family owns the controlling majority in all the companies ranging from 85% in the publicly traded companies to 100% in the non-traded companies.

PT–232 (Rumeli Holding Annual Report) at 12; *id.* (list of companies covered by report) at 8–9.

130. Kemal Uzan, the father, still exercises an overall control of the Rumeli Group of companies and few significant decisions are made without his involvement or consent. As Thomas Brunner, the Uzans' personal banker at UBS, testified: "I believe all those [Uzan companies] are somehow within the Rumeli Holding, which is controlled in essence by the family patriarch, Mr. Kemal Uzan." *See* PT–442 (Thomas Brunner Deposition) at 27, 56 (testifying that Kemal Uzan discussed Telsim's performance with Brunner and that Brunner understood that Kemal Uzan ultimately controlled Telsim).

131. Kemal Uzan's sons, Cem and Hakan, are responsible for the day-to-day management of many of the family's companies. Cem Uzan, for instance, is responsible for the family's media and energy interests, *see* PT–436 (Responses to MCC Requests to Admit) at Response No. 60; PT–47 (Risk Advisory Report describing Uzan family structure) at ML241, while Hakan Uzan is responsible for the family's telecommunications businesses, *see* PT–436 (Responses to MCC Requests to Admit) at Response No. 59; PI–33 (Rumeli Telefon board resolution); PT–233 (Telsim marketing brochure); PT–459 (Hakan Uzan testimony at contempt hearing) at 4.

132. In addition, defendant Akay holds or has held various officer and director positions within the Uzans' business empire, *see* PI–26 (Rumeli Telefon board resolution); PI–29 (Standart Telekom articles of incorporation); PI–30 (Telsim board of directors resolution); PT–178 (Rumeli Cimento charter); PT–186 (UBS power of attorney for Telsim), and defendant Melahat Uzan is listed as a founder of Rumeli Cimento, one of the Uzans' key companies, and was an initial shareholder of Rumeli Telekom, *see* PT–176; PT–178; PT–179.

133. Defendant Luna has extensive involvement with the Uzans' family businesses and serves as the Uzans' prime

assistant. *See* PT–151 (handwritten notes on Luna as assistant); PT–458 (Fatih Azami testimony at PI hearing) at 803. Luna carries a business card with the title "Director International" of Rumeli Group, which lists a Telsim email address, and he was present at Telsim's business meetings with MCC. *See* PT–458 (Edward Hughes testimony at PI hearing) at 10–11; C–137 (Luna business card); PT–1135 (Luna letter to Nokia). Luna also serves as a director of many "offshore" companies owned by the Uzans, including Hawk Aviation, EMS, and Novabrands, *see* PT–468 (listing of Hawk Aviation directors); PT–311 (power of attorney for EMS); PT–361 (Dun & Bradstreet report for EMS); PT–305 (Curacao Commercial Register report for Novabrands), and is an officer of Star TV and Rumeli USA, American corporations funded by the Uzans, *see* PT–450 (Luna Decl.) ¶¶ 2–4.

Joint–Decision Making and Control by the Uzan Family

134. The Uzan family jointly runs the various companies that it owns and controls. Indeed, the family—defendants Kemal Uzan, Melahat Uzan, Hakan Uzan, Cem Uzan, and Aysegul Akay—gathers regularly to discuss their business affairs and to make business decisions. *See* PT–458 (Edward Hughes testimony at PI hearing) at 59. As Edward Hughes testified:

> [Hakan Uzan] told us that the family was very close and that they would run all the businesses, and he said, I think it was every Sunday or Friday, I'm not sure now, they would have a dinner as a family and during dinner and after dinner they would review the financials and business decisions of all of their companies. He said deals that were made between them as a family were signed with MOUs between themselves to guarantee what was agreed on.

PT–458 (Edward Hughes testimony at PI hearing) at 59.

135. Similarly, Ernst Kramer stated that business decisions concerning Uzan-controlled companies were made by the Uzans "in Sunday evening dinners between members of the family." PT–458 (Ernst Kramer testimony at PI hearing) at 423. Mr. Kramer relayed the following description of these dinners as conveyed to him by Hakan Uzan:

> It was at the house of the parents. So Kemal was there, his wife would participate, and Cem and Hakan, and the sister will participate if available as well. It was stated that it was, you should have a highly valid reason that you could not be at that dinner meeting.

PT–458 (Ernst Kramer testimony at PI hearing) at 423.

136. In dealing with MCC, Hakan Uzan was the principal negotiator for Telsim, but he made "constant" phone calls to Cem Uzan to get his input. Kemal Uzan also took an active role in the negotiations, securing a $300 million loan from UBS toward Telsim's purchase of a GSM license from the Turkish government. Major decisions regarding Telsim, such as the decision to sell part of the company, also required Kemal Uzan's approval. *See* PT–458 (Edward Hughes testimony at PI hearing) at 10–11, 27–29, 58–59; *see also* PT–458 (Edward Hughes testimony at PI hearing) at 10–11; PT–131 (UBS loan commitment report); PT–436 (Responses to MCC Requests to Admit) at Response Nos. 220, 221, 222.

137. In dealing with Nokia, Hakan Uzan was the principal negotiator; however, "he made it clear that [a Telsim business decision] was a family decision." Hakan Uzan would frequently leave negotiations to discuss a particular issue with Cem Uzan, while major business decisions

(such as a Telsim share pledge) required Kemal Uzan's approval. Hakan Uzan also would frequently make telephone calls to Cem Uzan during the course of negotiations to consult with him. *See* PT–458 (Ernst Kramer testimony from PI hearing) at 420–23; PT–1193 (Declaration of Ernst Kramer dated January 28, 2002 ("Kramer Decl. dated January 28, 2002")) ¶ 7.

138. Merrill Lynch, which served as Telsim's financial advisor during a large part of the period here relevant, recognized that all major decisions required the agreement of Hakan, Cem, and Kemal Uzan. *See* PT–445 (Paul Raphael Deposition) at 29; PT–444 (Sean Carney Deposition) at 13–14. Representatives of Chase Bank, working on a possible high yield debt bond issuance for Telsim, realized that although primary responsibility for the day-to-day operations of the company rested with Hakan Uzan, Kemal Uzan and other members of the Uzan family still had a significant interest in the company. *See* PT–443 (Nikola Sutherland Deposition) at 54–55.

Family Control Over Relevant Companies

139. As a general matter, the Uzans ensure family control of the companies in their enterprise by appointing members of their family to positions on the boards of directors of these companies. As described by Hakan Uzan:

> [The board of directors is] an honorary position, your Honor. The board of directors of the company doesn't really do any day-to-day work. It's just an honorary position. And instead of putting somebody who is not from the family, we put family members there.

PT–459 (Hakan Uzan testimony at contempt hearing) at 9, 11.

140. Members of the board rubber stamp the joint decisions made by the family. As Hakan Uzan testified:

> I mean, for example, I am on the board of directors [of Telsim], the chairman. I will ask our lawyers or our in-house people who do these things to draft up, and then I will ask my sister or whoever is on the board to sign it, and they will sign it because I am putting it in front of them.
>
> . . . .
>
> My sister will do whatever I show her and ask her to do. She is just there [on the board of directors] as a name. It can be any other name. I can change and put any other person there for that matter, so it's not—it doesn't have to be my sister.

PT–459 (Hakan Uzan testimony at contempt hearing) at 9, 11.

141. Moreover, Hakan Uzan testified at the contempt hearing that corporate formalities are not followed with respect to the keeping of the books and records of the company. He stated that even if Telsim's shareholders or board of directors were to take action with respect to Telsim's stock, such action could not be carried out because he keeps Telsim's books and records in his personal possession. *See* PT–459 (Hakan Uzan testimony at contempt hearing) at 30.

Telsim

142. Telsim, an Uzan-controlled company, is the second largest supplier of cellular phone service in Turkey. A majority (over 99%) of Telsim is owned by the following Uzan-owned companies: Standart Telekom (66.48%); Rumeli Telefon (24.54%); Rumeli Holding (7.33%); Rumeli Elektrik (0.87%); and Pamukova Telekom (0.34%). *See* PI–36 (Telsim shareholder meeting report dated April 24, 2001).

143. Kemal Uzan was the President and Chairman of Telsim as of January 25, 2002. *See* PI–459 (Hakan Uzan testimony

at contempt hearing) at 13. Cem Uzan is a director and Vice President of Telsim. Akay is a director of Telsim. Hakan Uzan is a director, Chief Executive Officer ("CEO"), and chair of the Executive Committee of Telsim, and also primarily responsible for the day-to-day operations of the company. Although Luna has no known title, he carries a business card with a Telsim email address and was involved in Telsim's negotiations with MCC. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 58, 59, 60, 61, 68; PT–458 (Edward Hughes testimony at PI hearing) at 10–11; *see also* PI–36 (Telsim shareholder meeting report dated April 24, 2001); PT–459 (Hakan Uzan testimony at contempt hearing testimony) at 4.

144. Defendants have not materially disputed that the Uzan family controlled the affairs of Telsim at all relevant times.

145. On August 22, 1997, Cem Uzan, Hakan Uzan, and Akay all participated in a Telsim board meeting during which a capital increase was approved, financial statements were reviewed, and Cem Uzan, Hakan Uzan, and Akay were reelected to Telsim's board. *See* PT–184 (Telsim board minutes).

146. On April 22, 1998, Cem Uzan, Hakan Uzan, and Akay participated in and signed Telsim board resolutions authorizing the original Equipment Financing and Security Agreement ("Equipment Financing Agreement") and the Share Pledge Agreement with MCC, and authorizing the certification of shares to comply with the Share Pledge Agreement. *See* PT–188, 189, 190 (Telsim board resolutions).

147. On July 13, 1999, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in board decisions authorizing an increase of the financing under the Equipment Financing Agreement with MCC from $360 million to $590 million and in-creasing Telsim's guarantee of the Kar–Tel loan. *See* PT–193, 194 (Telsim board resolutions).

148. On October 11, 1999, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in an annual shareholders meeting where the officers and board members of Telsim were elected. At that meeting, Kemal Uzan, Cem Uzan, Hakan Uzan, Akay, and Yavuz Uzan were elected to the Telsim board. *See* PT–196 (Telsim shareholders meeting minutes).

149. On October 18, 1999, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in a board meeting during which Telsim granted signatory authority to Kemal Uzan, Cem Uzan, and Hakan Uzan. *See* PT–197 (Telsim board minutes).

150. On November 30, 1999, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed the Telsim board approval of the Fifth Amendment to the Equipment Financing Agreement, the Second Amendment to the License Financing and Security Agreement ("License Financing Agreement"), and the renewal of the Kar–Tel facility. *See* PT–198, 199 (Telsim board resolutions).

151. On January 20, 2000, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed the Telsim board approval of the Seventh Amendment to the Equipment Financing Agreement and voted to approve the certification of Telsim stock so that Rumeli Telefon could comply with the increase of the shares pledge to MCC from 51% to 66% of Telsim's stock. *See* PT–200 (Telsim board resolution); PI–31, 32 (Telsim board resolutions).

152. On March 8, 2000, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed a Telsim board decision approving the ABN–AMRO Bank, N.V. ("ABN–AMRO Bank") share pledge agreement with Nokia, and approving the

pledge of over 646,200 shares of Telsim stock to ABN–AMRO Bank. *See* PT–205 (Telsim board decision); PT–10031 (Telsim board decision).

153. On May 22, 2000, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed Telsim board resolutions approving the issuance of provisional share certificates in connection with the share pledge to Nokia and approving a share pledge agreement with ABN–AMRO Bank. *See* PT–209 (Telsim board resolutions); PT–210 (Telsim board resolutions); PT–1004M (Telsim board resolution).

154. On July 24, 2000, Kemal Uzan, Cem Uzan and Hakan Uzan participated in a Telsim board decision approving new agreements with MCC regarding Telsim's guarantee of the Kar–Tel facility. *See* PT–230 (Telsim board resolution).

155. On September 29, 2000, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed a Telsim board resolution approving the Eighth Amendment to the Equipment Financing Agreement, authorized Hakan Uzan to sign the agreement, and affirmed Telsim's guarantee of the Kar–Tel loan. *See* PI–34 (Telsim board resolutions); PI–35 (Telsim board resolutions).

156. On March 27, 2001, Cem Uzan, Hakan Uzan, and Akay participated in a board resolution designating the persons authorized to sign documents on Telsim's behalf. *See* PT–215 (Telsim board resolution).

157. On April 25, 2001, Cem Uzan, Hakan Uzan, and Akay participated in and signed a board resolution authorizing an increase in Telsim's capital and the exercise of preferential rights in a deliberate effort to dilute and eviscerate the collateral shares pledged to MCC and Nokia. *See* PT–216 (Telsim board resolution).

**Rumeli Telefon**

158. Rumeli Telefon, which held a majority of Telsim when Telsim was incorporated, and continued to hold a majority of Telsim's stock until the April 24, 2001 dilution meeting, also is controlled by the Uzans. Ninety-six percent of Rumeli Telefon's stock is owned by Kemal Uzan (24%), Hakan Uzan (24%), Cem Uzan (24%), and Akay (24%). *See* C–145 (Turkish Trade Register Gazette article dated May 18, 1993); PT–436 (Responses to MCC Requests to Admit) at Response Nos. 124–28.

159. Hakan Uzan, as Vice Chair and CEO of Rumeli Telefon, signed the Equipment Financing Agreement, the Share Pledge Agreement and the amendments thereto on its behalf. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 76, 86.

160. The Rumeli Telefon articles of incorporation were approved and signed by Kemal, Cem and Hakan Uzan. *See* PT–226 (Rumeli Telefon articles of incorporation).

161. Rumeli Telefon corporate documents during the relevant time period show that the Uzan family was collectively responsible for its business decisions in this case.

162. For example, on April 20, 1998, Hakan Uzan and Akay participated in Rumeli Telefon board resolutions that authorized the pledge of shares to MCC in connection with the Equipment Financing Agreement and authorized Hakan Uzan to execute the Share Pledge Agreement on behalf of Rumeli Telefon. *See* PI–26 (Rumeli Telefon board resolution); PI–27 (Rumeli Holding board resolution).

163. On September 30, 1999, Cem Uzan, Hakan Uzan and Akay participated in the Rumeli Telefon shareholders meeting during which they elected themselves to the board of directors. *See* PT–195

(Rumeli Telefon shareholder meeting minutes).

164. On January 20, 2000, Cem Uzan, Hakan Uzan, and Akay participated in and signed Rumeli Telefon board resolutions to increase Rumeli Telefon's share pledge in connection with the Seventh Amendment to the Equipment Financing Agreement and designating Rumeli Telefon's authorized signatories. *See* PI–28 (Rumeli Telefon board resolutions); PT–203, 204 (Rumeli Telefon board resolutions).

165. On March 8, 2000, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed a Rumeli Telefon board resolution approving the pledge of Telsim shares to ABN–AMRO Bank in connection with the Nokia–Telsim financing agreement. *See* PT–205, 206 (Rumeli Telefon board resolutions).

166. On May 23, 2000, Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay participated in and signed a Rumeli Telefon board resolution approving a modification of the ABN shareholders agreement. *See* PT–211 (Rumeli Telefon board resolution).

167. On September 29, 2000, Cem Uzan, Hakan Uzan, and Akay participated in and signed a Rumeli board resolution to increase Rumeli Telefon's pledge of Telsim stock to MCC in connection with the Eighth Amendment to the Equipment Financing Agreement. *See* PI–33 (Rumeli Telefon board resolution).

Standart Telekom

168. Collectively, 98.8% of the stock of Standart Telekom is owned by Hakan Uzan (197 shares, 39.4%), Cem Uzan (197 shares, 39.4%), and Akay (100 Shares, 20%). *See* Plaintiffs' separately marked trial exhibit C("C") 144 (Standart Telekom shareholder registry).

169. Hakan Uzan, Cem Uzan, and Akay were listed as incorporators and signed the Standart Telekom articles of incorporation in January 2000. Hakan Uzan and Cem Uzan were named directors of Standart Telekom in its articles of association. *See* PI–29 (Standart Telekom articles of incorporation).

170. Hakan Uzan, Cem Uzan, and Akay signed the Telsim shareholders' resolutions of April 24, 2001, which amended Telsim's articles of association to triple the number of authorized shares of Telsim, reflecting Standart Telekom's increase in ownership of Telsim from 0.32% of Telsim's stock to more than 66% of Telsim's stock. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 141–43.

Control of Corporate Finances and Ability to Divert Proceeds

171. UBS bank documents show that the Uzans collectively controlled the funds in both their personal accounts and in the corporate accounts of the various companies controlled by the Uzan family, giving them ample opportunity to divert funds from one entity to another, as well as into their own pockets.

172. Kemal Uzan, Melahat Uzan, Cem Uzan, Hakan Uzan, and Akay are all signatories to the Rumeli Cimento charter agreement and the registration of that charter, dated December 10, 1992. *See* PT–176 (Rumeli Cimento Charter Agreement); PT–178 (Registration and Approval of the Rumeli Cimento Charter Agreement). Kemal Uzan had authority to sign checks and make withdrawals from those accounts. Cem Uzan, Hakan Uzan and Akay all were designated as additional signatories to the Rumeli Cimento accounts, and any two of them could sign to issue checks or make withdrawals from those accounts. *See* PT–177 (Rumeli Cimento corporate resolution regarding UBS accounts).

173. The same signatory authorities applied to the two Rumeli Cimento accounts opened at UBS New York in 1997, with Kemal Uzan able to sign checks and make withdrawals upon his own signature, and Hakan Uzan, Cem Uzan, and Akay permitted to sign checks and make withdrawals so long as two of the three of them signed the necessary papers. *See* PT–180 (account opening); PT–182 (account master agreement).

174. Kemal Uzan, Melahat Uzan, Cem Uzan, Hakan Uzan, and Akay are all signatories to the certificate of incorporation for Rumeli Telekom dated August 26, 1993. In the certificate, all are listed as "foundation shareholders." *See* PT–179 (Rumeli Telekom certificate of incorporation).

175. Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay all had signatory authority over Kemal Uzan's personal account with UBS New York. Again, Kemal Uzan could transact business upon his own signature. Alternatively, signatures from any two of the other signatories (Hakan Uzan, Cem Uzan, and Akay) were required for the transaction of business on this account. *See* PT–181 (account master agreement).

176. Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay all had signatory authority over Telsim's account with UBS New York. Although Kemal Uzan has claimed to have little to do with Telsim's affairs, he was the only one of the four signatories who could transact business with respect to Telsim's account upon his own signature. *See* PT–185 (account master agreement); PT–186 (power of attorney).

177. Kemal Uzan, Cem Uzan, Hakan Uzan, and Akay all had signatory authority over Rumeli Telekom's account with UBS New York. As with the other Uzan-controlled accounts, Kemal Uzan could transact business on this account upon his own signature, while two signatures from the other signatories (Hakan Uzan, Cem Uzan, and Akay) were required for them to transact business without Kemal Uzan's signature. *See* PT–191 (account master agreement); PT–192 (client commercial profile).

178. Kemal Uzan, Cem Uzan, and Hakan Uzan all are listed as key client contacts on Yapi's UBS commercial client profile. In addition, a due diligence memo on Yapi discusses Kemal Uzan's and Hakan Uzan's roles within the company. Kemal Uzan is described as the owner of Yapi and the chairman of Imar Bank. Hakan Uzan is described as "very active in his father's business." *See* PT–134 (commercial client profile); PT–168 (due diligence memo).

179. An extensive series of Client Visit and Call Reports maintained by UBS show that the Uzans, and in particular Kemal Uzan, ran their individual companies as a large collective enterprise. For example, a facsimile from Thomas Brunner to Kemal Uzan dated May 23, 1996 shows Kemal Uzan negotiating a loan for the purchase of printing presses from Rockwell. *See* PT–146 (facsimile dated May 23, 1996 from Thomas Brunner to Kemal Uzan).

180. In a report dated July 10, 1997, the Uzans' personal banker at UBS New York notes that Kemal Uzan agreed to send financial statements for his companies, "Yapi ve Ticaret and the Holding, Rumeli Holding, Inc." The report further discusses the "entire organization, controlled by Kemal Uzan, who is known to be one of Turkey's richest and most influential men." *See* PT–148 (client visit report dated July 10, 1997).

181. A client report dated October 7, 1997 notes that Kemal Uzan visited UBS New York and withdrew $10,000 from the Yapi account. Kemal Uzan also discussed

the Rumeli electric companies and Telsim. In particular, Kemal Uzan discussed his desire to purchase a GSM license from the Turkish government and the possibility that he might "borrow against his assets" on deposit with UBS to finance the license. PT–147 (client visit report dated October 7, 1997).

182. A client report dated December 30, 1997 notes that Kemal Uzan visited UBS New York and once again made a $10,000 withdrawal from the Yapi account. On this visit, Kemal Uzan also provided instructions about two transfers from Rumeli accounts. Kemal Uzan also "reiterated that he will have to raise capital ($500 million) in the upcoming months in order to continue to build up their cellular company 'TELSIM.'" PT–145 (client visit report dated December 30, 1997).

183. A client report dated April 2, 1998 notes that Kemal Uzan visited UBS New York and withdrew $10,000 but the main purpose of his visit was to discuss a $300 million loan facility he sought in order to finance part of the cost of Telsim's GSM license. *See* PT–148 (client visit report dated April 2, 1998).

184. In a client report dated March 4, 1999, accounts for Yapi, Telsim, Rumeli Telekom, Rumeli Cimento, Kemal Uzan, Yavuz Uzan, Cem Uzan, and Hakan Uzan are all listed as "clients" with respect to a visit with Kemal Uzan. In the report, UBS representatives note Kemal Uzan's discussion of the financial health of "the Uzan Group," including the group's overall investment strategy. The report mentions that "the Uzan family" had lost money in the fall of 1998 in its construction sector. Kemal Uzan also discussed the $300 million loan to Telsim and Cem Uzan's and Hakan Uzan's responsibilities in running several of the Uzan family businesses. *See* PT–123 (client visit report dated March 4, 1999).

185. An email from Alfred Frank of UBS Zurich describes a meeting with Kemal Uzan during which Kemal Uzan signed personal financial documents and discussed "the industrial interests of his group." In particular, Kemal Uzan told Mr. Frank that, with respect to Telsim, "he invested $1.5 billion and that he could achieve a better return with placing the money in Repos or on overnight funds in Turkey." PT–125 (email dated September 13, 1999 from Alfred Frank to Thomas Brunner).

186. In a client report dated March 20, 2000, accounts for Yapi, Rumeli Telekom, Rumeli Cimento, Kemal Uzan, Yavuz Uzan, Cem Uzan, and Hakan Uzan are all listed as "clients" with respect to a visit with Kemal Uzan. According to this report, Kemal Uzan discussed the status of "his business conglomerate," including the financial status of Telsim. He also reviewed the successes of the Uzan-controlled construction companies, electric companies, and banks in the prior year. *See* PT–124 (client visit report dated March 20, 2000).

187. Other defendants similarly had multiple contacts with UBS New York where they, like Kemal Uzan, treated the various Uzan-controlled companies as a single enterprise. A client contact report dated April 24, 1999 described a visit by Hakan Uzan and Luna to UBS New York. Thomas Brunner described Hakan Uzan's representations about Telsim's performance as follows:

He is doing extremely well, business is expanding rapidly and TELSIM is now at about 40% of the Turkish Cellular market. Many foreign telecommunications companies interested in a merger or takeover are approaching them. However, the Uzans have absolutely no interest, whatsoever, to sell their enterprise. Hakan Uzan keeps himself busy looking to purchase GSM licenses in

neighboring countries in order to continue their successful expansion .... In order to save time he now commutes from his home to the office via a private helicopter.

*See* PT–172 (client visit report dated April 24, 1999).

188. A client contact report dated November 28, 2000 describes Luna as an executive of Rumeli Holding, a "Turkish conglomerate, owned by the Uzan Family," and as someone who works closely with Hakan Uzan. PT–158 (client contact report dated November 28, 2000).

189. The Uzans' control of the finances of so many companies provided endless opportunities to divert funds from one company to another as well as to divert funds to pay for the Uzans' personal expenditures. Moreover, by their own admission, the Uzans commingle their personal and business expenses and do not keep track of which is which.

190. Thus, as Hakan Uzan testified during the contempt hearing, he and Cem Uzan took $8 million "[f]rom our companies" to pay the deposit on luxury apartments in New York. PT–459 (Hakan Uzan testimony at contempt hearing) at 97. Hakan Uzan also admitted to Motorola, Inc. and MCC executives that he had claimed an urgent need for Telsim to borrow $35 million from MCC in cash in December 2000 when in reality the Uzans wanted to use it to pay for apartments they were purchasing in New York. As described by Edward Hughes:

We met with [Hakan Uzan] in Istanbul and told him that we had recently read an article in the, I think it was the Washington Post, that he had acquired an apartment for $35 million. I think actually the article said $38 million, in New York. I said it seemed coincidental to me that that was approximately the same amount of money that you were

asking for. Hakan kind of smiled sheepishly and said, We were hoping you guys didn't find that out.

PT–458 (Edward Hughes testimony at PI hearing) at 58.

191. Similarly, Cem Uzan provided a sworn statement to the English courts in which he stated:

I enjoy substantial salaries, benefits and corporate privileges that are associated with, and derive from, my shareholdings. These enable me to enjoy the lifestyle that has captured the imagination of the Claimants. This includes, but is not limited to, travel, meals, and accommodation. Beyond this, it is not necessary for me to have any substantial possessions or real property, as my needs are catered for largely by my business associations.

PT–447 (Cem Uzan witness statement in English proceeding) ¶ 12.

192. Kemal Uzan expressed a similar sentiment:

I have interests across a wide range of commercial enterprises and, therefore, it is impossible for me to accurately list all of my assets, the value of which is higher than £10,000 without allocating three or four persons for a period of 6–9 months to specifically identify all such assets.

PT–448 (Kemal Uzan witness statement in English proceeding) ¶ 2.

The Initial Fraudulent Inducement

193. In 1993, Telsim entered into an agreement with the Turkish government, permitting Telsim to provide GSM cellular telephone services. One year later, the Uzans launched the company's telecommunications business. *See* PT–233 (Telsim marketing materials) at 1.

194. Prior to negotiating and entering into the various loan agreements with

MCC that are the subject of MCC's fraud claims, Telsim entered into a smaller-scale agreement with Motorola Ltd. on November 29, 1994 (the "Concession Agreement"). Pursuant to this Concession Agreement, Motorola Ltd. provided cellular infrastructure equipment to Telsim that was partly paid for by Telsim with a series of promissory notes. *See* PT–458 (Edward Hughes testimony at PI hearing) at 9; PT–436 (Responses to MCC Requests to Admit) at Response Nos. 63–65.

195. The total debt under promissory notes, which were issued in several different currencies, grew to approximately $52.5 million (based on conversion rates in effect on January 18, 2002). Telsim made its payments under the promissory notes in a more or less timely manner. *See* PT–458 (Edward Hughes testimony at PI hearing) at 9; PT–436 (Responses to MCC Requests to Admit) at Response No. 65. Defendants thus established a relationship of trust with Motorola, Inc. and its affiliates, justifying MCC in relying on defendants' later representations and promises.

196. Beginning in 1998, Motorola, Inc. and Telsim began to exchange information and to engage in negotiations concerning the possibility of Motorola, Inc. and its affiliates providing Telsim with a cellular telephone system and related services, with MCC to provide the financing. *See* PT–458 (Edward Hughes testimony at PI hearing) at 9–10. As Telsim was one of only two licensed wireless communication providers in Turkey, MCC believed that Telsim was likely to receive a substantial market share of the Turkish cellular network when that network was eventually established. *See* PT–458 (Edward Hughes testimony at PI hearing) at 8–9, 13.

197. Throughout the dealings between MCC and Telsim, Hakan Uzan served as Telsim's principal negotiator, and Luna generally was also present. *See* PT–458 (Edward Hughes testimony at PI hearing) at 10–11. The two made "constant" phone calls to Cem Uzan to get his input on the negotiations and potential agreement. *Id.* at 10. Fatih Azami, Telsim's CFO, also attended meetings. *Id.* The approval of Kemal Uzan was also often required. *See* PI–74 (email dated March 6, 2000 from Hakan Uzan to Murat Kircuval); PT–458 (Ernst Kramer testimony at PI hearing) at 422–423; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 7.

198. In April 1998, Hakan Uzan, Luna, and Fatih Azami met with Edward Hughes and other MCC representatives in London to discuss a potential financing agreement. During this meeting, Hakan Uzan made numerous phone calls to Cem Uzan for advice on the potential transaction. *See* PT–458 (Edward Hughes testimony at PI hearing) at 10.

199. Throughout these negotiations, the Uzans unequivocally represented that any and all monies received from MCC pursuant to the negotiated arrangements would go to Telsim. At no time did they reveal their true intent to divert substantial portions of these monies to other Uzan-controlled entities and/or to their personal benefit. Nor did they reveal their intent to never let MCC collect on any collateral pledged as security for MCC's financing.

200. At the same time, Kemal Uzan was negotiating with UBS New York for a $300 million loan toward the purchase price of a GSM License from the Turkish government. Kemal Uzan arranged for the additional funding for the license from UBS, pledging as security for the loan time deposits in his personal account in New York, along with time deposits held by two of Uzan-controlled companies, Yapi and Rumeli Cimento. *See* PT–458 (Edward Hughes testimony at PI hearing) at 11; PT–131 (UBS loan commitment re-

port). Hakan Uzan relayed Kemal Uzan's activity in this regard to MCC. *See* PT–458 (Edward Hughes testimony at PI hearing) at 10–11; PI–59 (memorandum dated April 23, 1998 from Hakan Uzan to UBS).

201. On April 24, 1998, as a result of the aforementioned negotiations, MCC entered into the following series of agreements whereby MCC agreed to provide financing to Telsim: (1) the Equipment Financing Agreement (*see* DX–5) between Telsim and MCC; (2) the License Financing Agreement between Telsim and MCC (*see* Plaintiffs' trial exhibits separately marked as DX ("DX") at DX–3); (3) the Share Pledge Agreement between Rumeli Telefon and MCC (*see* DX–14); and the GSM Frame Contract ("Purchase Agreement") between Telsim, Motorola Ltd., and Motorola Turkey. Separately, MCC entered into an agreement to lend $73,723,000.99 to another Uzan-controlled entity, Kar–Tel, guaranteed by Telsim. Each of these agreements contained representations that the Uzan defendants who negotiated them knew were false and fraudulent.

The Equipment Financing Agreement

202. On April 24, 1998, MCC and Telsim entered into the Equipment Financing Agreement, which enabled Telsim to finance the purchase price of certain cellular infrastructure and equipment from Motorola Ltd. Under the original terms of the Equipment Financing Agreement, MCC loaned Telsim $360 million. *See* DX–5 (Equipment Financing Agreement); PT–458 (Edward Hughes testimony at PI hearing) at 12. Nowhere did the agreement indicate that any of the monies loaned thereby would be diverted to non-Telsim purposes.

203. Hakan Uzan, as Chief Executive Officer of Telsim, signed the Equipment Financing Agreement and each of the amendments to the Agreement on behalf of Telsim. Hakan Uzan also signed the amendments to the agreement on behalf of Rumeli Telefon, which pledged the majority of its shares in Telsim to MCC as security for the loans. *See* DX–5 to DX–13 (Equipment Financing Agreement and all amendments thereto). Cem Uzan signed the Third and Fifth Amendments to the Agreement on behalf of Telsim. *See* DX–8 (Third Amendment to Equipment Financing Agreement); DX–10 (Fifth Amendment to Equipment Financing Agreement). Nowhere did these agreements indicate that the Uzans would never permit MCC to take control of the collateral.

204. In accordance with the terms of the Equipment Financing Agreement, Hakan Uzan sent to MCC a series of Draw Down Requests ("DDRs"), which requests allowed Telsim to draw down on the line of credit provided by MCC for the purchase of equipment from Motorola Ltd. In each such request, Hakan Uzan certified that all conditions precedent for the respective draw had been satisfied, including certifications that: (1) such funds would be used for payment for and installation of equipment and services; (2) no event of default had occurred under either the Equipment Financing Agreement or License Financing Agreement; and (3) Telsim was in compliance with all terms of the Equipment Financing Agreement and License Financing Agreement. In each such request, Hakan Uzan also restated the "representations, warranties, and covenants" set forth in the Equipment Financing Agreement as of the date of the DDR. *See* PT–30 (Telsim–MCC Draw Down Requests dated 1998–2000); PT–464 (Declaration of Edward Hughes dated February 7, 2003 ("Hughes Decl.")) ¶ 6. Again, nowhere in any of this was there indicated the Uzans' plan to divert the proceeds to non-Telsim purposes.

License Financing Agreement

205. On April 24, 1998, Telsim and MCC also entered into a License Financing Agreement, pursuant to which MCC agreed to lend Telsim $200 million toward Telsim's purchase of a 25–year GSM 900MHz nationwide cellular license, which license was required in order to operate a GSM cellular system in the Republic of Turkey. Hakan Uzan, as CEO of Telsim, signed the License Financing Agreement on behalf of Telsim. *See* DX–3 (License Financing Agreement). MCC issued the loan in a single installment. *See id.;* PT–458 (Edward Hughes testimony at PI hearing) at 10–11; PI–59 (memorandum dated April 23, 1998 from Hakan Uzan to UBS).

206. Under the terms of the License Financing Agreement, Telsim was obligated to repay the loan with interest. But nowhere in the agreement was it disclosed that the Uzans intended to divert the proceeds to non-Telsim purposes.

Share Pledge Agreement

207. To secure the amounts loaned to Telsim under the Equipment Financing Agreement and the License Financing Agreement, MCC entered into the Share Pledge Agreement with another Uzan-controlled entity, Rumeli Telefon, which was then Telsim's majority shareholder. *See* PT–458 (Edward Hughes testimony at PI hearing) at 13–14; DX–14 (Share Pledge Agreement) at 2.

208. Under the original terms of the Share Pledge Agreement, Rumeli Telefon pledged 51% of Telsim's stock to MCC as collateral for the Equipment Financing and License Financing Agreements. *See* DX–14 (Share Pledge Agreement). Nowhere, however, was there disclosed the Uzans' intent not to permit this stock, or the control that accompanied it, to ever wind up in the hands of MCC. Moreover, because Telsim's financial statements were at all times overstated (a fact known to defendants but not to plaintiffs), the defendants misrepresented the value of the collateral even at the time the first loan was made.

Purchase Agreement

209. Also on April 24, 1998, Telsim, Motorola Ltd., and Motorola Turkey entered into the Purchase Agreement, pursuant to which Telsim agreed to purchase the above-described GSM cellular telephone system and services from the Motorola affiliates, and the Motorola affiliates agreed to provide warranty and support services for the system. *See* DX–1 (Purchase Agreement). Nowhere did the agreement disclose the Uzans' intent not to use the loans obtained under the License Financing Agreement to pay for the purchases.

210. Hakan Uzan, as Chief Executive Officer of Telsim, signed the Purchase Agreement on behalf of Telsim. *See* DX–1 (Purchase Agreement).

Kazakhstan Telephone Company ("Kar–Tel") Agreement

211. Kar–Tel is a cellular telecommunications company, owned and controlled by the Uzans, that operates in Kazakhstan. *See* PI–60 (letter dated August 19, 1998 from Hakan Uzan to MCC). On August 19, 1998, MCC loaned $60,000,000 to Kar–Tel toward the purchase of a $65,850,000 GSM license in Kazakhstan. *See* PT–464 (Hughes Decl.) ¶ 18. MCC transferred $60,000,000 in financing to UBS New York. This loan by MCC to Kar–Tel was guaranteed by Telsim. *See* PT–11 (Telsim guarantee of Kar–Tel loan).

212. In addition, MCC extended $13,723,000.99 to Kar–Tel to finance the purchase of equipment for Kar–Tel from Motorola Ltd., which loan was also guaranteed by Telsim. *See* PT–464 (Hughes

Decl.) ¶ 19. In total, MCC extended $73,723,000.99 in financing to Kar–Tel, on which Kar–Tel has defaulted and Telsim as guarantor is obligated to repay. *See id.* ¶ 19.

213. Nowhere did the Kar–Tel agreements disclose that the Uzans intended to divert some of the loan proceeds to non-Kar-Tel purposes.

Subsequent Amendments to the Equipment Financing Agreement

214. The Equipment Financing Agreement subsequently was amended numerous times, in part to increase the amount of MCC's loan.

215. On August 19, 1999, MCC and Telsim entered into the Fifth Amendment to the Equipment Financing Agreement, which increased MCC's loan commitment from $360 million to $483 million. *See* DX–10 (Fifth Amendment to the Equipment Financing Agreement).

216. On September 20, 1999, MCC and Telsim entered into the Sixth Amendment to the Equipment Financing Agreement, which increased MCC's loan commitment to $683,161,875.57. The Sixth Amendment provided, *inter alia*, that $35 million of the loan increase was to be used for Telsim working capital. *See* DX–11 (Sixth Amendment to the Equipment Financing Agreement).

217. On February 1, 2000, MCC and Telsim executed the Seventh Amendment to the Equipment Financing Agreement. Under the Seventh Amendment, MCC increased its loan commitment to $1,133,161,875.57, an increase of $450 million. Specifically, the amendment provided for $175 million in equipment financing, $125 million for marketing programs, and $150 million for handsets. *See* DX–12 (Seventh Amendment to the Equipment Financing Agreement); PT–458 (Edward Hughes testimony at PI hearing) at 35–36.

218. Finally, on September 29, 2000, MCC and Telsim entered into the Eighth Amendment to the Equipment Financing Agreement, an agreement that increased MCC's loan commitment to $1,833,161,875.57, an increase of $700 million. The Eighth Amendment provided $250 million for infrastructure financing, $250 million for cash and marketing expenses, and $200 million for handset financing. *See* DX–13 (Eighth Amendment to the Equipment Financing Agreement); *see also* PT–458 (Edward Hughes testimony at PI hearing) at 16–20; PT–436 (Responses to MCC Requests to Admit) at Response No. 112.

219. Neither in these Amendments nor in the negotiations thereof did the Uzans disclose that they had already diverted a portion of the previous loan proceeds to other entities and themselves and that they intended to make similar diversions with portions of the additional proceeds.

Subsequent Amendments to the Share Pledge Agreement

220. On February 1, 2000, the Share Pledge Agreement was amended to, *inter alia*, increase the percentage of Telsim stock pledged to MCC by Rumeli Telefon from 51% to approximately 66% of Telsim's outstanding shares. Hakan Uzan, the Vice Chairman and Chief Executive Officer of Rumeli Telefon and a member of Rumeli Telefon's board of directors, signed the Amended Share Pledge Agreement on behalf of Rumeli Telefon. *See* DX–15 (February 1, 2000 Amendment to Share Pledge Agreement) at 3, 9.

221. Previously, on July 2, 1998, MCC, Rumeli Telefon, and UBS had entered into a Pledgeholder Agreement (DX–18), pursuant to which MCC could only acquire the pledged collateral shares by agreement or by an award from a competent arbitration tribunal. However, on February 1, 2000,

§ 2.2 of the Pledgeholder Agreement was amended to allow MCC to foreclose on pledged shares by presenting evidence of default without the need for prior arbitration. *See* DX–19 (February 1, 2000 amendment to Pledgeholder Agreement) at 3–4; *see also* PT–458 (Edward Hughes testimony at PI hearing) at 167 (noting that as part of the amendment, defendants agreed to eliminate the "two-key" structure for default, so that MCC would not have to arbitrate prior to foreclosing on the shares pledged to MCC).

222. The Share Pledge Agreement was again amended in September 2000 when the Eighth Amendment to the Financing Agreement was executed to enhance MCC's control of the pledged shares. The September 2000 Amendment again allowed MCC to foreclose on the shares by presenting evidence of default and without the need for prior arbitration and also removed from 36% of the pledged shares the restriction prohibiting MCC and its affiliates from bidding on the shares when sold by a marketer. *See* DX–16 (September 2000 Amendment to the Share Pledge Agreement).

223. Nowhere in these agreements did the Uzans, who negotiated them, or their companies, disclose that they intended never to let MCC take control of, or obtain the proceeds from, their shares.

Additional Misrepresentations Used to Help Obtain the Increased Funding

224. From 1999 through 2001, as part of their successful effort to induce MCC to provide additional funding, defendants repeatedly represented to MCC that they were working to obtain "ECGD"-backed loans, undertaking efforts to sell all or part of Telsim, and pursuing a high yield debt offering. The representations they made in these regards were materially false and fraudulent.

ECGD–Backed Financing

225. At a meeting on September 3, 1999, Hakan Uzan represented to MCC that Telsim would seek financing backed by ECGD, an entity affiliated with the British government that works to promote exports to developing countries by providing insurance, loan guarantees, and other assistance to companies. *See* PT–458 (Edward Hughes testimony at PI hearing) at 20–21, 25; PI–119 (Memorandum of Understanding ("MOU") of meeting in Chicago on September 3, 1999).

226. This promise induced MCC to enter into the Sixth Amendment to the Equipment Financing Agreement. Indeed, as part of the Sixth Amendment, MCC agreed to make an additional $180 million in equipment financing available to Telsim if Telsim succeeded in obtaining ECGD-backed financing by the end of 1999. *See* PT–458 (Edward Hughes testimony at PI hearing) at 24–25; PI–119 (MOU of meeting in Chicago on September 3, 1999); DX–11 (Sixth Amendment to the Equipment Financing Agreement) at 5.

227. To assist Telsim in its efforts to obtain ECGD-backed financing, MCC engaged Deutsche Bank to undertake a financial review of Telsim and to serve as Telsim's primary lender if the ECGD loan guarantee were approved. *See* PT–458 (Edward Hughes testimony at PI hearing) at 26.

228. For their part, the Uzans promised to "diligently work towards successful completion of ECGD financing." DX–74 (letter dated September 21, 1999 from Edward Hughes to Hakan Uzan); *see also* PI–119 (MOU of meeting in Chicago on September 3, 1999). This, however, was simply a ruse, for the Uzans had no intention of letting Deutsche Bank or anyone else undertake a meaningful financial review of Telsim, which would have revealed

the Uzans' diversions of funds and lootings that were already ongoing.

229. Specifically, when the representatives from Deutsche Bank (who had been retained by MCC to assist Telsim in obtaining ECGD-backed financing) visited Telsim's offices to review Telsim's financial records, a Telsim employee, per what appears to have been a prearranged plan, accused a Deutsche Bank analyst of taking a Telsim financial document without permission. That evening, Hakan Uzan interrupted a dinner meeting between Walter Keating, Edward Hughes, and representatives from Deutsche Bank, brandishing sworn statements of Telsim employees that allegedly documented this episode. Hakan Uzan then announced that he would not provide Deutsche Banke with further access to Telsim's offices. *See* PT–458 (Edward Hughes testimony at PI hearing) at 26–27.

230. By refusing, on a pretext, to provide Deutsche Bank with access to Telsim's offices, and thereby restricting Deutsche Bank's access to Telsim's financial records, Hakan Uzan, as he intended, effectively killed any ECGD-backed Deutsche Bank financing deal. *See* PT–458 (Edward Hughes testimony at PI hearing) at 26; PT–234 (facsimile dated January 13, 2000 from James Pumphrey to Martin Crane).

Sale of Telsim

231. Beginning in late October 1999, defendants further induced MCC into lending additional funds to Telsim by falsely claiming that they were undertaking substantial efforts to sell Telsim and that an advantageous sale of Telsim was imminent.

232. On October 22, 1999, Luna sent an email to Walter Keating of MCC in which he referenced the sale of Orange Plc to Mannesmann and then stated, "Telsim will offer the biggest return in value yet." PI–72 (email dated October 22, 1999 from Luna to Walter Keating); *see also* PT–436 (Responses to MCC Requests to Admit) at Response No. 94.

233. Then at meetings held from October 31, 1999 through November 1, 1999 in Paris, France and London, England, Hakan Uzan told both Hughes and Keating that Telsim had received an unsolicited offer from France Telecom to purchase the company for several billion dollars. *See* PT–458 (Edward Hughes testimony at PI hearing) at 27, 30; PT–474 (Hughes Decl.) ¶ 5. This representation was false, as France Telecom had not in fact made this offer.

234. At this meeting, Hakan Uzan also stated that he and Cem Uzan had convinced their father to consent to the sale of Telsim in its entirety by promising him $1.2 billion from the sale proceeds as compensation for his role in securing the $300 million loan from UBS. *See* PT–458 (Edward Hughes testimony at PI hearing) at 27; PT–165 (letter dated May 4, 1998 from Hakan Uzan to Thomas Brunner); PT–166 (memorandum dated April 24, 1998 from Thomas Brunner regarding Telsim account); PT–167 (Rumeli Cimento Guarantee and Pledge Agreement).

235. Then, at a meeting on November 29, 1999 in Istanbul, Turkey, Hakan Uzan told MCC representatives that he was willing to sell at least a 40% stake in Telsim, and perhaps a greater portion at a premium, but that he needed an additional $450 million in financing from MCC to make Telsim a more attractive acquisition target. Hakan Uzan falsely represented to MCC that Telsim would use the additional financing provided by MCC to expand and improve Telsim's coverage areas and to increase Telsim's subscriber base. *See* PT–458 (Edward Hughes testimony at PI hearing) at 33; PT–436 (Responses to

MCC Requests to Admit) at Responses No. 99, 100. Hakan Uzan failed to disclose that this was just a ploy to obtain further monies from MCC that the Uzans could divert to their own non-Telsim purposes.

236. In reliance on Hakan Uzan's false representations, MCC representatives met on December 22–23, 1999, with Hakan Uzan, Cem Uzan, Fatih Azami and Luna to negotiate the terms of what would become the Seventh Amendment to the Equipment Financing Agreement. *See* DX–86 (MOU of meeting in Chicago on December 22 and 23, 1999).

237. Throughout these discussions defendants continued to represent that they would sell an interest in Telsim, whereas they had no intention of so doing. *See* PT–458 (Edward Hughes testimony at PI hearing) at 45. Part of their motive in so representing was to lull MCC, which was increasingly concerned by Telsim's failure to pay its loans on time, into a false sense of security. Thus, for example, Hakan Uzan told Edward Hughes that MCC would be repaid when the company was sold. *See* PT–458 (Edward Hughes testimony at PI hearing) at 74–78.

238. On February 1, 2000, in reliance on defendants' false representation that they had in fact received an offer to purchase Telsim and on defendants' fraudulent promises that they would either sell an interest in or otherwise secure additional financing for Telsim, MCC entered into the Seventh Amendment to the Equipment Financing Agreement, which provided an additional $450 million in financing to Telsim. *See* PT–458 (Edward Hughes testimony at PI hearing) at 35–36; DX–12 (Seventh Amendment to Equipment Financing Agreement).

239. Telsim also agreed that it would repay any amounts of the additional $450 million drawn by Telsim under the Seventh Amendment upon the earlier of the sale of Telsim or September 15, 2000. *See id.* § 2.1.4; DX–86 (MOU of meeting in Chicago on December 22 and 23, 1999).

240. On March 9, 2000, Hakan Uzan sent an email to Hughes and Keating, which stated in relevant part:

"As of today we have two offers .... The lowest of the offers was set at 12 Billion USD for the [e]valuation of Telsim and asked for a 51% stake[.] The second offer was slightly higher than this at 14 Billion and also a minimum of Q [sic][.]"

PI–75 (email dated March 9, 2000 from Hakan Uzan to Edward Hughes and Walter Keating); *see also* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 104, 105. This email was false in that, while two tentative offers had been received, one, from Deutsch Telecom, valued Telsim at $9 billion, while the other, from Mannesmann, valued Telsim at $5 billion. *See* PT–39 (letter dated March 8, 2000 from Deutsche Telekom to Merrill Lynch); PT–444 (Sean Carney Deposition) at 38–39; PT–40 (Mannesmann letter dated March 8, 2000).

241. On July 28, 2000, Hakan Uzan sent an email to Hughes falsely claiming that a company called Telefonica was also interested, along with Mannesmann, in purchasing Telsim. *See* PT–32 (email dated July 28, 2000 from Hakan Uzan to Edward Hughes). In actuality, Telefonica never expressed interest in purchasing Telsim, and Telsim had already cut off negotiations with Mannesmann months earlier when Mannesmann had requested detailed financial information about Telsim. *See* PT–40 (Mannesmann offer letter dated March 8, 2000); PT–54 (letter dated March 16, 2000 from Mannesmann to Merrill Lynch); PT–55 (letter dated March 31, 2000 from Mannesmann to Merrill Lynch);

*see also* PT–445 (Paul Raphael Deposition) at 101, 107.

242. In similar fashion, the Uzans also refused to provide Deutsche Telecom with requested financial information on Telsim, thus causing the negotiations to abort. *See* PT–444 (Sean Carney Deposition) at 54–78; PT–445 (Paul Raphael Deposition) at 124–27.

243. Yet even while undercutting the purported sale negotiations, Hakan Uzan continued to use the possibility of such a sale as a basis for requesting more money from MCC. Thus, he emailed Hughes on July 28, 2000 that Telsim has "urgent additional financing needs, in cash, . . . terminal financing, . . . and hardware . . .," needs that had to be satisfied if Telsim were to remain an attractive acquisition for potential purchasers. *See* PT–32 (email dated July 28, 2000 from Hakan Uzan to Edward Hughes).

244. Similarly, on August 30, 2000, Hakan Uzan sent an email to Keating and Hughes, falsely claiming that defendants were still planning on completing the sale of Telsim to a strategic partner, *see* PI–81 (email dated August 30, 2000 from Hakan Uzan to Walter Keating), while all negotiations had essentially ceased.

245. Around the same time, falsely claiming that a sale was imminent, although no buyer had yet been identified, Telsim requested from MCC an additional $700 million in financing for Telsim. *See* PT–458 (Edward Hughes testimony at PI hearing) at 48.

246. On September 25, 2000, Motorola and MCC executives Merle Gilmore, Michael Leahy, and Edward Hughes met with Hakan Uzan in Istanbul, Turkey. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 109; PT–458 (Edward Hughes testimony at PI hearing) at 48–49. At this meeting, Hakan Uzan requested additional financing from MCC, promising that any additional funds would be used to grow and improve Telsim's business and to make Telsim a more attractive acquisition target. Hakan Uzan committed to doing everything in his power to either sell Telsim or to raise capital from alternative sources so that MCC would be repaid. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 109, 110; PT–458 (Edward Hughes testimony at PI hearing) at 48–49. These representations were false in that, among other things, the Uzans had already undercut or terminated all serious negotiation for sale of Telsim, had no intention of selling Telsim, and intended to continue diverting substantial portions of any monies received from MCC to non-Telsim purposes.

247. In reliance on defendants' fraudulent representations, MCC, on September 29, 2000, entered into the Eighth Amendment to the Equipment Financing Agreement, lending Telsim an additional $700 million as a bridge loan to be repaid in seven months or upon an earlier sale of Telsim. *See* DX–16 (September 2000 Amendment to Share Pledge Agreement); PT–436 (Responses to MCC Requests to Admit) at Response No. 110. That agreement expressly reconfirmed, in effect, defendants' fraudulent representations by reciting, in § 5 of the Eighth Amendment, that:

In order to better ensure that [Telsim] will have sufficient funds available to pay all indebtedness owed by [Telsim] to [MCC] on or prior to April 30, 2001, [Telsim] hereby agrees to make aggressive efforts to pursue all potential third-party sources of such funds, including, without limitation, placement of equity and high-yield debt of [Telsim].

DX–13 (Eighth Amendment to Equipment Financing Agreement) § 5.

546

248. In actuality, however, defendants had no real prospects for obtaining any additional financing, and no intention of pursuing such efforts, since it would have required them to provide financial information that would have exposed their diversions. *See* PT–36 (Telsim Information Memorandum dated October 2000); PT–445 (Paul Raphael Deposition) at 128.

249. Moreover, so as to conceal their true intentions with respect to selling Telsim, defendants excluded MCC from the sales process. While MCC frequently requested updates on the sales effort, *see e.g.,* PT–31 (email dated August 30, 2000 from Walter Keating to Fatih Azami); PI–82 (email dated October 3, 2000 from Walter Keating to Hakan Uzan); PT–458 (Edward Hughes testimony at PI hearing) at 80, defendants repeatedly denied MCC access to such information. *See* PT–458 (Fatih Azami testimony at PI hearing) at 917–918; PT–458 (Edward Hughes testimony at PI hearing) at 70–71, 88–89; PT–445 (Paul Raphael Deposition) at 142.

High Yield Debt Offering

250. Finally, as an alternative to selling Telsim, the Uzans also fraudulently represented that they were pursuing financing through the issuance of high yield debt securities.

251. For example, on August 23, 2000, Hakan Uzan sent an email to Hughes and Keating, on which he copied Cem Uzan and Luna, stating in an attachment:

The works [sic] on a Private Placement as well as a high yield financing have commenced, and are viable options. They are there to serve as a fall back plan to the Motorola debt refinancing should a strategic sale not occur within another 4 months (by end November).

PI–79 (attachment to email dated August 23, 2000 from Hakan Uzan to Edward Hughes and Walter Keating) at 3.

252. In actuality, however, by the time the above email was sent, the bank advising Telsim as to such a financing had given up because, as elsewhere, the Uzans refused to let Telsim provide adequate financial data.

253. Specifically, sometime prior to May 26, 2000, Chase learned that Telsim's financials did not comply with U.S. GAAP standards and that Deloitte & Touche, Telsim's auditors, would be giving Telsim a qualified opinion. *See* PT–109 (briefing document dated May 26, 2000).

254. On June 13, 2000, representatives from Chase sent a facsimile to Sema Sanigok of Telsim indicating the need for financial information to remove the qualification from Telsim's audited financial statements. Chase attached to the email the offering of a company that was "in a similar stage of financial and business development as Telsim" and suggested that Telsim might be able to use a similar accounting method to achieve an audit report "with no qualifications" and that the parties arrange a call with Deloitte & Touche to discuss possible accounting treatments. Chase never received a meaningful response to this message. *See* PT–113 (letter dated June 13, 2000 from Chase to Sema Sanigok); PT–443 (Nikola Sutherland Deposition) at 113.

255. In June 2000, Chase performed its "due diligence" on Telsim. Its experience was identical to that of ECGD and Deutsche Telekom, in that Telsim refused to provide Chase with essential financial information necessary to complete the offering. Chase sent various emails to Telsim representatives in an attempt to access further information for the offering, but was unsuccessful. *See* PT–111 (email dated May 6, 2000 from Alain Stalker to Nikola Sutherland and others); PT–112 (memo dated June 9, 2000 regarding outstanding due diligence); PT–443 (Nikola

Sutherland Deposition) at 19–21, 91–93, 109–111.

256. By July 2000, Chase had become concerned that the lack of information from defendants was jeopardizing the transaction. *See* PT–443 (Nikola Sutherland Deposition) at 113–114. Accordingly, Chase requested a meeting with defendants. At the meeting, held on July 24, 2000, Hakan Uzan, contradicting his contemporaneous statements to MCC, informed Chase that he was no longer pursuing efforts to obtain a strategic partner through the infusion of new equity. *See* PT–443 (Nikola Sutherland Deposition) at 136–137.

257. On July 28, 2000, Chase wrote to Hakan Uzan, suggesting that Chase might be able to set up a debt offering without the injection of additional equity, but only if Telsim could provide more information about its debt and a "clean" opinion from its accountants. *See* PT–443 (Nikola Sutherland Deposition) at 136, 138–139; PT–117 (letter dated July 28, 2000 from Chase to Hakan Uzan).

258. On August 3, 2002, Hakan Uzan responded with an "irritated and annoyed and dismissive" email, accusing Chase of trying to take over the role of strategic advisor and stating that at no point had "Telsim made any commitment to undertaking the strategic sale." PT–443 (Nikola Sutherland Deposition) at 142. Thereafter, Chase ceased work on the high yield offering. *See id.* at 142–145.

259. Defendants' false representation as to the viability of and commitment to obtaining a high yield debt offering helped induce MCC into entering into the Eighth Amendment to the Equipment Financing Agreement on September 29, 2000. Indeed, § 5 of the Eighth Amendment provides:

> In order to better ensure that [Telsim] will have sufficient funds available to pay all indebtedness owed by [Telsim] to [MCC] on or prior to April 30, 2001, [Telsim] hereby agrees to make aggressive efforts to pursue all potential third-party sources of such funds, including, without limitation, placement of equity and high-yield debt of [Telsim].

DX–13 (Eighth Amendment to Equipment Financing Agreement) § 5.

Misrepresentations Regarding the Collateral

260. Even before the fraudulent dilution of the collateral, discussed *infra*, defendants materially misled plaintiffs as to the value and security of the pledged shares, as well as to the intentions of the Uzans not to relinquish control of either Telsim or its shares.

261. During early negotiations with defendants, MCC informed Hakan Uzan, Luna, and others that a pledge of Telsim shares as collateral was an absolute prerequisite to MCC's agreeing to provide financing and equipment to Telsim, and that without such a pledge, MCC would walk away from the negotiations. *See* PT–458 (Edward Hughes testimony at PI hearing) at 13–14.

262. MCC also insisted that the Uzans provide proof that the Turkish government would honor any share pledge agreement entered into and that the share pledge would be enforceable. *See* PT–458 (Edward Hughes testimony at PI hearing) at 17. Responding to this request, the Uzans provided MCC with a letter from Turkey's Ministry of Communications and Transport, dated April 22, 1998, stating that the pledge of Telsim stock to MCC did not violate any regulations under the Ministry's jurisdiction as long as the pledge did not affect the communications service provided by Telsim, as well as a letter from Turkey's Ministry of State, dated April 22,

1998, confirming that a pledge of a majority of Telsim's stock to MCC was consistent with Turkish law even if it ultimately resulted in a share transfer. *See* PT–458 (Edward Hughes testimony at PI hearing) at 17; PI–57 (letter dated April 22, 1998 from Ministry of Communications and Transport); PI–58 (letter dated April 22, 1998 from Ministry of State).

263. Accordingly, on April 24, 1998, MCC and the Uzan-controlled entity that then held approximately two-thirds of Telsim's shares, Rumeli Telefon, entered into the Share Pledge Agreement, pursuant to which Rumeli Telefon pledged 51% of Telsim's shares to MCC. *See* DX–14 (Share Pledge Agreement) at 2; PT–458 (Edward Hughes testimony at PI hearing) at 13–14.

264. Subsequently, in a letter agreement dated August 19, 1998 from Rumeli Telefon to MCC, Hakan Uzan promised not to reduce the shares pledged to MCC under the Share Pledge Agreement until permitted to do so under the Equipment Financing Agreement, the License Financing Agreement, and the Share Pledge Agreement, and until the Kar–Tel loan guaranteed by Telsim had been repaid. *See* PI–60 (letter dated August 19, 1998 from Hakan Uzan to MCC). The board of directors of Rumeli Telefon, including Akay, also executed a resolution specifically authorizing Hakan Uzan to make this covenant with MCC. *See* PI–27 (Rumeli Telefon board of directors resolution dated April 20, 1998).

265. Then on February 24, 1999, in an effort to further mislead MCC as to the security of its collateral, Hakan Uzan sent an email to several MCC and Motorola, Inc. employees in the United States, copying Cem Uzan and Luna, falsely stating:

> There is no financial exposure on MCC and or Motorola [Inc.], the share pledge you are holding for 51% of this company, has recently received a written offer

from a major European Operator (for 35% of the company) that would value the total company at over 3.5 billion USD. Lets not kid our selves by thinking that there is a financial exposure on your part.

PI–64 (email dated February 24, 1999 from Hakan Uzan to Edward Hughes and others) at 395.

266. In conjunction with execution of the Seventh Amendment to the Equipment Financing Agreement on February 1, 2000, which by itself increased MCC's loan commitment by $450 million, the Share Pledge Agreement was amended to increase the percentage of Telsim's outstanding shares pledged to MCC from 51% to 66%. *See* DX–15 (February 1, 2000 Amendment to Share Pledge Agreement) § 5. At the same time, both the Share Pledge Agreement and Pledgeholder Agreement were amended to eliminate any requirement that MCC had to arbitrate prior to foreclosing on the pledged shares. *See* DX–19 (February 1, 2000 Amendment to Pledgeholder Agreement) at 3; PT–458 (Edward Hughes testimony at PI hearing) at 167.

267. After this amendment was executed, defendants continued to mislead MCC as to the value and security of the pledged shares. For example, on March 9, 2000, Hakan Uzan sent an email message to Hughes and Keating in Illinois, describing various purported third-party offers to buy Telsim and stating:

> So you can tell all the guys with shaky hands and who were worried, ... well just tell them not to worry any more, according to the written offers you are presently holding as share pledge a value greater than 7.8 billion USD for a debt of 1.4 billion USD.

PI–75 (email dated March 9, 2000 from Hakan Uzan to Edward Hughes and Walter Keating). This message placed the

value of Telsim at approximately $11.8 billion, a figure that, as previously noted, was far in excess of the valuation made in any written offers to purchase Telsim. But the false statement, like others, was designed to lull plaintiffs into a false sense of security.

268. The pledged collateral was vital to MCC not only for the financial protection it purported to provide but also for the potential control of Telsim that it seemingly provided if foreclosure occurred. Thus, for example, when MCC entered into the Eighth Amendment to the Equipment Financing Agreement, the Share Pledge Agreement was also amended to further enhance MCC's control over the pledged shares. *See* DX–16 (September 2000 Amendment to the Share Pledge Agreement). At no time, however, did defendants reveal their true intent, which was never to part with control of Telsim under any circumstances.

The Events Preceding Default

269. At a meeting on January 9, 2001, Hakan Uzan unintentionally provided a hint of the Uzans' fraudulent ways by boasting to Hughes, Keating, and others that he had been able to obtain a twelve-month extension on amounts owed under a contract with the Turkish Football League by arguing that a recent earthquake was a "force majeure" event. Hakan Uzan admitted that he had not intended to pay the Turkish Football League the amounts he owed, regardless of the earthquake, and that when the twelve-month extension was up, he also probably would not make payments. *See* PT–458 (Edward Hughes testimony at PI hearing) at 62. The Court finds that defendants' recent reliance on "economic force majeure" for non-payment is a similarly fraudulent mechanism, designed to obscure defendants' true intent.

270. After numerous extensions on repayment of its loans from MCC, Telsim was finally given a "final" repayment deadline of April, 2001 on $700 million of the loan. But as the deadline approached, the Uzans again began to try to buy more time with false representations. On February 15, 2001, Hakan Uzan sent an email to Hughes, falsely stating that a recent meeting with Vodaphone was very positive and that two serious candidates were interested in the sale. *See* PI–85 (email dated February 15, 2001 from Hakan Uzan to Edward Hughes). Three days later, on February 18, 2001, Hakan Uzan sent an email to Keith Bane of Motorola, Inc. again falsely claiming that two buyers were still interested in Telsim. The email concluded: "So although the April deadline might look to be difficult, we are confident that our desire to execute a strategic transaction will result in success for Telsim within a reasonable period of time." PI–86 (email dated February 18, 2001 from Hakan Uzan to Keith Bane).

271. In March 2001, MCC retained Goldman Sachs to make an independent valuation of Telsim. Defendants, however, denied Goldman Sachs access to Telsim's financial information for any purpose. *See* PT–237 (email dated March 7, 2001 from Keith Bane to Hakan Uzan); PT–25 (letter dated March 26, 2001 from Hakan Uzan to Keith Bane); PT–458 (Fatih Azami testimony at PI hearing) at 921; PT–458 (Edward Hughes testimony at PI hearing) at 80; PI–91 (email dated April 20, 2001 from Hakan Uzan to Keith Bane).

272. In a letter dated March 26, 2001, Hakan Uzan again claimed that he was engaged in serious efforts to sell Telsim and that Orange Plc, and Vodaphone were interested in pursuing a deal. *See* PT–25 (letter dated March 26, 2001 from Hakan Uzan to Keith Bane). Again, these representations were false. *See* PT–444 (Sean Carney Deposition) at 77–80 (as to Vodaphone, "there may have been some prelim-

**550**

inary discussions which didn't go anywhere," and as to France Telecom and Orange, there may have been a meeting or just phone calls, "but within four to six weeks the trail had run cold again"); PT–445 (Paul Raphael Deposition) at 127–28 (after September 2000, "I recall there were a couple of conversations, but they were just conversations.").

273. By mid-March, it became clear that defendants had no intention of repaying the $700 million due in April 2001. MCC, therefore, by letter dated March 19, 2001, attempted to negotiate a rescheduling of Telsim's debt. *See* PT–16 (letter dated March 19, 2001 from Keating to Telsim). However, by letter dated March 20, 2001, defendants rejected MCC's rescheduling proposal, falsely representing that "the discussions of a potential strategic partner joining Telsim [were] in progress and underway," including a "possible contact with France Telecom/Orange." PT–235 (letter dated March 20, 2001 from Hakan Uzan to Keith Bane); *see also* PT–236 (letter dated March 22, 2001 from Keith Bane to Hakan Uzan).

274. On May 22, 2001, MCC issued its Notice of Default based on defendants' failure to make the $700 million payment at the end of April. The letter noted that MCC had no alternatives given defendants' refusal to respond to the rescheduling proposal and to perform other obligations under the agreement, such as provide accurate financial statements. *See* DX–130 (letter dated May 22, 2001 from MCC to Hakan Uzan) at 2.

The Fraud on Nokia

275. As part of their overall scheme to use Telsim as a front for fraudulently obtaining monies for non-Telsim uses, defendants induced Nokia to extend loans to Telsim on the basis of very similar misrepresentations to those practiced on MCC, a parallelism that is further proof of defen-

dants' fraudulent intent. *See generally* PT–458 (Ernst Kramer testimony at PI hearing) at 465–473; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 3.

276. Prior to negotiating and entering into the agreements that form the basis of Nokia's claims, Telsim entered into an agreement in 1997, much smaller in scope, to purchase radio equipment and services from Nokia. *See* PT–1002F (Supply Contract dated September 15, 1997); PT–458 (Ernst Kramer testimony at PI hearing) at 413–414; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 1. Under this arrangement, Telsim paid for its purchases, in part, with a series of promissory notes. *See e.g.,* PT–1180 (promissory note for $7,459 dated April 3, 1999). The debt under the promissory notes grew to approximately $5 million. *See* Answer ¶ 77. In large part, Telsim paid these promissory notes in a timely fashion. Thus, the Uzans established a positive track record to make Nokia feel comfortable entering into the much larger arrangements that followed and that are now the subject of this litigation. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 4.

277. Eventually, the parties entered into an agreement whereby Telsim purchased a Network Switching Sub-system ("NSS") and related products and services from Nokia. As part of the agreement, Nokia agreed to provide financing, and, to that end, arranged for the Stockholm branch of ABN–AMRO Bank to provide Telsim with a loan facility, fully backed by Nokia, to finance Telsim's purchases from Nokia. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 414. By May 2000, Nokia had caused the amount of the loan facility to increase to $800 million. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 5.

278. Throughout the negotiations leading up to each version of the operative agreements, Nokia made clear to Hakan Uzan, Cem Uzan, and Fatih Azami that there were two non-negotiable prerequisites to Nokia's providing financing to Telsim: (1) defendants' commitment to sell all or a controlling portion of Telsim to a strategic partner within a reasonable amount of time; and (2) defendants' promise to provide Nokia with sufficient security for the financing. Each of these requirements was eventually reduced to writing. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 414–419, 436–437, 443–444; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 6.

279. In the negotiations between Nokia and Telsim concerning the parties' agreements and subsequent amendments, Hakan Uzan served as Telsim's principal negotiator. Cem Uzan was physically present at one negotiation session in May 2000, and Hakan Uzan made frequent and lengthy telephone calls to Cem Uzan to discuss substantive issues that arose during the negotiations, with Cem Uzan providing input that significantly influenced Hakan Uzan. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 419, 421–423; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 7; *see also* Answer ¶¶ 80, 115.

280. Although Kemal Uzan was not present during the negotiations, it was clear that his approval was necessary for Telsim to enter into the agreements. *See* PI–74 (email dated March 6, 2000 from Hakan Uzan to Murat Kircuval); PT–458 (Ernst Kramer testimony at PI hearing) at 422–423; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 7. Additionally, Aysegul Akay attended critical Telsim Board of Directors meetings relating to these transactions. *See* PT–216 (Telsim Board of Directors decision dated April 24, 2001); PT–

1193 (Kramer Decl. dated January 28, 2002) ¶ 7.

The First Facility Agreement

281. In approximately 1997, prior to entering into the agreements at issue, Nokia and Telsim began exchanging information and discussing the possibility of Nokia supplying Telsim with switching technology. *See* PT–1192 (Responses to Nokia Requests to Admit) at Response No. 2. As a result, Nokia and Telsim signed a MOU dated May 1, 1997 concerning the supply by Nokia of a NSS to Telsim, and a later MOU dated June 18, 1998 concerning the supply by Nokia of products and services related to the NSS. *See* PT–1001 (MOU dated June 18, 1998); PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 9; *see also* Answer ¶ 82.

282. As a result of these preliminary agreements, on October 9, 1998, Nokia and Telsim entered into the NSS Frame Contract for the Supply of Products and Related Services for a Network Switching Subsystem (the "Supply Contract"). *See* PT–1006A. Defendant Hakan Uzan signed this agreement on behalf of Telsim. *See* PT–1192 (Responses to Nokia Requests to Admit) at Response No. 5. The Supply Contract required Nokia to arrange financing through an international bank to fund Telsim's purchases of Nokia's products and services. *See* PT–1006A (Supply Contract) ¶ 5.51; PT–458 (Ernst Kramer testimony at PI hearing) at 414–416; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 11. Nowhere, however, was it disclosed that the Uzans intended to divert substantial portions of the proceeds of this financing to their own, non-Telsim purposes.

283. Nokia eventually engaged ABN–AMRO Bank to establish the loan facility (the "Nokia Financing") to Telsim, which was backed by Nokia. *See* PT–1006A (Supply Contract) ¶ 5.5.1; PT–458 (Ernst

Kramer testimony at PI hearing) at 414–416, 440–441; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 12; *see also* Answer ¶ 85; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 7. Defendants were aware that the Nokia Financing through ABN–AMRO Bank was backed by Nokia. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 12. On or about June 24, 1999, Telsim and ABN–AMRO Bank, on behalf of Nokia, entered into two related agreements providing for a total loan facility in the amount of $78,059,698 (collectively the "First Facility Agreement"). *See* PT–1002A–G; PT–458 (Ernst Kramer testimony at PI hearing) at 415–16. Hakan Uzan and Fatih Azami signed these agreements on behalf of Telsim. *See* PT–1002A (First Facility Agreement), 1002E (First Facility Agreement); PT–1192 (Responses to Nokia Requests to Admit) at Response No. 9; PT–458 (Ernst Kramer testimony at PI hearing) at 808.

284. The express purpose of the First Facility Agreement was to finance Telsim's purchase of products and services from Nokia under the Supply Contract. *See* PT–1002A (First Facility Agreement) § 2.2; 1002E (First Facility Agreement) § 2.2; PT–458 (Ernst Kramer testimony at PI hearing) at 413–416; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 13. Nowhere did the First Facility Agreement disclose the Uzans' intent to divert proceeds to non-Telsim purposes.

285. By a separate Amendment Agreement dated June 24, 1999, executed by ABN–AMRO Bank and Telsim, and agreed to and acknowledged by Nokia, Telsim agreed to provide ABN–AMRO Bank, on behalf of Nokia, with a pledge of 20% of Telsim's stock. *See* PT–1002D (Amendment Agreement); PT–458 (Ernst Kramer testimony at PI hearing) at 417–419; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 13; PT–458 (Fatih Azami

testimony at PI hearing) at 810; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 12; *see also* PT–1101 (email dated Feb. 17, 1999 from Fatih Azami to Mikko Routti). To further effectuate this pledge, on October 1, 1999, Rumeli Telefon and ABN–AMRO Bank, on behalf of Nokia, entered into a Share Pledge Agreement (PT–1002A). *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 14; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 14, pursuant to which Rumeli Telefon, which at the time owned approximately 73% of Telsim's shares, pledged, on a secondary-ranking basis (behind MCC's first-ranking pledge), 20% of Rumeli Telefon's interest in Telsim to ABN–AMRO Bank. *See* PT–1002A (Share Pledge Agreement); PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 14; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 15.

286. Defendant Hakan Uzan signed this agreement on behalf of Rumeli Telefon. *See* PT–1002A (Share Pledge Agreement); PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 14; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 16. He at no time disclosed his already-formed intent not to honor the pledge.

The Second Facility Agreement

287. Beginning in or about January 2000, Hakan Uzan approached Nokia about restructuring their financial relationship. Hakan Uzan indicated that he needed Nokia to provide additional equipment financing (up to a total of $300 million), cash financing of $75 million in order to boost subscriber levels, and an extension of the parties' supply contract. *See* PT–1120 (email dated January 14, 2000 from Suha Akyol to Murat Kircuval); PT–1141 (email dated February 7, 2000 from Ernst Kramer to Sema Sanigok); PT–458 (Ernst Kramer testimony at PI hearing) at 431–

32; *see also* PT–1192 (Responses to Nokia Requests to Admit) at Response Nos. 19, 20, 29; Answer ¶ 88.

288. Hakan Uzan also stated that Telsim was already in negotiations with potential strategic partners or investors, and that they intended to and would have an agreement with a strategic partner or investor by the summer of 2000. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 432–434; *see also* PT–1192 (Responses to Nokia Requests to Admit) at Response Nos. 24, 28. In actuality, the Uzans had no intention of entering into such arrangements, since to do so would have required them to disclose financial information that would have revealed their fraudulent diversions.

289. In addition, beginning in early March 2000 Hakan Uzan informed Nokia that if Nokia was not able to restructure their agreements immediately, Telsim would thereafter purchase their switching equipment from rival Siemens, A.G. ("Siemens"). For example, on March 3, 2000, Hakan Uzan sent an email to Murat Kircuval of Nokia in which he wrote:

> Please believe me that I want to wrap up this issue with Nokia despite the technical capacity of Siemens.... Believe me, and tell this to your friends, it is important to me that Nokia stays. Have them approve of this matter (the cash amount issue). I will personally come on Thursday and finalize this, and will do anything to prevent Siemens from coming in.

PI–73 (email dated March 3, 2000 from Hakan Uzan to Murat Kircuval); *see also* PT–458 (Ernst Kramer testimony at PI hearing) at 437–438; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 19; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 34; Answer ¶ 92.

290. On March 6, 2000, Kircuval received another email from Hakan Uzan, stating that Hakan "received instructions from Kemal [Uzan] today.... Siemens is at this point ready. We need to finalize the project with Nokia by Wednesday (8/3), the day the requests will be made by potential investors." PI–74 (email dated March 6, 2000 from Hakan Uzan to Murat Kircuval); *see also* PT–458 (Ernst Kramer testimony at PI hearing) at 437–438; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 20; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 35; PT–458 (Fatih Azami testimony at PI hearing) at 818–820; Answer ¶ 93. Hakan Uzan also stated that Siemens had already paid a $25 million cash advance and that if he was required to terminate the arrangement with Siemens, he would need cash to repay that advance. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 437–439; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 19; PT–1192 (Responses to Nokia Requests to Admit) at Response Nos. 21, 30, 32, 33.

291. In actuality, Siemens had not advanced $25 million to Telsim at this time. But after Nokia, fearing the competition, provided the additional $25 million to Telsim, Telsim went and borrowed an additional $25 million from Siemens anyway, falsely assuring each company that it was Telsim's sole supplier of switching equipment. *See* PI–3 (Declaration of Gunter Breuninger dated April 2, 2002 ("Breuninger Decl.")) ¶ 7; PI–458 (Fatih Azami testimony at PI hearing) at 831.

292. Specifically, the Supply Contract, as amended on March 10, 2000, provided that Nokia would be Telsim's exclusive supplier for a two-year period. *See* PT–1003F (Amendment No. 1 to the Supply Contract) § 1.2; PT–1015 (minutes of May 15, 2002 meeting); PT–458 (Ernst Kramer testimony at PI hearing) at 437, 445–446; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 40; PT–458 (Fatih

Azami testimony at PI hearing) at 820–824. But, at the very time this representation was made, the Uzans, who were finalizing the parallel agreement with Siemens, knew it was false. The Uzans, recognizing that Nokia was unlikely to be in contact with arch-rival Siemens (and *vice versa*), would be unlikely to find out about the fraud and that the Uzans could therefore obtain still more divertible money via Telsim.

293. Under the Second Facility Agreement, which replaced and canceled the First Facility Agreement, the amount of the loan facility, which remained fully backed by Nokia, was increased to $400 million. *See* PT–1003B (Second Facility Agreement); PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 23; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 42. Nowhere did the agreement disclose the Uzans' diversion of funds to non-Telsim uses.

294. At defendants' direction, the wire transfers that carried out the transfer of funds were executed through the Bank of New York. *See* PT–1077 (email dated March 10, 2000 from Ayse Aksel to Yahim Nassen containing wire transfer instructions); PT–458 (Ernst Kramer testimony at PI hearing) at 444–445; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 46.

295. As described above, collateral was a major issue for Nokia during these negotiations. During the parties' meetings, Hakan Uzan told Nokia representatives that by pledging Telsim shares, he would not only provide Nokia with more than adequate security, he would be pledging to them the "heart and soul" of his family, and something very "precious" to him and his family. He also stressed how difficult it was to obtain the approval of his father, defendant Kemal Uzan, for the pledge. PT–458 (Ernst Kramer testimony at PI

hearing) at 436–437; *see also* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 25; Answer ¶ 99.

296. Based on these false assurances, a new Share Pledge Agreement between ABN–AMRO Bank and Uzan-controlled Rumeli Telefon was executed. Rumeli Telefon now pledged, on a first-ranking basis, 5% of the issued and outstanding shares of Telsim to ABN–AMRO Bank as security for the loan facility. Defendant Hakan Uzan signed this agreement on behalf of Rumeli Telefon. Defendant Aysegul Akay signed the Board Resolutions of Rumeli Telefon authorizing the pledge. *See* PT–1003C (Share Pledge Agreement); PT–1003I (Resolutions of Board of Directors of Rumeli Telefon Nos. 110, 111, and 112); PT–458 (Ernst Kramer testimony at PI hearing) at 434, 436; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 26; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 49, 50. The Uzans, however, failed to disclose that MCC's pledged shares had now increased to 66%, so that virtually the entirety of Rumeli Telefon's shares was being pledged. On the contrary, Hakan Uzan and Fatih Azami represented to Nokia that Telsim's debt to MCC had not increased from the amount owed when the Phase I Agreements were signed, exclusive of interest. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 435–436; PT–458 (Fatih Azami testimony at PI hearing) at 813.

297. Nokia would not have provided the whole financing included in the Phase II Agreements if they had been informed that MCC financing to Telsim had increased between June 1999 and March 2000. *See* PT–1090 (letter dated February 4, 1999 from Mikko Routti to Fatih Azami); PT–1106 (email dated May 14, 1999 from Mikko Routti to Sema Sanigok and others); PT–1099 (letter dated July 9, 1999 from Mikko Routti to Fatih Azami); PT–

1098 (email dated August 4, 1999 from Mikko Routti to Sema Sanigok); PT–1097 (email dated August 26, 1999 from Joacim Nassen to Sema Sanigok); PT–1096 (email dated August 26, 1999 from Fatih Azami to Joacim Nassen); PT–1011 (email dated Nov. 16, 1999 from Ernst Kramer to Hakan Uzan); PT–1016 (email dated Dec. 28, 1999 from Ernst Kramer to Fatih Azami and Sema Sanigok); PT–458 (Ernst Kramer testimony at PI hearing) at 436.

The Third Facility Agreement

298. Within a matter of weeks, in April 2000, the Uzans approached Nokia seeking to increase the loan facility again, once more raising both the threat of taking their business elsewhere and the likelihood of their finding a strategic partner. Thus, in an email to Murat Kircuval of Nokia dated April 26, 2000, Hakan Uzan stated: "We have received a lot of attractive offers from other parties.... Perhaps we can pay everything off and take back our shares, all depending on the numbers. Our goal is to pay everything off, if nothing unexpected happens. We will see after that what will happen, there are many attractive offers on the table." PI–78 (email dated April 26, 2000 from Hakan Uzan to Murat Kircuval); see also PT–458 (Ernst Kramer testimony at PI hearing at 448–450); PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 28; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 56.

299. On or about April 26, 2000, Hakan Uzan stated that Telsim was in the final stages of negotiations with Siemens, and that Nokia could only remain a supplier to Telsim if they could meet Siemens' offer. See PT–458 (Ernst Kramer testimony at PI hearing) at 447. Thus, within weeks of signing the Phase II Agreements, defendants were already threatening to breach one of the key aspects of the deal—the exclusivity provision of the Supply Con-

tract. See PT–1003F (Amendment No. 1 to Supply Contract) § 1.2; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 29; PT–458 (Fatih Azami testimony at PI hearing) at 821–824. At the same time, the Uzans failed to disclose during these negotiations that Telsim had already signed a MOU with Siemens on April 5, 2000. See DX–458; PI–3 (Breuninger Decl.) ¶ 6; PT–458 (Fatih Azami testimony at PI hearing) at 820. Indeed, as Nokia later learned through the Turkish Customs office, a Siemens switch was delivered to Telsim in Turkey in approximately May 2000. See PI–3 (Breuninger Decl.) ¶ 5; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 29; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 58; see also Answer ¶ 103.

300. At the same time, defendants continued to mislead Nokia into believing that they intended to find a strategic partner for Telsim. In this regard, the Uzans also told Nokia that they had engaged Merrill Lynch to help them find a strategic partner, but refused to allow any communication between Nokia and Merrill Lynch. See PT–1115 (email dated May 14, 2000 from Hakan Uzan to Ernst Kramer); PT–458 (Ernst Kramer testimony at PI hearing) at 452–454; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 30; PT–1192 (Responses to Nokia Requests to Admit) at Response Nos. 62, 63; see also Answer ¶ 104.

301. On May 22–24, 2000, the parties met in Zurich to negotiate and draft a new series of agreements (the "Phase III Agreements"). See PT–458 (Ernst Kramer testimony at PI hearing) at 453; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 31; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 64; see also Answer ¶ 105. Defendant Hakan Uzan, who was actively involved throughout the entire negotiation process, attend-

ed the May 23 and May 24 meetings personally, and was joined by his brother Cem Uzan for the May 23 meeting. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 453–454; PT–1193 (Kramer Decl. Jan. 28, 2002) ¶ 31; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 65; *see also* Answer ¶ 105. At these meetings, Hakan Uzan represented that Telsim was in final negotiations with both Deutsche Telekom and Vodafone, and that an agreement for a strategic partner would be concluded by July 1, 2000. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 452; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 42. As previously noted, these representations were false. But when Nokia requested that Cem Uzan and Hakan Uzan show to Nokia representatives the agreement that Telsim was allegedly drafting with a potential strategic partner or investor, *see* PT–458 (Ernst Kramer testimony at PI hearing) at 453, Cem Uzan responded that Nokia was making an unethical request. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 453–454.

302. The issue of the strategic partner was discussed on May 24, 2000 by video conference among Hakan Uzan and Faith Azami, and for Nokia by its CFO Olli–Pekka Kallasvuo and Messrs. Mikko Heikkonen and Pertti Melamies. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 454–455. While Hakan Uzan, in the presence of Fatih Azami, refused to include a written commitment to secure a strategic investor as a condition precedent to the new Third Facility Agreement, claiming that he did not wish to disclose such a commitment to interested partners or investors, *see* PT–458 (Fatih Azami testimony at PI hearing) at 840–842, he gave his verbal commitment, memorialized in a Side Letter, and promised that $200 million of the facility would be repaid immediately if by October 1, 2000, no agreement was

reached to sell a substantial part of the share capital and voting rights in Telsim to an international foreign telecom-operator that thereby would have become a strategic partner. The Uzans made these representations intending to dishonor them and for the purpose of inducing Nokia to enter into the Phase III Agreements and to increase the loan facility. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 455–457; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 31; PT–458 (Fatih Azami testimony at PI hearing) at 840–845, 846–848; PT–1192 (Responses to Nokia Requests to Admit) at Response Nos. 69, 70.

303. On May 24, 2000, Hakan Uzan signed the Side Letter, thereby obligating Telsim to obtain a strategic partner or investor by October 1, 2000, on behalf of Telsim. *See* PI–203. At that time, Hakan Uzan knew that he could not fulfill this representation, and did not intend to, since it would have meant disclosing financial information that would have revealed the Uzans' diversions of funds.

304. The Third Facility Agreement increased the amount of the loan facility to $800 million, also in two tranches. Tranche A, which funded the Nokia Financing in the amount of $350 million, was to be used only to pay Nokia for products and services. Tranche B, in the amount of $450 million, provided Telsim with an additional $350 million in cash beyond the $100 million previously transferred under the Second Facility Agreement. Hakan Uzan signed this agreement on behalf of Telsim. *See* PT–1004D (Third Facility Agreement) § 2.2, p. 39; PT–458 (Ernst Kramer testimony at PI hearing) at 458–460; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 34; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 77, 79.

305. Among other things, defendants insisted on this cash tranche so, they claimed, that they could pay taxes owed to the Turkish government in connection with their GSM license. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 34. This representation was false.

306. At Hakan Uzan's direction, these wire transfers to Telsim were executed through the Bank of New York. *See* PI–204 (wire transfer order signed by Hakan Uzan); PT–1062 (SWIFT printout notices for wire transfer); PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 35; PT–458 (Ernst Kramer testimony at PI hearing) at 460; PT–1192 (Responses to Nokia Requests to Admit) at Response No. 83.

307. Based on the Uzans' continuing false assurances concerning the adequacy of the share pledge, the Phase III Share Pledge Agreement between ABN–AMRO Bank and Rumeli Telefon increased the amount of the pledge from 5% to 7.5% of the issued and outstanding shares of Telsim to ABN–AMRO Bank. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 460; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 36. Hakan Uzan signed this agreement on behalf of Rumeli Telefon. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 36; PT–1004E (Third Facility Agreement). Defendant Aysegul Akay signed the Board Resolutions of Rumeli Telefon authorizing the pledge. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 36; PT–1004M (Telsim board resolution). Again, the Uzans failed to disclose their intention never to let control of the collateral pass to Nokia.

Events Leading to Default on the Nokia Loans

308. As described above, the basis of the Third Facility Agreement was defendants' commitment in a Side Letter to secure an international foreign telecommunications operator as a strategic partner by October 1, 2000, *or* be required immediately to repay ABN–AMRO Bank $200 million. While negotiating this point, Hakan Uzan and Fatih Azami falsely represented that Telsim was so close to a deal that they needed only until July, not October, as provided in the Side Letter, to fulfill their obligations.

309. In approximately August and September 2000, it became apparent to Nokia that the Uzans did not intend to find a purchaser or strategic partner for Telsim. *See* PT–1040 (letter dated September 19, 2000 from Timo Korvenpaa to Fatih Azami). Indeed, by October 1, 2000, they had not succeeded in finding a strategic partner; thus, $200 million became immediately due and payable under the Side Letter. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 44; PT–458 (Ernst Kramer testimony at PI hearing) at 462.

310. On March 15, 2001, the first payment of approximately $25 million under the Facility Agreements became due. This amount, together with the $200 million owed under the Side Letter, was not paid, and has never been paid. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 463–464. On May 9, 2001, Nokia formally notified Telsim of its default status. *See* DX–126, 127 (notices of default).

311. The parties also exchanged other written correspondence during this time period. Nokia pointed out Telsim's many failures under the agreements, as well as Telsim's refusal to sign the amended agreement negotiated and drafted in January 2001. The Uzans responded with still more false representations in a futile attempt to explain away their many failures under the agreements, raising, among other things, purported performance failures of Nokia and the purported "force majeure" effects of changes in the Turkish economy in December 2000 and early 2001

upon Telsim's ability to fulfill any of its financial obligations. The Uzans knew that their purported justifications were false. *See* PI–322A–D (correspondence dated March 15–19, 2001 between Nokia and Hakan Uzan); PT–1041 (email dated April 10, 2001 from Hakan Uzan to Murat Kircuval); PT–1046 (email dated May 29, 2001 from Timo Korvenpaa to Telsim); PT–1051 (letter dated July 9, 2001 Nokia to Telsim); PT–1049 (letter dated July 17, 2001 from ABN–AMRO Bank to Fatih Azami); PT–1121 (letter dated August 1, 2001 from Hakan Uzan to ABN–AMRO Bank); PT–1052 (letter dated September 17, 2001 from Jorma O. Lila to Hakan Uzan); PT–458 (Ernst Kramer testimony at PI hearing) at 463–466; PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 47; *see also* Answer ¶ 123.

The Diversions of Loan Proceeds From Telsim

312. As the foregoing account shows, plaintiffs relied to their detriment on numerous false and fraudulent statements made by the defendants that served to induce plaintiffs to extend both their initial and their subsequent loans to Telsim. These misrepresentations were, without exception, sufficiently material that, had plaintiffs known the truth, plaintiffs would never have extended the loans, let alone done business with the Uzans.

313. It is true that plaintiffs appear to have had some awareness of the frequent allegations of fraud that have been made against the Uzans over the years by Turkish regulatory authorities, *see e.g.*, report of the Turkish Capital Markets Board ("SPK") accusing the Uzans of fraudulently diverting nearly $12 million from a Uzan-controlled power company into one of their banks, *see* PT–433 (SPK Audit Report), and that continue even now, *see*, *e.g.*, L. Boulton and C. Daniel, *Bank Watchdog Wants Uzans Charged*, Finan-

cial Times, July 26, 2003, 2003 WL 60564182 ("Turkey's banking watchdog is pressing for criminal charges against the controversial Uzan family after claiming to have discovered a system of double-accounting at their failed Imarbank."). But Turkey was a tempting market for cellular communications expansion, and the Uzans lulled the plaintiffs into complacency by making timely payment on small initial transactions by which plaintiffs "tested the waters." Once, moreover, plaintiffs had committed very large sums in reliance on defendants' false representations regarding the transactions here in issue, they were psychologically predisposed to credit defendants' further lies rather than admit that they had been swindled and faced huge losses.

314. The motive for defendants' scheme is not hard to discern: defendants sought to enrich themselves at plaintiffs' expense. More particularly, the Uzans—building a diverse economic empire and constantly confronted with the uncertainties and vicissitudes of the Turkish economy—saw plaintiffs' loans to Telsim as a great opportunity to funnel vast sums into their control and then divert them wherever they chose, whether to prop up other companies in their far-flung enterprise or to simply launder monies into their own pockets.

315. In any event, while defendants' refusal to supply adequate discovery in this case (all the while accepting substantial discovery provided by plaintiffs) has made it difficult to trace every relevant transaction, the Court agrees with the findings of plaintiffs' expert, Anthony Samuel, that the Uzans siphoned into their own banks or into non-Telsim entities they controlled more than $1 billion of the monies lent to Telsim. The extent and frequency of these diversions, especially when coupled with the overwhelming evidence of

defendants' fraudulent intent, lead inexorably to the further conclusion that defendants intended such diversion of funds from the outset of the transactions here at issue.

316. Of the more than $1 billion that was fraudulently diverted from Telsim, $450 million was siphoned directly to other Uzan entities in Turkey, and another $133 million was diverted to Uzan-controlled offshore entities on the island of Curacao in The Netherland Antilles, named Brampton, Novabrands, Kingsbury, and Klavma (collectively referred to as "offshore entities"). Finally, at least $552 million was laundered into the control of Uzan-controlled companies by the device of reimbursing them for fraudulently overstated expenses. *See* PT–435 (Samuel Report).

317. While some of the testimony of defendants' own witness, Fatah Azami, inferentially supports these conclusions, the primary basis for these findings is the detailed report of Anthony B. Samuel, lead partner of the Intellectual Property & Licensing Disputes Group of the Forensic Services Practice in the London office of the accounting firm of Price Waterhouse-Coopers. *See* PT–435 (Samuel Report) at Appendix 1. Mr. Samuel, a Chartered Public Accountant, has had substantial experience in investigating accounting issues in the telecommunications industry, and over the last nineteen years has led accounting, forensic accounting, and/or valuation assignments in Europe, Asia, the United States, Australia, and numerous other countries around the world. *See* PT–435 (Amuel Report) at Appendix 1. In addition, Mr. Samuel testified at the trial, and responded to specific inquires from the Court. The Court found his testimony to be credible and soundly based.

318. Mr. Samuel's analysis of the flow of funds involves a detailed review of thousands of individual banking transactions from many sources, which Mr. Samuel compiled in a summary exhibit that shows each transaction in chronological order. *See* PT–284 (Appendix to Samuel Report); PT–284A (supplement to Appendix 7). Although, as noted, Mr. Samuel's review was handicapped by defendants' refusal to be deposed and to produce numerous responsive documents, he was able to satisfactorily document the following conclusions:

- In 1999–2001 the total amount diverted by defendants was $1.135 billion or more.
- At least $583 million in cash and other assets was directly diverted from Telsim to entities owned and controlled by the Uzans;
- Of this $583 million in diversions, $133 million was diverted from Telsim to the offshore entities, which were then used to transfer $90.1 million in cash directly to the individual defendants and $77.9 million to pay and/or maintain assets for the individual defendants' personal benefit, including at least four yachts, seven luxury apartments in the Trump World Tower, two jet planes, one helicopter, personal credit card bills, etc., funded at least in part by funds from Telsim.
- An additional $552 million in overstated or suspicious "expenses" paid to Uzan–related companies more likely than not represents additional diversion to defendants. Further, there is unrefuted evidence that additional subscriber revenues that were supposed to go to Telsim were siphoned off and never reached Telsim's accounts, and instead were diverted to defendants and/or entities they control.
- When viewed together, the pattern of payments to and from Telsim and each related party indicates clearly that the overall picture is one of a single group operation, with the Uzans using funds from various sources as they saw fit and

for their own personal use and benefit. Indeed, during the period of the MCC and Nokia loans, the individual Uzan defendants received over $296 million in or for their personal accounts.

• Finally, Mr. Samuel found that defendants' inability to cause Telsim to repay plaintiffs' loans was unrelated to any claimed changed economic circumstances in Turkey in late 2000 and the devaluation of the Turkish lira in February 2001 (the components of the alleged "economic *force majeure*"). Rather, it was caused by defendants' aforementioned diversion of monies from Telsim. (Although, apart from the Samuel Report, plaintiffs adduced considerable other evidence convincingly refuting defendants' claims of "economic *force majeure*," defects in plaintiffs' equipment, etc., the Court need not reach any of this, since defendants waived all such defenses by declining to appear at trial. In addition, these defenses were raised at the preliminary injunction hearing, but the Court found them entirely unconvincing, as shown by its conclusion that plaintiffs had shown substantial likelihood of success).

319. The Court has very carefully reviewed the Samuel Report and finds its conclusions fully supported by the evidence referenced therein. It would serve no useful purpose to reproduce here the 133 pages of the Samuel Report, plus exhibits and Supplemental Report. Rather, the Court hereby adopts as its own findings the entirety of the Samuel Report, which will be filed contemporaneously with the Clerk of the Court.

320. In addition, the fact of the siphoning, if not its amount, is further corroborated by the unrebutted sworn statements of two knowledgeable individuals. The first individual is Tarik Camanli, a former Telsim employee who served as regional sales director. *See* PI–4 (Declaration of Tarik Camanli dated March 23, 2002 ("Camanli Decl.")). In his declaration, he states that he personally observed the diversion of "money from Telsim for the Uzans' personal use and for use by the Uzan companies." PI–4 (Camanli Decl.) ¶¶ 1–5. He states that diversion of revenue took place through the Uzan-owned company Standart Paz. *See id.* ¶¶ 13–16. According to Mr. Camanli, in July of 2001, Telsim required all of its dealers to make payments to Standart Paz instead of Telsim. *See id.* He further indicates that Standart Paz is essentially a shell company with no employees of its own that was used to divert and launder revenues. *See id.*

321. Camanli's testimony is corroborated by the sworn declaration of Kenan Yusuf Aktay. *See* PI–1 (Declaration of Kenan Yusuf Aktay dated February 4, 2002 ("Aktay Decl.")). Until January 2001, Mr. Aktay was a Telsim dealer. According to Mr. Aktay, dealers were required to make payments to Standart Paz instead of Telsim. *See* PI–1 (Aktay Decl.) ¶¶ 1–3, 10.

322. Additionally, although it is detailed in the Samuel Report, the Court takes special note, for both jurisdictional and attachment purposes, that the following New York properties were purchased by three of the individual defendants with monies diverted from Telsim via the official entities:

| Address | Owner | Purchase price ($) | Date |
| --- | --- | --- | --- |
| 845 UN Plaza Unit # 59C | Luna | 1,600,000 | 26 April 1999 |
| 845 UN Plaza Unit # 59D | Luna | 1,225,000 | 26 April 1999 |
| 845 UN Plaza Unit # 80B | Cem Uzan | 3,151,900 | 26 April 1999 |

| 845 UN Plaza Unit # 89A | Hakan Uzan | 6,171,400 | 26 April 1999 |
|---|---|---|---|
| 845 UN Plaza Unit # 89B | Hakan Uzan | 8,036,700 | 26 April 1999 |
| 845 UN Plaza Unit # 90A | Cem Uzan | 7,665,000 | 26 April 1999 |
| 845 UN Plaza Unit # 90B | Cem Uzan | 9,975,000 | 26 April 1999 |
| 515 Park Avenue Unit # 19 | Cem Uzan | 6,150,000 | 14 January 2000 |
| 515 Park Avenue Unit # 3K | Cem Uzan | 300,000 | 14 January 2000 |

*See* PT–435 (Samuel Report) ¶¶ 10.3–10.10.

323. Further, the Court notes that, during the period of the MCC and Nokia loans, the individual defendants received over $296 million into their personal accounts, most or all of which can be imputed, directly or indirectly, to the loan monies diverted from Telsim. These amounts can be seen in the bank records entered into evidence by plaintiffs. *See* PT–435A (Supplemental Samuel Report) at Appendix 11; PT–284 (Appendix 7 to Samuel Report); PT–285 (bank statements).

The Dilution of the Collateral

324. Immediately preceding plaintiffs' declarations of default, defendants, recognizing that they could no longer stall plaintiffs with false representations as to forthcoming funding and the like, and further recognizing that defendants were therefore in jeopardy not only of having the collateral foreclosed but also thereby losing control of Telsim, took steps to carry out what the Court finds was always their intention: to dilute the value of the collateral and totally eviscerate its rights respecting Telsim.

325. On April 24, 2001, immediately preceding the due date of a $700 million payment to MCC, the shareholders of Telsim held a secret and specially called meeting, without the knowledge of MCC, Nokia, or ABN–AMRO Bank, at which they resolved that the number of outstanding shares of Telsim would be tripled, from 12,924,000 to 38,772,000. *See* PI–36 (Telsim shareholder meeting report dated April 24, 2001).

326. Defendants Hakan Uzan, Cem Uzan, and Aysegul Akay all signed the resolutions authorizing the actions at the April 24, 2001 Dilution Meeting. *See* PI–36 (Telsim shareholder meeting report dated April 24, 2001); PT–436 (Responses to MCC Requests to Admit) at Response No. 129.

327. In addition to being directors of Telsim as of May 7, 2001, defendants Cem Uzan, Hakan Uzan, and Aysegul Akay were all shareholders of Standart Telekom, together owning 494 of the 500 outstanding shares of Standart Telekom. *See* PI–37 (Standart's list of shareholders dated May 7, 2001); PT–436 (Responses to MCC Requests to Admit) at Response Nos. 131–133. Akay owned 100 shares, and her brothers Cem and Hakan Uzan each owned 197 of the 500 outstanding shares. *See id.* The combined ownership of the three was 98.8% of Standart Telekom.

328. Additionally, at the time of the April 24, 2001 meeting, defendants owned 480 of the 500 outstanding shares of Rumeli Telefon, with Cem Uzan, Kemal Uzan, Hakan Uzan, and Aysegul Akay each owning 120 shares, totaling 96% of the outstanding shares. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 124–128.

329. Prior to the meeting, the Uzan entities Rumeli Holding and Rumeli Telefon respectively owned 21.99% and 73.63% of Telsim's shares. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 135; PI–36 (Telsim shareholder meeting report dated April 24, 2001).

330. Rumeli Telefon, in turn, had pledged to MCC shares that represented 66% of the outstanding shares of Telsim as collateral for MCC's loans; Rumeli Telefon had further pledged additional shares that represented 7.5% of the outstanding shares of Telsim to ABN–AMRO Bank. *See* PI–100 (letter dated August 16, 2001 from Rumeli Telefon to MCC); PI–122 (September 2000 amendment to Pledgeholder Agreement between MCC and Rumeli Telefon dated July 2, 1998); DX–37 (share pledge agreement between Rumeli Telefon and ABN–AMRO Bank).

331. In furtherance of defendants' scheme to defraud MCC and Nokia and steal their security, the Uzans thereupon caused Rumeli Telefon to waive its preemptive right to subscribe to a proportional amount of the newly authorized Telsim stock, notwithstanding the fact that the additional shares were offered on advantageous terms and for a nominal price. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 138; PI–36 (Telsim shareholder meeting report dated April 24, 2001). Had Rumeli Telefon exercised its rights, it would have retained its 73.63% pro rata share of Telsim's stock. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 139.

332. Rumeli Telefon's failure to exercise its rights to take up the newly issued shares diluted its ownership interest and, in turn, devaluated plaintiffs' collateral. *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 140–143, 151; PI–36 (Telsim shareholder meeting report dated April 24, 2001).

333. Simultaneously with Rumeli Telefon's waiver of its preemption rights, the Uzans caused the shareholders of Telsim to transfer Rumeli Telefon's waived preemption rights to defendant Standart Telekom. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 140;

PI–36 (Telsim shareholder meeting report dated April 24, 2001).

334. As a result of these actions, Rumeli Telefon's interest in Telsim was intentionally reduced to 24.54% (one-third of the original 73.63%). *See* PT–436 (Responses to MCC Requests to Admit) at Response Nos. 123, 141; PI–36 (Telsim shareholder meeting report dated April 24, 2001).

335. In addition, MCC's collateral was intentionally reduced from 66% of the outstanding capital shares of Telsim to approximately 22% of such shares. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 151; PT–458 (Fatih Azami testimony at PI hearing) at 706; PI–36 (Telsim shareholder meeting report dated April 24, 2001). Similarly, Nokia and ABN–AMRO Bank's security interest was intentionally reduced from 7.5% to 2.5%. *See* PT–458 (Fatih Azami testimony at PI hearing) at 706; PI–36 (Telsim shareholder meeting report dated April 24, 2001).

336. At the same time, however, Uzan-owned-and-controlled Standart Telekom's interest in Telsim *increased* from 0.32% to 66.48%, of which 49.089% was derived from the proportion of the collateral shares that Rumeli Telefon had in effect relinquished. *See* PT–436 (Responses to MCC Requests to Admit) at Response No. 142; *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 138 n. 5 (2d Cir.2003).

337. Defendants Hakan Uzan, Cem Uzan and Aysegul Akay signed the amendment to Telsim's articles of association, which increased the shares of Telsim and reflected the dramatic increase in Standart Telekom's percentage ownership. *See* PI–36 (Telsim shareholder meeting report dated April 24, 2001); PT–436 (Responses to MCC Requests to Admit) at Response No. 143.

338. This fraudulent dilution in value of assets pledged to MCC and Nokia thus also resulted in a transfer of value directly from MCC and Nokia to Standart Telekom, an Uzan-controlled entity in which MCC and Nokia do not hold an interest and which thereby was unjustly enriched. *See* PT–1193 (Kramer Decl. dated January 28, 2002) ¶ 54.

339. This transfer would have constituted a fraud on MCC and Nokia even if they had received notice of it in advance. But in fact at no time prior to this meeting were MCC or Nokia informed that it would occur, nor were they warned about the actions to be taken at the meeting. *See* PT–458 (Edward Hughes testimony at PI hearing) at 80–82, 89; PT–458 (Ernst Kramer testimony at PI hearing) at 465–466; PT–458 (Fatih Azami testimony at PI hearing) at 852. Indeed, Nokia only learned of the collateral dilution in June 2001. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 465–466.

340. The fact that notice was published in the Turkish Trade Chronicle Newspaper on April 5, 2001 did not provide notice to MCC or Nokia of the Uzans' intention to dilute plaintiffs' pledged interests. Defendants' own witness admitted at the preliminary injunction hearing that the Turkish Trade Registry is not generally available. *See* PT–458 (Professor Omer Teoman testimony at PI hearing) at 994. Moreover, the Court finds that the fact that defendants resorted to publication in a little known or read trade publication is simply further evidence of defendants' fraudulent intent.

341. Moreover, far from seeking to provide notice to MCC and Nokia, the Uzans throughout this period were purposefully misleading MCC and Nokia by pretending to negotiate with plaintiffs about Telsim repaying the loans, all the while planning to dilute plaintiffs' security.

*See* PT–436 (Responses to MCC Requests to Admit) at Response No. 121.

342. For example, on April 7, 2001, Hakan Uzan emailed Keith Bane, copying Cem Uzan and Telsim executives Enver Ibek, Fatih Azami, Deniz Turhan, and defendant Luna, to discuss Hakan Uzan's impending plans for a meeting in New York. In this meeting there was no mention of the April 24, 2001 meeting, despite the fact that the notice had already gone out to shareholders. *See* PI–361 (email dated April 7, 2001 from Hakan Uzan to Keith Bane); *see also* PT–25 March 26, 2001 letter from Hakan Uzan to Keith Bane.

343. Similarly, on April 9, 2001, Hakan Uzan again emailed Keith Bane, this time copying Edward Hughes and Cem Uzan, to inquire about the meeting in New York that was to be held the following Wednesday, April 11, 2001. This email made no mention of the April 24, 2001 meeting or the plans to steal MCC's and Nokia's security. *See* PI–90 (email dated April 9, 2001 from Hakan Uzan to Keith Bane). A second email sent that day from Hakan Uzan to Keith Bane and copying Edward Hughes, Cem Uzan and Enver Ibek indicated that Enver Ibek, defendant Luna, Fatih Azami, and Hakan Uzan would be present at the New York meeting. Again no mention was made of the impending dilution of plaintiffs' collateral. *See* PI–96 (email dated June 11, 2001 from Hakan Uzan to Keith Bane).

344. Although Edward Hughes did not attend the April 11, 2001 meeting, when he telephoned Hakan Uzan about the meeting there was no mention of the upcoming dilution meeting in Turkey or the fact that a notice of it had gone out to shareholders. *See* PT–458 (Edward Hughes testimony at PI hearing) at 80–81.

345. At the actual meeting in New York City on April 11, 2001, less than two weeks before the dilution meeting was to occur, no mention was made of it, although Hakan Uzan knew that the dilution was scheduled to occur. *See* PT–458 (Fatih Azami testimony at PI hearing) at 706–707.

346. Finally, on April 20, 2001, Hakan Uzan sent an email following up on the New York meeting to Keith Bane and Rick Severns of MCC, copying Cem Uzan, and stating, "We hope that we will find mutually acceptable and beneficial resolutions to the open tasks, and therefore also expect that [MCC] will halt all notifications and will suspend all contractually working time frames . . . ." PI–91 (email dated April 20, 2001 from Hakan Uzan to Keith Bane and Rick Severns). Again, there was no mention of the dilution.

347. In other words, at the very time that Hakan Uzan was suggesting that MCC not take adverse action against Telsim pending the ongoing discussions, he purposely concealed from plaintiffs that the Uzans had already initiated their plan to dilute plaintiffs' pledged interest in Telsim's shares. *See* PI–36 (statement in Telsim shareholder meeting report dated April 24, 2001 that notice of dilution meeting occurred on April 6, 2001) at 1.

348. Indeed, at the preliminary injunction hearing, Mr. Azami testified that Telsim's entire executive board recognized that the dilution was wrong and that Telsim's shareholders—the Uzans—were obligated to restore plaintiffs' pledged interests. *See* PT–458 (Fatih Azami testimony at PI hearing) at 711. Nevertheless, despite this representation, defendants have taken no actions to fulfill this promise.

349. As for defendants' purported excuses for their actions surrounding the April 24, 2001 dilution, the Court finds them to be palpable shams. For example, while Hakan Uzan claims that Telsim's shares were tripled to comply with Article 324 of the Turkish Commercial Code, *see* PT–454 (Hakan Uzan Decl. dated March 14, 2002) ¶¶ 49, 144, which requires that a company take steps to increase its capital when the company loses two thirds of its capital, *see* PT–458 (Fadlullah Cerrahoglu testimony at PI hearing) at 603–604, defendants' own expert witness, Professor Omer Teoman, testified that due to the market price revaluation Telsim obtained in April of 2001 (including revaluation of Telsim's GSM license at $1.8 billion), Telsim had already satisfied Article 324 before the April 24 meeting. *See* PT–458 (Omer Teoman testimony at PI hearing) at 1001–1002. Secondly, plaintiffs' Turkish law expert, Dr. Fadlullah Cerrahoglu, testified that a recapitalization was not necessary under Article 324 due to the revaluation Telsim had already obtained. *See* PT–458 (Fadlullah Cerrahoglu testimony at PI hearing) at 602–604. These, and defendants' other purported explanations for the dilutions, are, the Court finds, blatant sophistry designed to conceal their fraud even from this Court.

350. Not content with the April 2001 dilution, on January 4, 2002, the Uzans initiated a general assembly meeting of the Telsim shareholders for the purpose of further diminishing the value of the collateral. *See* PI–38 (Telsim shareholder meeting agenda dated January 4, 2002); PT–436 (Responses to MCC Requests to Admit) at Response Nos. 154–155.

351. At this meeting, the Uzans (1) voted to create a privileged class of shares (the "Class A shares") controlled by the Uzans and unencumbered by any pledge to MCC or Nokia, with authority to nominate four of Telsim's five directors and all three of Telsim's statutory auditors, and (2) voted to allow Telsim to become a member of foundations, entities whose assets are ma-

terially harder for creditors to reach. *See* PI–38 (Telsim shareholder meeting agenda dated January 4, 2002); PI–39 (minutes of January 4, 2002 Telsim shareholders meeting); PT–458 (Fadlullah Cerrahoglu testimony at PI hearing) at 613; PT–436 (Responses to MCC Requests to Admit) at Response No. 159.

352. The January 4, 2002 meeting was held over the objection of Detecon Gmbh ("Detecon")—a company that owns less than one-half of one percent of Telsim and is the only non-Uzan related shareholder—which had objected to the meeting on the grounds that the notice and the proposed actions were not in accordance with law or with the principles of good faith. Indeed, Detecon had itself received notice of the meeting only one day before it occurred. *See* PI–39 (minutes of January 4, 2002 Telsim shareholder meeting). No timely notice whatsoever was given to plaintiffs.

353. The Court rejects defendants' suggestion that they created a preferential class of Telsim stock in order to attract a foreign investor because (1) the evidence shows that no such potential investor existed as of January 2002, *see* PT–445 (Paul Raphael Deposition) at 128; PT–444 (Sean Carney Deposition) at 77–78; (2) the evidence already discussed above overwhelmingly demonstrates that the Uzans never intended to sell Telsim; (3) the extraordinary control rights that the January 4 resolutions gave the Uzans would have made acquisition of the company less desirable to an outside investor; and (4) the Uzans' failure to inform plaintiffs of the January 4 meeting creates a strong inference that the Uzans intended to damage plaintiffs.

354. Rather, the obvious purpose of the resolutions of the January 4, 2002 general meeting was to further diminish the value of plaintiffs' collateral and deprive plaintiffs of attendant rights.

355. Shortly after the January 4, 2002 meeting, the instant lawsuit was commenced. In a sworn declaration filed with this Court in March 2002, Hakan Uzan expressly pledged that the January 4, 2002 resolution would not be registered with the Turkish government and, therefore, would not take effect, *see* PT–454 (Hakan Uzan Decl. dated March 14, 2002) ¶ 153. In addition, on May 9, 2002, the Court issued an order prohibiting defendants and their agents from taking any step, directly or indirectly, to "certificate, transfer, encumber, or affect in any way whatever" the collateral or its "value, status, and/or availability to this Court." Order dated May 9, 2002. Nonetheless, just one day later, on May 10, 2003, defendants undertook registration of the January 4 resolutions, which was thereafter accomplished. *See* C–29 (Declaration of Ece Unlu dated May 23, 2002); C–30 (registration of January 4, 2002 amendments to Telsim's articles of association); C–126; PT–436 (Responses to MCC Requests to Admit) at Response Nos. 161, 163 (Defendants admit they requested registration, that Hakan Uzan made the decision to seek registration, and that the Turkish government has in fact registered the resolutions).

356. As the Court has previously held, the Court wholly discredits Hakan Uzan's subsequent testimony to this Court that the registration occurred inadvertently, with no intent to break his prior sworn promise to the Court or to act in contempt of its orders. *See* Opinion and Order, dated August 22, 2002, 2002 WL 1963301 at *2–3. Rather, the registration was part of the fraud, and Hakan Uzan's testimony was simply one more attempt to disguise the fraud with false statements. *See id.; see also* PT–459 (Hakan Uzan testimony at contempt hearing) at 19.

The False Criminal Charges in Turkey

357. Although various of the agreements between plaintiffs and Telsim obli-

gated Telsim to provide plaintiffs with complete financial information, *see e.g.,* DX–15 (February 1, 2000 Amendment to Share Pledge Agreement) at 6, defendants repeatedly declined to fulfill these obligations, giving a host of pretexts. Accordingly, when plaintiffs reached the point of declaring defaults, they hired the well-known financial investigative firm of Kroll Associates to go to Turkey to try to uncover the facts.

358. In retaliation, and both to help conceal the fraud and to extort concessions from the plaintiffs, the Uzans first threatened to file and then did file materially false criminal charges against high level executives of plaintiffs and their affiliates.

359. Thus, on July 17, 2001, Hakan Uzan explicitly threatened plaintiffs with the filing of false criminal charges by sending an email to Chris Galvin and Keith Bane, stating that he would initiate "very messy and potentially harmful criminal proceedings" against MCC and its executives. PI–98 (email dated July 17, 2001 from Hakan Uzan to Chris Galvin); *see also* PT–436 (Responses to MCC Requests to Admit) at Response No. 192. The email was copied to Cem Uzan and Luna.

360. Then, on July 23, 2001, days before a scheduled meeting between defendants and MCC, Hakan Uzan and Cem Uzan filed false allegations against various executives of Motorola, Inc., Motorola Turkey, and Nokia, charging the executives with making an "explicit and armed threat to kill" them and their families. *See* PI–99 (Turkish criminal complaint); *see also* PT–436 (Responses to MCC Requests to Admit) at Response No. 191.

361. This allegation was unsupported by anything other than the criminal complaint filed by Hakan Uzan and Cem Uzan, which in turn purported to be based on newspaper reports that Kroll Associates were "hunters" and "experts in kidnap-

ping." PI–99 (Turkish criminal complaint). The actual newspaper articles in question, however, simply said that Kroll Associates had experience in *rescuing* kidnapping victims, hunting for stolen assets, and solving crimes. *See* DX–430 (Hurriyet article dated July 17, 2001); PT–458 (Necmi Yuzbasioglu testimony at PI hearing) at 1014–1015.

362. Moreover, defendants' own witness at the preliminary injunction hearing testified that he was aware of no basis for the charges, *see* PT–458 (Necmi Yuzbasioglu testimony at PI hearing) at 1017–1019, and Telsim's CFO at the same hearing admitted that the charges were "ridiculous" and that he would "never think that one of the executives here will commit such a thing." PT–458 (Fatih Azami testimony at PI hearing) at 859. Nor was Hakan Uzan when he testified at the contempt hearing able to point to any evidence supporting the charges in his testimony before this Court. *See* PT–459 (Hakan Uzan testimony at contempt hearing) at 124–126, 129.

363. After the filing of the false criminal charges, defendants sought to use them in further acts of extortion to extract concessions from plaintiffs. For example, at an August 2, 2001 meeting between Nokia, ABN–AMRO Bank, and Fatih Azami, Mr. Azami stated that the Uzans would withdraw the criminal charges if Nokia would renegotiate Telsim's payment schedule. *See* PT–458 (Ernst Kramer testimony at PI hearing) at 471. While the extortion predicates contained in the RICO claims are not presently before the Court, the evidence is relevant to the assessment of punitive damages, as well as defendants' consciousness of guilt, on the fraud claims.

364. Ultimately, the Turkish court dismissed the charges against the first group of executives whose cases proceeded to

trial, holding there was insufficient evidence to support the charges. *See* PI–12 (Turkish criminal case hearing transcript and decision dated March 14, 2002). However, charges still remain pending against certain executives of plaintiffs and their affiliates, charges which defendants have continued to press throughout the pendency of this action.

365. The filing of false criminal charges is a tactic that the Uzans have used before to extort demands in their business dealings. Thus, Ferda Yildiz (a Telsim supplier) testified at the preliminary injunction hearing that Hakan Uzan and Cem Uzan brought false criminal charges against him, which charges were eventually dismissed, in an attempt to intimidate him for their business advantage. *See* PT–458 (Ferda Yildiz testimony at PI hearing) at 549–550.

The Defendants' Contempts

366. In an effort to avoid redress for their wrongs and further subvert the administration of justice, defendants have carried their fraud into this and other courts by, *inter alia,* defying court orders, concealing information from the Court, and falsely representing facts to the Court.

Contempt Relating to the Court's Orders

367. Defendants have failed to comply with this Court's express orders regarding the pledged Telsim stock. To begin, as previously noted, on May 10, 2002, one day after the Court issued its preliminary injunction order prohibiting defendants from taking any action to dilute their pledged interest, Hakan Uzan, in violation of the Court's order and his own express promise to the Court, successfully petitioned the Turkish government to register the January 4, 2002 amendments to Telsim's articles of association, thereby further impairing the collateral.

368. On May 28, 2002, defendants' counsel for the first time informed the Court that defendants allegedly could not comply with the requirement of the Court's Order dated May 9, 2002 that defendants deposit 73.5% of Telsim's stock in the Court's registry because three Telsim distributors had obtained injunctions from Turkish courts purporting to prohibit the transfer of Telsim stock outside of Turkey. Upon the Court's inquiry, defendants' counsel disclosed that he was aware of the Turkish injunctions by late April or early May 2002 (*i.e.* before the Court had issued its May 9 preliminary injunction order) but had not disclosed these injunctions to this Court or to the Court of Appeals in seeking an emergency stay on May 22, 2002. *See* Opinion dated August 22, 2002, 2002 WL 1963301 at \*5.

369. At the June 10, 2002 contempt hearing, Hakan Uzan testified (1) that he had "forgotten" that he had represented to the Court by sworn declaration that he would hold the January 4, 2002 amendments in suspense; and (2) that he had not yet decided whether to comply with the preliminary injunction *even* if the Turkish injunctions were resolved. *See* PT–459 (Hakan Uzan testimony at contempt hearing) at 19, 48–49.

370. Following the contempt hearing, the Court, by Order dated August 22, 2002, found defendants in civil contempt for their failure to abide by the preliminary injunction order. The Court concluded that the Turkish distributor suits were largely the product of collusion between the Uzans and the plaintiffs in those cases and that the Uzans' decision to conceal the Turkish injunctions from the Court until May 28, 2002 was designed "to conceal as long as possible their involvement in these collusive suits and their intent to use them, if all else failed, to subvert the orders of this Court and of the Court of Appeals."

Opinion dated August 22, 2002, 2002 WL 1963301 at *5. In addition, the Court found "incredible on its face" Hakan Uzan's testimony that he had "forgotten" his representation to the Court that he would hold the January 4, 2002 amendments in suspense. *Id.* at 2 n. 2.

371. Notwithstanding the Court's contempt order, defendants have not reversed the January 4, 2002 amendments, even though it has been at all times in their control to do so and despite their representations to the Court that they would take steps to reverse the amendments. *See* Transcript dated October 1, 2002, at 51. Nor have defendants deposited any of Telsim's stock into the Court's registry.

372. On September 30, 2002 and October 15, 2002, the Court issued orders requiring defendants not to further pursue three Swiss arbitrations that defendants and the companies they control had initiated after plaintiffs had filed the instant action. With respect to these arbitrations, the Court stated that "it is painfully obvious that they were commenced in an effort to undercut the prior orders of, and proceedings before, this Court." Opinion dated October 15, 2002, at 7.

373. Despite the Court's order, on November 27, 2002, defendants filed an action in the Turkish Civil Court of Kucukcekmece against plaintiffs and their affiliates, and obtained an *ex parte* injunction purporting to stay the present action and to vacate the preliminary injunction and attachments orders issued by this Court. Recognizing that the November 27 suit was an overt attempt to interfere with the jurisdiction of this Court and was "initiated by defendants in contravention of and in a tactical effort to evade the prior orders of this Court," the Court issued an Order on January 6, 2003 commanding defendants and those acting in concert with them to withdraw the November 27

suit as well as an attachment suit filed by defendants on June 19, 2002. *See* Opinion dated January 6, 2003, 2003 WL 56998 at *2-3. The Court further ordered defendants to refrain from filing any similar actions in the future. *See id.* at *3.

374. In defiance of this order, defendants not only failed to seek withdrawal or dismissal of the November 27 or June 19 Turkish suits, but also, as found by Justice Gross in ancillary English proceedings, caused Telsim employees to file a suit in Turkey on or about January 17, 2003, once again seeking (and obtaining) an injunction purporting to stay the present action as well as ancillary actions in England, France, Germany, Switzerland, Bermuda, and Guernsey. *See* PT–467 (unapproved opinion of Gross, J. dated January 31, 2003) at 19. Indeed, in opposing plaintiffs' most recent motion for a finding of contempt, defendants tacitly conceded that the Telsim employees acted at defendants' behest in filing the January 17, 2003 Turkish injunction suit.

375. With respect to discovery, Magistrate Judge Maas (to whom the Court referred certain discovery aspects of this case) has stated his "clear sense" that defendants did not produce all responsive documents they were required to produce. *Motorola Credit Corp. v. Uzan*, 02 Civ. 666(JSR)(FM), 2003 WL 203011, at *1 (S.D.N.Y. Jan. 29, 2003).

376. Defendants have also failed to comply with Magistrate Judge Maas' order that they sign forms consenting to the release of their foreign bank records. *See id.* at *8.

377. Defendants also misled Magistrate Judge Maas with respect to their intention to appear for depositions. First, on October 2, 2002, defendants refused to appear for depositions scheduled to take place in Spain, offering instead to appear for depo-

sitions in Switzerland. *See id.* at *2. On October 28, 2002, however, defendants decided that Kemal Uzan, Melahat Uzan, and Akay would not appear for depositions scheduled to take place that week in Zurich and that they would not make key Telsim employees available for depositions scheduled to take place the same week in London, stating that the depositions might somehow affect Cem Uzan's candidacy in upcoming Turkish elections. The Court finds defendants' explanation palpably implausible as Magistrate Judge Maas had already ruled that until after the Turkish elections, defendants' counsel would keep custody of the only copies of the videotape of these depositions. *See id.* at *3.

378. As a result, Magistrate Judge Maas directed that the depositions previously scheduled to take place in Zurich be held there beginning on November 12, 2002, and that those previously scheduled to take place in London take place there beginning on November 14, 2002. *See id.* But on November 8, 2002, defendants' counsel informed plaintiffs and the Court that defendants had decided not to appear for the depositions scheduled to take place on November 12, 2002. *See id.* Thereafter, on November 19, 2002, Magistrate Judge Maas directed that Cem Uzan, Hakan Uzan, Luna, and representatives of the corporate defendants appear for depositions in New York, London, or Zurich on or before November 22, 2002. Defendants once again disobeyed the Magistrate Judge's Order and failed to appear. *See id.*

379. Magistrate Judge Maas then ordered defendants to pay MCC $128,411.59 and Nokia $49,236.00 for the costs incurred by plaintiffs in preparing for the depositions that the Uzans canceled in violation of the Court's orders. *See id.* at *6. In so finding, Magistrate Judge Maas found that the Uzans "knowingly and with-out justification refused to comply with this Court's proper discovery orders." *Id.* at *4. In a further act of contempt, defendants have failed to pay these amounts to plaintiffs.

Contempt in Foreign Ancillary Proceedings

380. Defendants have repeatedly misled courts presiding over ancillary proceedings in foreign jurisdictions in an effort to interfere with those courts' administration of justice and with plaintiffs' ability to obtain a remedy in this action.

381. On January 30, 2002, two days after plaintiffs filed the present action, MCC moved in the English High Court of Justice, Queen's Bench Division, for a freezing order prohibiting Cem Uzan from disposing of any assets in England and Wales up to a maximum value of $50 million. *See* PT–279 (transcript dated December 20, 2002 recounting procedural history of English case) at 4; PT–259 (freezing order dated January 30, 2002). Justice Cresswell granted the motion and ordered Cem Uzan to disclose all of his assets in England and Wales. *See* PT–279 (transcript dated December 20, 2002) at 4; PT–259 at 12 (freezing order dated January 30, 2002).

382. On May 30, 2002, MCC returned to the English Court and obtained a freezing injunction against Cem Uzan, Kemal Uzan, Hakan Uzan, and Akay, freezing their assets worldwide up to a total value of $200 million each. These orders similarly required these four defendants to disclose all assets worldwide with a value in excess of £10,000. *See* PT–278 (transcript dated January 20, 2003) at 1 (unapproved judgment describing procedural history of case); PT–279 (transcript dated December 20, 2002) at 6–7. Cem Uzan and Akay applied to stay the disclosure requirements of the worldwide freezing or-

der but that application was denied. The English court has described Cem Uzan and Akay as having made this request "for no apparent good reason." PT–279 (transcript dated December 20, 2002) at 7. The Court of Appeals denied Cem Uzan and Akay's appeal of the English Court's refusal to stay its disclosure orders. *See* PT–278 (transcript dated January 20, 2003) at 1 (unapproved judgment describing procedural history of case); PT–279 (transcript dated December 20, 2002) at 7–8. Defendants applied to have the freezing orders set aside, but the English court denied those applications on July 22, 2002. *See* PT–279 (transcript dated December 20, 2002) at 8–12.

383. On July 25, 2002, MCC moved for an order requiring Cem Uzan and Akay to appear for cross-examination on their assets based on their failure to submit proper asset disclosures. Justice Steel of the English court gave these defendants " 'a last opportunity to put their house in order.' " PT–279 (transcript dated December 20, 2002) at 12. On August 12, 2002, MCC renewed its request for cross-examination of Cem Uzan and Akay based on the clear inadequacies of their asset disclosures. Upon reviewing Cem Uzan and Akay's asset disclosures, Justice Steel ordered these defendants to appear in court for cross-examination as to their assets. In ordering this cross-examination, Justice Steel stated as follows:

> Suffice it to say for the moment that there is a wealth of material here which both viewed in isolation and in the round suggests very strongly that these defendants have failed to make any real attempt to make full and frank disclosure of their asset position.

PT–270 (judgment of Justice Steel dated August 12, 2002) at 749.

384. Justice Steel further noted the Uzans' strategy of misleading the Court as to their assets and then admitting the true facts only after MCC could prove that they were lying:

> The claimants have more than made out their assertion that the defendants have been very reluctant to adduce a full and complete list of their shareholdings until the claimants themselves rub their nose in those holdings which they have been able to unearth.

PT–270 (judgment of Justice Steel dated August 12, 2002) at 748. The English Court further denied the application of Cem Uzan and Akay to appeal the order requiring that they appear for cross-examination on their assets. The English court subsequently ordered Cem Uzan and Akay to appear in court for cross-examination on November 19, 2002 and November 20, 2002, respectively. *See* PT–279 (transcript dated December 20, 2002) at 15.

385. Cem Uzan and Akay did not appear on November 19, 2002 or November 20, 2002 for their court-ordered cross-examinations. As a result, the English court scheduled a committal hearing for November 28, 2002 to consider MCC's request that Cem Uzan and Akay be sentenced to confinement for failing to appear for cross-examination. After hearing from counsel for the parties on November 28, 2002 and November 29, 2002, Justice Gross issued an order finding Cem Uzan and Akay in contempt. The court further ordered that Cem Uzan and Akay appear on December 16 and 17, 2002, either in court or by video link, to be cross-examined on their asset disclosures. *See* PT–279 (transcript dated December 20, 2002) at 19–20. When Cem Uzan and Akay failed to appear for these cross-examinations, the English court sentenced them to confinement for fifteen months and six months, respectively. *See id.* at 41. The court concluded its judgment by stating: "The message of this court is simple: no one is above the law;

the court's orders are to be obeyed; the game of non-compliance is not worth the candle." *Id.* at 42. The English court also has found that the Turkish injunction of November 27, 2002 did not prohibit the English court from requiring defendants' attendance. *See* PT–279 (transcript dated December 20, 2002) at 36 ("The first and fourth defendants have, as I have said, themselves colluded in the creation of the obstacle to their compliance.").

386. The evasions of Kemal Uzan and Hakan Uzan in the English proceeding followed a similar course. On May 30, 2002, Kemal Uzan and Hakan Uzan were ordered to disclose their worldwide assets having a value in excess of £10,000. On July 22, 2002, Justice Steel of the English court denied defendants' application to discharge the worldwide freezing order. *See* PT–278 (transcript dated January 20, 2003) at 2 (unapproved judgment). After Kemal Uzan and Hakan Uzan "failed to provide adequate disclosure of their assets," Justice Steel ordered Kemal Uzan and Hakan Uzan to disclose their worldwide assets by August 2, 2002. *Id.* at 2.

387. On August 1, 2002, Kemal Uzan submitted an affidavit to the English court in which he offered the following excuse for his failure to disclose his assets:

I have interests across a wide range of commercial enterprises and, therefore, it is impossible for me to accurately list all of my assets the value of which is higher than £10,000 without allocating three or four persons for a period of 6–9 months to specifically identify all such assets.

PT–448 (Affidavit of Kemal Uzan dated August 1, 2002) ¶ 2.

388. As with Cem Uzan and Akay, MCC moved for an order requiring that Kemal Uzan and Hakan Uzan appear for cross-examination based on the inadequacy of their asset disclosures. With respect to Kemal Uzan's compliance with the court's asset disclosure order, Justice Steel made the following observation at a hearing on October 18, 2002:

All he has tendered by way of particularisation of his assets is the existence of some real estate property in the United States and the suggestion that he has a shareholding of 14.2% in Cukurova Elektrik valued at $200 million. . . . I am afraid to say that he has in effect made not the slightest effort to respond to the order, albeit many months have gone by. There is some evidence to suggest that even his information with regard to the shareholding he has in Cukurova Elektrik is untrue and that his shareholding may be twice as much as that. In any event, he has, from other material that I have been shown, failed to disclose a whole range of other assets, including direct or indirect interests in Telsim, which company he has himself described as having within its purview an asset amounting to 1.8 billion. He too is in the remarkable position of having no bank accounts or at least no bank account with more than £10,000 in it. I am satisfied that the apparent lack of frankness, indeed the admitted lack of frankness, in the scope of his disclosure, cries out for an order for cross-examination and I so order.

PT–273 (transcript of English hearing dated October 18, 2002) at 1000.

389. With respect to Hakan Uzan's asset disclosures, Justice Steel noted the following:

The third defendant, if I may start with him, has produced an affidavit dated the 1st of August in which he discloses, first of all, a list of current shareholdings in various companies within the family group, discloses the existence of two properties in New York and three cars. Apart from the cars, which I will assume to be worth more than £10,000 each, in

effect no disclosure of any asset worth more than £10,000 has been made, despite the fact that Mr. Hakan Uzan is a leading member of a family within the "Fortune 500" reported to be worth more than a billion dollars. The schedule of shareholdings, which is annexed to his affidavit, identifies the nominal or par value of his shareholdings with some companies. [Hakan Uzan's counsel], I think, recognises that the par or nominal value of these shares are of no materiality whatsoever, although I have no doubt at all that the witness intended to suggest that these values were of some assistance with regard to disclosing his asset position.

PT–273 (transcript of English hearing dated October 18, 2002) at 997. As with Cem Uzan and Akay, Kemal Uzan and Hakan Uzan failed to appear for cross-examinations scheduled for January 20, 2003 and January 21, 2003. *See* PT–278 (transcript dated January 20, 2003) at 4.

390. On January 20, 2003, the English court found Kemal Uzan and Hakan Uzan in contempt for their refusal to appear for cross-examination. *See* PT–278 (transcript dated January 20, 2003). On January 31, 2003, Justice Gross sentenced Kemal Uzan and Hakan Uzan to imprisonment for fifteen months as a penalty for their contempt of court. *See* PT–467 (unapproved opinion of Gross, J. dated January 31, 2003) at 21.

391. In sentencing Kemal Uzan and Hakan Uzan, Justice Gross unequivocally rejected the Uzans' claims that the injunction they obtained on November 27, 2002 and the injunction Telsim employees obtained on January 17, 2003 excused defendants' failure to appear for cross-examination:

> There is nothing accidental or inadvertent about the contempt of these defendants. They were at the centre of the Uzan strategy. Their contempt is every bit as cynical and calculated as that of the first defendants. These last observations are emphasised by the very late notification of these defendants' non-attendance on 20th January.
>
> . . . .
>
> Three, as to the failure by these defendants to apply to lift or vary the [Turkish injunction] order of 27th November: (a) I am sure that, whatever the position as to the status of this order, they would not have attended on 20th January … (b) the 27th November order was obtained, inter alia, by these defendants; (c) on no view, therefore, do I view the 27th November order as mitigation for their non-attendance; (d) I am further sure that a party subject to the 27th November order who genuinely desired to attend for cross-examination would at least have instructed his lawyers to attempt an application to lift or vary the injunction. . . . If and to the extent that the 27th November order impeded or, as a matter of Turkish law, prohibited them from [attending the court-ordered cross-examination], that was a problem of their own creation. I do not think that such considerations aggravate their position when compared with that of the first and fourth defendants. Conversely, nothing in this sorry chapter of events serves to mitigate their position.
>
> Four, as to the 17th January ordered by Telsim [employees], I am amply sure that the second and third defendants at the least colluded in obtaining it. The contrary suggestions are unreal and fanciful. In particular, I have regard here to the following: (a) the improbability of the employees seeking such an order; (b) the material which suggests that Telsim was the pawn of the Uzans; (c) the remarkable coincidence of the timing. The 17th January order appeared on the

first day that an application ... could have been made to vary or lift the 27th November order—added to the fact that this is not the first occasion when the Uzans have sought refuge in a well timed order from the Turkish court; (d) the further remarkable feature that the 17th January order served to "top up" the second and third defendants' protection; (e) the points as to drafting, which I regard as inexplicable if indeed the 17th January order had been sought independently of any involvement on the part of the Uzans, including these defendants; (f) the lack of any direct evidence from the second and third defendants that they were not involved ...; (g) the complete absence of any suggestion that they regretted this development and were seeking to lift or vary the order. I regard the facts concerning the 17th January [order] as a grave and aggravating feature of the conduct of the second and third defendants not present when I was dealing with the first and fourth defendants.

PT–467 (unapproved opinion of Gross, J. dated January 31, 2003) at 18–20.

392. Thus, as they have done in this Court, the Uzans' conduct in the English proceeding has revealed an intent to mislead courts, conceal facts, and offer false excuses for their refusal to comply with the courts' lawful orders.

Injuries

393. As a direct and proximate result of defendants' fraudulent misrepresentations, MCC was fraudulently induced to make a series of advances to Telsim and Kar–Tel between 1998 and 2001 totaling $1,975,753,069.14. In turn, defendants made $161,235,240.40 worth of payments and received $11,428,512.17 in credits for a total of $172,663,752.57, which when offset from the total amount funded, gives a total net funding by MCC of $1,803,089,316.57.

*See* PT–464 (Hughes Decl.) ¶ 3. (A detailed summary of fund distributions and credits in favor of, or on behalf of, Telsim and/or Kar–Tel, is set forth in chart format ("the Chart") at PT–455 (funding by tranche summary)). These calculations are supported by direct evidence in the form of wire transfers, draw down requests, and sample wire credits. *See* PT–456 (wire transfer records); PT–30 (draw down requests); PT–457 (wire transfers). Moreover, Mr. Hughes, who has first hand knowledge of the facts and reviewed the relevant documents, averred to the accuracy of the Chart. *See* PT–464 (Hughes Decl.) ¶ 2.

394. The figure of $1,803,089,316.57 therefore represents the amount of damage suffered by MCC, exclusive of prejudgment interest and punitive damages. Defendants have not carried their burden under Illinois law of showing that plaintiffs have failed to mitigate these damages. Instead, while the failure to fully pursue all contractual remedies is an impediment to plaintiffs' pursuing their RICO claims at this time, the evidence before the Court demonstrates that defendants have intentionally thwarted every effort plaintiffs have made to recover the monies due them, even to the point of diluting and eviscerating the collateral, contemptuously refusing to transfer Telsim shares to the registry of this Court, hiding assets, obtaining collusive injunctions, and lying to courts here and abroad.

395. The interest calculations on the above scheme as allowed by Illinois law are detailed in the interest chart. *See* PT–455. The interest amount is calculated from the date of each relevant transaction (the date recorded on the Chart) until February 18, 2003 by applying the statutory interest rate of 5% per annum based on a 365 day year (for a daily rate of $246,998.54) and accounting for all pay-

**574**

ments and credits. *See* PT–455 (per diem calculation, third summary chart); PT–464 (Hughes Decl.) ¶ 21. Applying this same methodology through the date of this Order (July 31, 2003), the total interest is $329,807,589.09, which when added to the aforementioned amount outstanding of $1,803,089,316.57 comes to a total of $2,132,896,905.66.

396. Although the only claim by Nokia presently pending before this Court is its claim for a constructive trust, computation of the damages sustained by Nokia as a result of defendants' action is relevant, among other things, to determining the proper sanction for defendants' contempt vis-à-vis their refusal to transfer Nokia's portion of the Telsim stock to this Court's registry, *see infra*. Nokia's net injury, exclusive of interest, totals $711,000,977.23. This figure is the sum of three component parts: (1) $238,458,226.85 of equipment financing provided under so-called "Tranche A" of the relevant financing agreement; (2) $435,000,000 of cash financing provided under "Tranche B" of that agreement; and (3) $37,542,750.38 for services and miscellaneous equipment. *See* PT–1053, PT–1003P, PT–1062, PT–1066 and PT–1078. Nokia has not submitted a calculation of interest. But, taken most conservatively, if pre-judgment interest were to be awarded on the amount in accordance with New York law (9%) from the date Nokia declared Telsim in default (May 9, 2001), through July 31, 2003, it would add $142,706,661.90 in interest, leading to an overall total of $853,707,639.13.

### Conclusions of Law

Having already ruled on the motions, *see* Part I, *supra*, the Court, adopting by reference the Findings of Fact, *supra*, which will not be repeated here, reaches the following conclusions of law regarding the remaining substantive claims, to wit,

MCC's claims under Illinois law for common law fraud, promissory fraud, and civil conspiracy, and both of the plaintiffs' claim under New York law for imposition of a constructive trust.

Personal Jurisdiction

■■■ 1. The Court has previously ruled that it has personal jurisdiction over all the defendants, including the three corporate defendants, under section 302(a) of the New York Civil Practice Law & Rules ("CPLR"), since Cem Uzan does not dispute the Court's jurisdiction over him and since he and his agents committed substantial overt acts in New York in furtherance of a conspiracy with all the defendants to commit numerous tortious acts. *See* Memorandum Order, dated October 15, 2002, at 2–3. The dismissal of the RICO conspiracy claim in no way alters this conclusion, since the Court finds that all defendants were engaged in a civil conspiracy in violation of Illinois law that embraces all the aforementioned acts.

2. Accordingly, on this ground alone, *all* of the defendants—including the corporate defendants—are subject to jurisdiction in New York based on the actions of their co-conspirators. *See, e.g., Best Cellars, Inc. v. Grape Finds at Dupont, Inc.*, 90 F.Supp.2d 431, 446 (S.D.N.Y.2000); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1266 (S.D.N.Y. 1991) ("It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2).") (citations omitted). In this regard, plaintiffs have demonstrated that: "(a) the defendant[s] had an awareness of the effects in New York of [their] activity; (b) the activity in New York was to the benefit of the out-of-state co-conspirators; and (c) the co-conspirators acting in New York acted . . . 'at the request of or on

behalf of" the out of state defendant[s]." *Id.* at 1269, *quoting Dixon v. Mack,* 507 F.Supp. 345, 350 (S.D.N.Y.1980). All of the individual defendants were intimately aware of the scheme embracing both the loans from and the share pledges to plaintiffs, and this knowledge is imputed to the corporate defendants based on the Uzans' control over those corporations. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 n. 3 (2d Cir.1972); *SEC v. Ballesteros Franco,* 253 F.Supp.2d 720, 728–9 (S.D.N.Y.2003).

3. Additionally, the further findings set forth in the Findings of Fact establish other, independent bases for personal jurisdiction, as set forth below.

4. New York's long arm statute, CPLR § 302, provides in pertinent part:

(a) As to a cause of action arising from any acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary . . . who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state . . .; or

3. commits a tortious act without the state causing injury to person or property within the state . . .

N.Y. C.P.L.R. § 302(a).

5. Under this section, a single transaction of business is sufficient to confer jurisdiction, even if the defendant never entered New York, "so long as the defendant's activities [in New York] were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 43 (1988).

6. Here, as part of their scheme to defraud plaintiffs, defendants Kemal Uzan, Hakan Uzan, and Luna transacted business and committed fraud in New York, thereby subjecting themselves to jurisdiction under CPLR § 302(1) and (2). The following dealings are illustrative: (1) Hakan Uzan participated in negotiations concerning the Seventh Amendment to the MCC Equipment Financing Agreement from his home in New York; (2) Hakan Uzan and Cem Uzan met with MCC representatives in New York on April 11, 2001 and fraudulently represented that Telsim would take no adverse action against MCC, in order to delay any action by MCC to foreclose on the share pledge and to give defendants time to execute their scheme to dilute the value of the collateral; (3) Kemal Uzan financed $300 million of the purchase price of the GSM license through UBS A.G. in New York; (4) Hakan Uzan, Cem Uzan, and Luna engaged in money laundering activity in New York in connection with the diverted proceeds of the fraud; and (5) all of the defendants induced plaintiffs to make a multitude of wire transfers from banks in the United States to Telsim.

7. The defendants are also subject to jurisdiction pursuant to CPLR § 302(3), as it was clearly foreseeable that as a result of defendants' fraudulent acts, plaintiffs would suffer financial loss in New York.

8. Still another section of the CPLR, section 301, authorizes general jurisdiction over defendants who have such "systematic and continuous contact with New York as to be tantamount to presence within the state." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1044 (2d Cir.1990). "Presence" includes conducting or purposefully "doing business" in New York, "not occasionally or casually, but with a fair measure of permanence and continuity." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 563 N.Y.S.2d

**576**

739, 565 N.E.2d 488, 490 (1990) (internal quotation omitted). Indicia of such "presence" include (1) maintaining an office, (2) soliciting business, (3) maintaining bank accounts, and (4) maintaining employees or agents. *See Landoil Resources,* 918 F.2d at 1043. As the findings of fact establish, Kemal Uzan, Hakan Uzan, Melahat Uzan, and Luna have engaged in most or all of such activities in New York. Accordingly, they are subject to general jurisdiction in New York.

9. Finally, it should be noted that the exercise of long-arm jurisdiction under any and all of the foregoing bases comports with due process.

10. For due process to be satisfied, two requirements must be met. First, defendant must have "certain minimum contacts [with the forum] ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 152 (2d Cir.2001) (internal quotation marks omitted). Second, "the assertion of personal jurisdiction [must] comport[ ] with traditional notions of fair play and substantial justice—that is, ... it [must be] reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 129 (2d Cir.2002) (internal quotation marks omitted).

11. As to the first inquiry, minimum contracts are satisfied for the following reasons: With respect to Kemal Uzan, Hakan Uzan, Melahat Uzan, Luna, and Akay (not to mention Cem Uzan, who concedes personal jurisdiction), plaintiffs have established these defendants' "continuous and systematic" business contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). With respect to all these defendants, moreover, plaintiffs have shown that each defendant purposefully availed [him or her self] of the privilege of doing business in the forum and could foresee being haled into court here. *See Bank Brussels Lambert,* 305 F.3d at 127.

12. As to the second inquiry, in assessing reasonableness courts consider four factors: (1) the burden on defendant of defending itself in the forum; (2) the interest of the forum state in adjudicating the controversy; (3) the interest of the plaintiff in obtaining convenient and effective relief; and (4) "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by the ... court." *Asahi Metal Ind. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 113, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

13. Here, these factors all weigh toward the reasonableness of exercising personal jurisdiction in this case. First, the Uzans' vast wealth, the substantial overlap between the individual and corporate defendants, and defendants' extensive participation in this action through the employ of numerous lawyers from several major law firms demonstrate that defendants have more than ample resources to defend themselves in this forum. Second, any decision by this Court to decline jurisdiction would result in a substantial hardship to plaintiffs, whose ability to obtain convenient and effective relief would be substantially impaired. Finally, defendants have not demonstrated a valid competing interest.

14. Accordingly, exercise of long-arm jurisdiction is consistent with due process. Though not necessary to this Court's exercise of personal jurisdiction over defendants, it should also be noted that their fraudulent activities substantially impacted, not only New York, but also Illinois,

where MCC is based and whence defendants directed numerous fraudulent emails and telephone calls.

Common Law Fraud

15. To prevail on a claim for common law fraud (or fraudulent misrepresentation) under Illinois Law, a plaintiff must prove the following elements by clear and convincing evidence: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. *City of Chicago v. Michigan Beach Housing Cooperative*, 297 Ill.App.3d 317, 231 Ill.Dec. 508, 696 N.E.2d 804, 809 (1998), *citing Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 131 Ill.Dec. 155, 538 N.E.2d 530, 536 (1989). *See also Bensdorf & Johnson, Inc. v. Northern Telecom Ltd.*, 58 F.Supp.2d 874, 881 (N.D.Ill.1999). In contrast to promissory fraud, *infra*, the false statement must concern "existing facts." *Asad v. Hartford Life Ins. Co.*, 116 F.Supp.2d 960, 964 (N.D.Ill.2000). "A statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation" under common law fraud. *Lefebvre Intergraphics, Inc. v. Sanden Machine Ltd.*, 946 F.Supp. 1358, 1364 (N.D.Ill.1996) (internal quotation marks omitted).

16. MCC has proved by clear and convincing evidence that Hakan Uzan and Cem Uzan, as agents for all the defendants, made numerous false statements of material existing fact designed to induce MCC to extend each of the loans here in issue. As demonstrated in the Findings of Fact, *supra*, these false representations included, *inter alia*, material false statements regarding the business practices and finances of Telsim, the value and security of the collateral, the uses to which prior loan proceeds had been put, the status of other financing for Telsim, the existence and value of offers to purchase an interest in Telsim, and the status of negotiations with third parties. MCC has also shown that it was justified in relying and that it did in fact rely on these statements, that MCC did not know and could not through reasonable diligence have discovered the falsity of defendants' representations (which, indeed, defendants went to great lengths to conceal), and that MCC would not have extended the loans if it had known the truth.

17. In addition, MCC has proved by clear and convincing evidence that there were material facts peculiarly within the defendants' knowledge that they failed to disclose even though, given their special access and all the other circumstances, they had a duty to do so. Under Illinois law, "failure to disclose material information may be considered a false statement of material fact … if the person failing to disclose the information owed a duty to disclose that information." *Lefebvre*, 946 F.Supp. at 1366; *see Coca–Cola Co. Foods Div. v. Olmarc Packaging Co.*, 620 F.Supp. 966, 973 (N.D.Ill.1985); *Tcherepnin v. Franz*, 393 F.Supp. 1197, 1217 (N.D.Ill. 1975). These facts included, *inter alia*, the Uzans' already-existing practice of funneling monies from Telsim to other Uzan-controlled entities and the absence of meaningful checks at Telsim to prevent such a practice. Had it known these facts, MCC would not have made any of the loans, since they would have recognized that, as was the case, defendants simply used Telsim as a "front" to fund their overall economic enterprise and line their personal pockets.

*Promissory Fraud*

18. Even assuming *arguendo* (and contrary to the foregoing conclusions) that not all the aforementioned misrepresentations of present facts served to induce all MCC's loans here in issue (in particular the first one), defendants would still be fully liable to MCC on all the loans because it is beyond reasonable dispute that every one of MCC's loans was induced by promissory fraud.

19. Under Illinois law, a plaintiff can state a claim for fraud based "upon a false representation of intent concerning future conduct," *General Elec. Credit Auto Lease, Inc. v. Jankuski*, 177 Ill.App.3d 380, 126 Ill.Dec. 676, 532 N.E.2d 361, 363–64 (1988), where "the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud," *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir.1992). Such a scheme exists where "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Id.* (internal quotation marks omitted). In addition, "although a single broken promise" is insufficient to constitute promissory fraud, "repeated false promises" by a defendant may give rise to an "actionable scheme." *Zic v. Italian Gov't Travel Office*, 149 F.Supp.2d 473, 477 (N.D.Ill.2001).

20. MCC has proved by clear and convincing evidence that defendants induced each and every one of the loans here in question by repeatedly making material promises to MCC that defendants never intended to fulfill. These included, *inter alia*, representations concerning the uses to which the loan proceeds would be put, the value and security of the collateral that would be provided, the intent to honor the share pledge agreements, the intent to sell an interest in or obtain financing for Telsim, and the intent to provide meaningful financial information to MCC.

21. MCC relied to its detriment on some or all of these promises, which materially induced MCC to make its various loans. Such reliance was justified under all the circumstances, including defendants' concealment of their elaborate and well-developed fraudulent scheme.

*Civil Conspiracy*

22. Although all the defendants are liable for common law fraud and promissory fraud under ordinary principles of agency, in addition, they are liable jointly and severally, because of their participation in a civil conspiracy to defraud.

23. A civil conspiracy claim "extend[s] liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Scott v. Aldi, Inc.*, 301 Ill.App.3d 459, 234 Ill.Dec. 665, 703 N.E.2d 526, 528 (1998). The necessary elements of civil conspiracy under Illinois law are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) resulting in an injury caused by the unlawful act; and (4) a showing that the act was done in furtherance of a common scheme. *See Vance v. Chandler*, 231 Ill. App.3d 747, 173 Ill.Dec. 525, 597 N.E.2d 233, 236 (1992). The overt act need not itself be tortious or independently actionable in tort to support a cause of action for civil conspiracy. The act need only be overt, *i.e.* "an outward act done in pursuance and manifestation of an intent or design." *Id.* (quoting Black's Law Dictionary 1104 (6th ed.1990)).

24. Illinois courts rely on circumstantial evidence to infer an agreement among conspiring defendants: "[A] con-

spiracy is rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances." *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 895 (1994).

■ 25. The evidence introduced at trial establishes conclusively that all defendants conspired to defraud MCC in ways previously addressed. While most of the fraudulent representations and promises were made by Hakan Uzan and Cem Uzan, the overall scheme was cleared with Kemal Uzan and implemented with his active participation. Additionally, the record shows that Melahat Uzan, Aysegul Akay, and Luna planned, assisted, and encouraged the wrongdoers in their conspiracy to defraud MCC. All the Uzan defendants had substantial holdings or interests in the enterprise to which the loan proceeds were diverted, and, among other overt acts, Melahat Uzan and Akay signed documents and/or participated in meetings or transfers that diluted plaintiffs' collateral, and Luna played a central role in diverting assets from Telsim to offshore companies for the Uzans' personal benefit. Finally, all defendants received money diverted from Telsim, whether directly or through other Uzan-controlled companies.

Constructive Trust

■ 26. A constructive trust is a flexible equitable remedy designed to prevent unjust enrichment and the like. Although under New York law, it often requires proof of a confidential or fiduciary relationship, a promise, a transfer in reliance on the promise, and unjust enrichment, *see In re Stylesite Marketing, Inc.,* 253 B.R. 503, 508 (Bankr.S.D.N.Y.2000), one or more of these elements can be relaxed when "property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest." *Republic of Philippines v. Marcos,* 806 F.2d 344, 355 (2d Cir.1986). "The court reserves the freedom to apply this remedy to whatever knavery human ingenuity can invent. And, a constructive trust will be erected wherever necessary to satisfy the demands of justice.... Its application is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Id.*

■ 27. Here, through the machinations previously described, defendants have wrongfully converted to their benefit and control most of the value of plaintiffs' promised collateral of approximately 73.5% of Telsim's outstanding shares, approximately 66% of which had been pledged to MCC and 7.5% of which had been pledged to Nokia. As a result of the April 24, 2001 dilution meeting, defendants fraudulently reduced the value of plaintiffs' pledged interest to 24.5% of Telsim's outstanding shares, transferring the difference (49% of Telsim's outstanding shares) to defendant Standart Telekom. Then, through the May, 2002 registration of the January 4, 2002 resolutions, defendants stripped plaintiffs' remaining collateral of its voting, auditing, and management control rights, transferring such rights to Uzan-owned-or-controlled shares. While it cannot be said that the shares remaining under the original collateral are completely worthless, *see* Part I, *supra,* nonetheless the huge diminution in value because of defendants' conversions more than satisfies the requirements for imposing a constructive trust in plaintiffs' favor over the functional equivalent of the value stolen by defendants from plaintiffs' shares, in other words, over Telsim shares, held by any one or more of the entities controlled by the Uzans, that col-

lectively constitute 73.5% of the ownership, control, and share value of Telsim.

### Orders of Relief

Based on the foregoing, the Court hereby orders relief in plaintiffs' favor, as follows:

Damages: MCC

■ 1. Where a loan has been fraudulently induced, Illinois law permits (but does not require) the Court to award in damages the full amount of the loan, plus interest. *See Horne v. Walton*, 117 Ill. 141, 7 N.E. 103, 104 (1886); *Application of Busse*, 124 Ill.App.3d 433, 79 Ill. Dec. 747, 464 N.E.2d 651, 658–59 (1984); *Commercial Nat'l Bank of Peoria v. Fed. Deposit Ins. Corp.*, 131 Ill.App.3d 977, 87 Ill.Dec. 107, 476 N.E.2d 809, 815 (1985). The borrower bears the burden of providing any reductions, set off, or mitigation. *See Commercial Nat'l Bank of Peoria*, 87 Ill.Dec. 107, 476 N.E.2d at 813.

2. Here, defendants have hugely and fraudulently heightened the risk borne by MCC in makings its loans, by such means as vastly impairing the value of plaintiffs' security and diverting enormous sums from Telsim's coffers to other Uzan entities and to their own pockets. While defendants through their fraudulent concealment and their failure to provide adequate discovery have made impossible a precise determination of what value, if any, remains in the collateral or what possibility, if any, there is of recovering any payment from Telsim (which has defaulted), it is clear that defendants never intended to have the loans repaid beyond the small sums that they previously paid in order to lull MCC into advancing still greater sums. In such circumstances, the best measure of plaintiff's compensatory damages is that set forth in *Horne, i.e.* the full amount of MCC's outstanding loan plus interest. Moreover, defendants have failed to meet their burden of proving any reductions, set offs, or mitigation of damages and, instead, by their failure to appear at trial, have waived any defenses they might otherwise have had to this measure of compensatory damages.

■ 3. Accordingly, as set forth *supra*, MCC is entitled on its fraud claims, taken jointly and severally, to an award of compensatory damages from the defendants, jointly and severally, in the amount of $1,803,089,316.57 plus interest.

4. As previously calculated, prejudgment interest through July 31, 2003 on the MCC compensatory damages is $329,807,589.09. Thus, MCC is entitled to a compensatory damage award of $2,132,896,905.66 through July 31, 2003.

■ 5. Punitive damages are also available in Illinois fraud cases, "when fraud, actual malice, deliberate violence or oppression accompanies the tort, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others." *Parsons v. Winter*, 142 Ill.App.3d 354, 96 Ill. Dec. 776, 491 N.E.2d 1236, 1241 (1986). "Punitive damages are in the nature of punishment and a warning and example to deter the defendant and others from committing like offenses in the future." *Id. See also, Carter v. Mueller*, 120 Ill.App.3d 314, 75 Ill.Dec. 776, 457 N.E.2d 1335, 1342 (1983). Here, the evidence establishes beyond question that in defrauding MCC, defendants acted willfully and with actual malice so as to indicate a wanton and deliberate disregard for MCC's rights. An award of punitive damages is therefore appropriate.

■ 6. The Supreme Court has held that in determining the magnitude of punitive damages awards, due process requires that courts take account of three guide-

posts: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Considering the reprehensibility of defendants' conduct in this case, the Court perhaps would be justified in imposing an award of punitive damages several fold the amount of actual damages awarded. *See id.* ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."). *See also State Farm Mut. Auto. Ins. Co. v. Campbell,* ––– U.S. –––, ––––––––, 123 S.Ct. 1513, 1520–21, 155 L.Ed.2d 585 (2003).

■ 7. Here, however, in light of the large size of the compensatory damages imposed, the Court finds that an award of punitive damages equal in amount to the compensatory damages awarded will be sufficient to achieve the desired deterrent effects. Accordingly, the Court hereby awards MCC the sum of $2,132,896,905.66 in punitive damages, for a total damages award of $4,265,793,811.32 against the defendants, jointly and severally. (Post-judgment interest will also be added, by the Clerk, in the rates automatically provided by federal law).

Constructive Trust: MCC and Nokia

■ 8. As plaintiffs have prevailed on their constructive trust claim relating to the original value of their collateral that defendants stole from them, plaintiffs are hereby converted into the equitable owners of Telsim shares that are the functional equivalent of the original collateral, that is, Telsim shares held by any one or more of the entities controlled by the Uzans that collectively constitute 73.5% of the ownership, control, and share value of Telsim.

9. Defendants are ordered to convey the shares encompassed by the constructive trust to the registry of this Court within one week from entry of judgment for the purposes of execution of judgment.

Permanent Injunction

■ 10. Plaintiffs are also entitled to a judgment of permanent declaratory and injunctive relief. *See, e.g., Caterpillar, Inc. v. Jerryco Footwear, Inc.,* 880 F.Supp. 578, 587 (C.D.Ill.1994) (granting injunction in connection with Illinois fraud claim); *People ex rel. Hartigan v. Dynasty Sys. Corp.,* 128 Ill.App.3d 874, 83 Ill.Dec. 937, 471 N.E.2d 236 (1984); *Am. Bluefriesveem v. Heidl,* 69 F.Supp. 49, 52 (S.D.N.Y.1946) (awarding injunctive relief in connection with a constructive trust claim).

11. Accordingly, defendants (jointly and severally, as applicable), and all those acting as their agents or in concert with them, are hereby:

a. Prohibited from taking any other step, directly or indirectly, to certificate, transfer, encumber, or affect in any way whatever the shares of stock over which plaintiffs have been given a constructive trust and/or the value, status, and/or availability of those shares to the plaintiffs, other than to transfer the functional equivalent of the value stolen from plaintiffs' collateral to the registry of this Court, within one week of entry of judgment, in accordance with the foregoing order;

b. Prohibited from exercising the Class A voting rights they purportedly created during the January 4, 2002 meeting of the shareholders of Telsim;

c. Prohibited from transferring any asset of Telsim to a foundation;

d. Prohibited from diverting any revenue derived by or on account of Telsim to any other entity;

e. Prohibited from removing or transferring any assets from Telsim, other than in the ordinary course of business;

f. Directed to take all steps necessary to dissolve the Turkish injunctions collusively procured by defendants beginning on April 19, 2002 purporting to prohibit transfer of the collateral outside of Turkey.

g. Directed to take all steps necessary to withdraw and cause to be dissolved the Turkish injunction granted on November 27, 2002 and the action on which it is premised, and enjoined from initiating any similar proceeding;

h. Barred from effectuating the attachment entered on June 19, 2002 against Motorola Turkey and Motorola Ltd. in connection with the Swiss arbitration and, instead, required to seek its immediate dissolution;

i. Prohibited from engaging in future activities that would result in the diversion of revenue, opportunities or assets from Telsim to any other entity or individual, and are further required to restore to Telsim the full value of any such improperly diverted revenue, opportunities or assets; and

j. Prohibited from bringing, commencing or causing the initiation of proceedings in any foreign court that would interfere with the enforcement of plaintiffs' judgment, and are ordered immediately to withdraw or to cause the withdrawal of any such actions that are now pending.

Contempt Sanctions and Enforcement of Judgment

■ 12. Defendants have already been found to be in contempt of the Court's prior orders regarding the transfer of stock. Since Nokia has no meaningful remedy for the fraud perpetrated upon it other than the constructive trust imposed herein on its behalf, therefore, in light of the defendants' past contempts, if defendants now fail to transfer or cause to be transferred the requisite Telsim shares to the Court's registry on behalf of Nokia within one week from the entry of judgment, the Court hereby orders that judgment will automatically then enter requiring defendants (jointly and severally) to pay to Nokia two times the full amount outstanding on the loans extended by Nokia to Telsim (*i.e.*, $711,000,977.23, plus pre-judgment interest in the amount of $142,706,661.90, for a total of $853,707,639.13) for a grand total of $1,707,415,278.26. (Post-judgment interest, in accordance with federal law, will be taxed by the Clerk.)

■ 13. Defendants also remain in contempt of the prior orders of the Court to the extent reaffirmed herein. It is also clear from the record of this case that monetary sanctions will not suffice to bring defendants into compliance with this these orders. The Court therefore orders that unless and until defendants purge their contempts, the individual defendants, if found within the jurisdiction of the United States, will be immediately arrested and held in confinement until such time as they comply with the directives of the Court's January 6 and May 9 Orders in so far as they are reincorporated into the orders set forth above. Plaintiffs' counsel shall consult with the U.S. Marshals Service as promptly as possible as to the means of effectuating this order. In addition, the Court hereby grants plaintiffs' request for their attorneys' fees and costs incurred in prosecuting their contempt motion, *see N.Y. State N.O.W. v. Terry,* 159 F.3d 86,

96 (2d Cir.1998), with Magistrate Judge Maas to determine the amount thereof.

 14. All the attachment orders previously entered shall remain in place to satisfy the judgment and contempt sanctions entered herein. Among other things, this Court has previously issued certain orders of attachment, pursuant to which, *inter alia,* funds held in bank accounts in the names of companies that the defendants own and/or control, either directly or indirectly, have been attached by the U.S. Marshals Service. At a hearing held on November 25, 2002, defendants objected to such attachments as to non-parties, and the Court directed any affiliated non-parties to file objections to the Court's attachment orders by December 2, 2002. No such objections were filed, and accordingly any such objections have been waived. The Court finds that plaintiffs are entitled to execution of their judgment upon these bank accounts and all bank accounts that previously have been, or hereunder will be, attached in this action, and/or in any foreign actions ancillary thereto. More generally, because of the Uzans' complete control over more than 130 entities, listed at ¶ 125 of this Opinion, and because plaintiffs have utilized transfer between these controlled entities to avoid creditors, plaintiffs are entitled to collect their judgments not only from the assets owned by any of the defendants directly, but also from the assets of any or all of the entities identified in ¶ 125 above and any other entities defendants own and/or control, directly or indirectly, over each of which defendants exercise complete domination and control and through which domination defendants committed the foregoing frauds against plaintiffs.

The Clerk of the Court is directed to enter final judgment, as promptly as possible, (a) finding defendants liable to MCC on MCC's claims of common law fraud, promissory fraud, and civil conspiracy, and awarding MCC from the defendants, jointly and severally, the sum of $4,265,793,811.32 plus post-judgment interest; (b) finding defendants liable to plaintiffs on plaintiffs' constructive trust claims and directing defendants to transfer from any of the entities controlled by the Uzans to the registry of this Court, within one week of entry of judgment, the Telsim shares that collectively constitute 73.5% of the ownership, control, and share value of Telsim; and (c) imposing the other relief set forth in paragraphs 1–14 of this section.

SO ORDERED.